IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: SOUTHEASTERN MILK ANTITRUST LITIGATION | ) ) ) ) | MDL No. 1899 |
| | | Master File No. 2:08-MD-1000 |
| THIS DOCUMENT RELATES TO: ALL CASES | ) ) ) ) | Judge J. Ronnie Greer Magistrate Judge Dennis H. Inman |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion of Southern Marketing Agency, Inc. ("SMA") and James Baird ("Baird") to dismiss plaintiffs' complaints for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Variations of the motion had been filed in all the cases except No. 2:07-CV-272 and No. 2:08-CV-53 and this order is intended to dispose of the pending motions in all cases. As grounds, SMA and Baird argue that plaintiffs' complaints fail to state a claim on which relief can be granted because (1) the Capper-Volstead Act, 7 U.S.C. § 291, immunizes SMA and Baird for the conduct alleged against them; (2) the filed rate doctrine bars plaintiffs' claims against SMA and Baird; and (3) plaintiffs have failed to plead specific allegations against SMA and Baird as required by *Bell Atlantic v. Twombly*, 127 S. Ct.1955 (2007). At least one of the motions filed also raises issues related to counts 3, 4 and 6 of the plaintiffs' complaint. The issue raised by plaintiffs with respect to *Bell Atlantic v. Twombly* was the subject of a prior order. This order will address the other issues raised by defendants. For the reasons which follow, the motions of SMA and Baird will be DENIED.

## I. Background

Plaintiffs in these cases have sued various entities and/or individuals involved in either the marketing and sale of milk on behalf of dairy farmers or the purchase and processing of that milk. Plaintiffs have filed these actions on behalf of themselves and as a class action on behalf of various proposed classes. The complaints generally allege a far ranging conspiracy and combination among the various defendants to eliminate competition and fix prices in violation of § 1 of the Sherman Act and to monopolize and monopsonize in violation of § 2 of the Sherman Act. The complaints allege various other causes of action; however, the defendants SMA and Baird are named as defendants only in the conspiracy counts of the complaints. SMA is named as a defendant in all complaints and Baird is named as a defendant in the *Sweetwater, Baisley* and *Breto* complaints.

## II. Factual Allegations

The following facts, taken as true for purposes of these motions, are from plaintiffs' complaints:

In 2001, Dean Foods ("Dean") and National Dairy Holdings, L.P. ("NDH"), the two largest milk bottlers in the United States, entered into long-term full-supply agreements[1] with Dairy Farmers of America, Inc. ("DFA") for the supply of raw Grade A milk to Dean's and NDH's bottling plants in the Southeast. These agreements vested DFA with control over access to Dean's and NDH's bottling plants, which amount to 77 percent of the fluid Grade A milk bottling capacity in the Southeast. DFA also jointly owns eight bottling plants in the Southeast which it also supplies

---

[1] Although these agreements are for one year terms, they can be renewed annually for 20 successive one year terms. The agreements contain significant penalties for non-renewal and significant financial incentives if renewed, virtually guaranteeing that the full supply agreements will be in effect for the full 20 years.

exclusively.

Access to bottling plants is critical to Southeast dairy cooperatives since each month their dairy farmer members must "touch base," which is a regulatory requirement that dairy farmers deliver certain minimum quantities of their monthly milk production to bottling plants in order to qualify to participate in the Federal Milk Program. DFA's own membership in the Southeast lacked the milk production necessary to meet the requirements of its long term full-supply agreements with Dean, NDH and others. Defendants agreed that DFA would establish SMA, and that defendants would require previously independent dairy cooperatives to join SMA as a condition of access to defendants' bottling plants. SMA played a central role in implementing and maintaining defendants' conspiracy to eliminate competition for the purchase of Grade A milk.

Pursuant to this conspiracy, for example, Dean and DFA forced Maryland & Virginia Milk Producers Cooperative Association, Inc. to join SMA in order to have continued access to Dean's bottling plants. Other dairy cooperatives were subjected to the same coercive threats, and had no choice but to join SMA or lose access to bottling plants. As the result of defendants' agreement to force dairy cooperatives to join SMA as a condition to access defendants' bottling plants, SMA gained control of 90 percent of the milk produced in the Southeast.

SMA began operating in April 2002. Defendants designed SMA to "market" dairy farmers' Grade A milk to bottling plants in the Southeast in order to carry out the goals of defendants' conspiracy to monopolize, stabilize prices paid to farmers and engage in other unlawful acts specified in the complaint. "Marketing" milk in this context consists of SMA coordinating the hauling of milk from dairy farms to bottling plants, reporting related data to the USDA, and calculating prices for Grade A milk paid to dairy cooperatives or independent dairy farmers, less

3

SMA and defendants' fees and expenses.

Baird is the general manager of SMA. As general manager, Baird has directed, participated in and authorized SMA's unlawful conduct. This participation includes Baird's attendance at numerous meetings with DFA and SMA management, and with dairy farmers and cooperatives. Baird is also the principal owner, officer and manager of several for-profit businesses that, under his control and direction, have participated in the conspiracy through defendants' agreement to utilize Baird and his for-profit businesses to haul milk for SMA. These businesses include Lone Star Milk Transport, Inc., BullsEye Transport, LLC and Bullseye Logistics, LLC.

SMA, Baird and other defendants have maintained SMA's market power by collectively enforcing compliance with their conspiracy. SMA, Dean, NDH and others have acquired the Grade A milk sold to defendants' bottling plants by dairy cooperatives being marketed pursuant to DFA's full-supply agreements, *e.g*., marketed by SMA, and Dean and NDH have refused to accept milk from dairy cooperatives that resist joining SMA. Consequently, dairy cooperatives must join SMA in order for their dairy farmer members to have access to bottling plants in the Southeast. SMA has monitored compliance with the conspiracy through its marketing of milk sold pursuant to defendants' conspiracy, including tracking prices paid by defendants and other processors. In addition, SMA and other defendants have agreed to utilize Baird's Bullseye companies to market milk for SMA, which further enables SMA and Baird to monitor and confirm compliance with defendants' conspiracy because SMA and Baird control the amounts, origins and destinations of nearly all Grade A milk shipped in the Southeast.

SMA requires its members to pay excessive, anti-competitive and unlawful fees and dues. Baird's Bullseye companies inefficiently haul excessive quantities of milk into the Southeast, thus

generating large hauling bills. Since defendants have eliminated alternative means for dairy cooperatives to access bottling plants, dairy cooperatives have no other choice but to pay SMA's and Baird's fees, dues and bills. In addition, SMA and Baird, in collaboration with other defendants, have "flooded" the Southeast market by pooling on the Southeast market substantial and excessive quantities of Grade A milk produced outside of the Southeast with the intent of depressing prices for milk paid to Southeast dairy farmers.

### III. Standard of Review

For the purpose of deciding this motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept as true the facts as plaintiffs have pleaded them and construe the complaint in the light most favorable to plaintiffs. *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Defendants' motion must be denied where the complaint's "[f]actual allegations [are] enough to raise a right to relief above the speculative level of the assumption that all of the complaint's allegations are true." *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1959 (2007)." In reviewing a Rule 12(b)(6) motion to dismiss, all well pleaded allegations in the complaint are treated as true, and dismissal is proper only if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him or her to relief. *Downie v. City of Middleburg Heights*, 301 F.3d 688, 693 (6th Cir. 2002) A complaint may not be dismissed based on a district court's assessments that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the fact finder. *Twombly*, 127 S. Ct. at 1970. While the court must construe the complaint in the light most favorable to the plaintiff, the court is not required to accept "the bare assertion of legal conclusions" as enough, nor does it "accept as true . . . unwarranted factual inferences." *In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 400 (6th Cir. 1997).

**IV.	Analysis and Discussion**

    **A.	Capper–Volstead Act**

The Capper–Volstead Act, 7 U.S.C. § 291, which provides a limited exemption from anti-trust liability, provides:

> Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: . . .

7 U.S.C. § 291. In order to qualify for Capper–Volstead immunity, a cooperative must satisfy two requirements: (1) the cooperative must be composed of members that are producers of agricultural products or cooperatives composed of such producers, and (2) the organization must be involved in the "processing, preparing for market, handling, or marketing" of the agricultural products of its members. SMA argues that it satisfies both of these requirements and is therefore entitled to the immunity provided by the Capper-Volstead Act.

The parties agree that Capper-Volstead immunity is an affirmative defense that must be pled and proven by defendants. *See Alexander v. National Dairy Farmers Org.*, 687 F.2d 1173, 1184 (8th Cir. 1982), *cert. denied*, 461 U.S. 937 (1983). Because Capper-Volstead is an affirmative defense, the court must first determine whether this matter is appropriate for disposition on a Rule 12(b)(6) motion before addressing the merits of the motion itself.

The purpose of a motion under Rule 12(b)(6) is generally to test the sufficiency of the

complaint. *Ashiegbu v. Purviance*, 76 F. Supp.2d 824, 827 (S.D. Ohio.1998). The court will grant a motion for dismissal under Rule 12(b)(6) only if there is an absence of law to support a claim of the type made or a fact sufficient to make a valid claim, or if on the face of the complaint there is an insurmountable bar to relief indicating that the plaintiff does not have a claim. *Id.* at 828 (citing *Rauch v. Day & Night Mfg., 576 F.2d 697,702(*6th Cir.*1978*)). SMA and Baird, relying on *Rauch*, allege that the defense is properly asserted by a Rule 12(b)(6) motion here because the complaint, on its face, shows that relief is barred by the Capper-Volstead Act. If the defense is not apparent on the face of the complaint, however, it may still be raised by a motion to dismiss accompanied by affidavits or other evidentiary matter. *Jablon v. Dean Whitter*, 614 F.2d 677, 682 (9th Cir.1980). Such a motion may then be considered tantamount to one for summary judgment.

While defendants assert that Capper-Volstead immunity is apparent from the allegations of the complaint, they do so in largely conclusory fashion. On the one hand, defendants assert that their actions are legitimate business activities protected by Capper-Volstead. On the other hand, plaintiffs argue that defendants have engaged in a host of anti-competitive and/or predatory practices which place defendants' conduct outside Capper-Volstead's limited grant of immunity. Resolving such issues necessarily requires a fact intensive inquiry which can be completed by this Court only after proper discovery has been conducted.

While this issue may well be a proper one for resolution on summary judgment after discovery, this Court concludes that the affirmative defense of Capper-Volstead immunity cannot be resolved through a Rule 12(b)(6) motion and the motion will, therefore, be denied on this ground alone. In addition, it appears that the defendants' reliance on *Rauch* may be misplaced in that the *Rauch* complaint, on its face, indicated that the claim was barred by the applicable statute of

7

limitations. Nothing quite so obvious appears on the face of the complaints in this case.

      **B.**      **The Filed Rate Doctrine**

The filed rate doctrine, sometimes referred to as the "*Keogh*" doctrine, originated in the decision of the United States Supreme Court in *Keogh v. Chicago and Northwestern Railway Co.*, 260 U.S. 156 (1922). In *Keogh*, the Supreme Court barred the plaintiffs' antitrust claim based on a price fixing conspiracy because the Interstate Commerce Commission had approved defendant's rates, even though those rates were higher than those possible in a competitive market. The Supreme Court held that a plaintiff could not recover for damages caused by paying transportation rates that had been allegedly set in violation of the Sherman Act, because the rates had been filed with and approved by the Interstate Commerce Commission. The Court held that a plaintiff could not suffer antitrust injury under the Sherman Act by paying rates that had been approved by the ICC and were thus the legal rates. *Id.* at 163. Although the doctrine was first applied to rates filed with the Interstate Commerce Commission, it has been subsequently extended to situations where rates set by various federal regulatory agencies have been challenged. *See, e.g., Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (Natural Gas Act, 15 U.S.C.§§ 717-717w); *Nantahala Power and Light Company v. Thornburg*, 476 U.S. 953 (1986) (Federal Power Act); *AT&T v. Central Office Telephone, Inc.*, 524 U.S. 214 (1998) (Communications Act of 1934).

The Supreme Court revisited and reaffirmed the *Keogh* Doctrine more than 60 years after it was first stated in *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409 (1986). There, the Court explained that the doctrine is not an antitrust immunity but that "*Keogh* simply held that an award of treble damages is not an available remedy for a private shipper claiming that the rates submitted to, and approved by, the ICC was the product of an antitrust violation." *Id.* at 422.

In essence, then, the filed rate doctrine prevents plaintiffs from attacking judicially any "filed rate" – that is, one filed with and approved by the governing regulatory agency. *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2nd Cir. 1994).

### 1. Milk Industry Regulation

Necessary to a resolution of this motion is an understanding of the government regulatory scheme for the milk industry, an industry which has been subject to extensive government regulation since the 1930's. The Sixth Circuit Court of Appeals has had occasion several times in recent years to examine the regulatory scheme which applies to the milk industry. *See generally Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339 (6th Cir. 1994); *Farmers Union Milk Marketing Cooperative v. Yeutter*, 930 F.2d 466 (6th Cir. 1991); *Defiance Milk Products Co. v. Lyng*, 857 F.2d 1065 (6th Cir. 1988). Much of the following background comes from those cases.

In 1937, Congress passed the Agricultural Marketing Agreement Act of 1937 ("AMAA") which authorizes the Secretary of Agriculture to regulate the dairy industry. The AMAA sets up a complex structure to regulate the milk industry and authorizes the Secretary of Agriculture to issue and amend milk marketing orders which set the minimum prices "which those who process dairy products, designated as handlers (as defined in 7 C.F.R. § 1040.9 (1994)), must pay the dairy farmers, designated as producers (as defined in 7 C.F.R. § 1040.12 (1994))." Prior to regulation, raw milk to be used as fluid milk commanded a much higher price than milk to be used in manufactured products, such as cheese, butter and dry milk. The minimum prices set by the Secretary of Agriculture guaranteed that producers would receive a uniform minimum price for their milk, regardless of its end use, eliminating much of the competition among farmers to sell as much of their milk as possible for fluid use.

9

Under the AMAA, the Secretary of Agriculture classifies Grade A milk into four classes for minimum pricing purposes based on the actual end use of the milk: Class I (beverage milk products); Class II (soft dairy products such as sour cream, cottage cheese, ice cream and custards); Class III (cheese); and Class IV (butter and nonfat dry milk). Milk handlers pay different prices for each class but producers receive a uniform "blend price" regardless of the end use of the milk they produce. These minimum prices are calculated on a monthly basis based upon a codified regulatory framework. In implementing this system of minimum prices, the Secretary of Agriculture has divided the country into milk marketing areas each governed by a separate federal milk market order ("FMMO"). The Secretary of Agriculture propagates these FMMOs only after formal, on the record rule making. 7 U.S.C. § 608 (c)(3) and (4). Dairy farmers "pool" their Grade A milk on an order, delivering specified minimum quantities of Grade A milk to USDA regulated milk bottling plants associated with that order. The minimum blend price for an order is then based upon all the uses of the Grade A milk pooled on the order.

Although this regulatory scheme removes from the system significant competition among farmers who produce milk, the free market also affects prices to some extent. Although the minimum price is set by regulation, there is no maximum price. Cooperatives and independent producers are free to negotiate for prices in excess of FMMO minimum prices to reflect more accurately market forces. The amounts by which prices for Grade A milk exceed FMMO minimum blend prices are called "over-order" premiums. Market forces can, therefore, raise the price of milk but cannot lower it. The actual price a dairy farmer receives for Grade A milk is referred to as the "mailbox price." The mailbox price is comprised of the FMMO minimum blend price plus any over- order premiums and bonuses for volume or quality, minus marketing costs.

Before issuing, or amending, a milk marketing order, the Secretary of Agriculture must conduct a formal on-the-record rule making proceeding. The public must be notified of these proceedings and provided an opportunity for public hearing and comment. 7 U.S.C. § 608c(3). In addition, before a milk marketing order, or amendment, may become effective, it must be approved by the handlers of not less than 50 percent of the volume of milk covered by the proposed order or amendment and also must be approved by at least 2/3 of the affected dairy producers in the region. 7 U.S.C. § 608c(8).

### 2. The Parties' Positions

The defendants, SMA and Baird, focus on the allegations of plaintiffs' complaints that the defendants are "diluting" or "flooding" the pools of milk on FMMOs 5 and 7. FMMOs 5 and 7 generally cover the Southeast, which are at issue in this case. According to the plaintiffs, defendants increase the total volume of milk pooled to the point that it decreases the order's Class I utilization, thereby reducing the minimum blend price. In other words, the plaintiffs allege that defendants manipulate components of the formula for setting minimum blend prices in order to reduce the minimum prices. SMA and Baird argue that these "flooding" allegations represent a "practical impossibility" because the Secretary of Agriculture strictly controls and dictates what kind of milk and how much milk can be pooled in an order. They further argue that plaintiffs' allegations of flooding are inherently related to the issue of what volume of milk is allowed to be pooled in an order, which directly impacts the minimum blend price. Therefore, they argue, plaintiffs' complaints are in essence challenging the determinations of the Secretary of Agriculture regarding the volume of milk to be pooled in an order and the lawful rates established by the Secretary.

Plaintiffs respond by arguing that defendants have not proven that minimum blend prices are

11

filed with and approved by a regulatory agency so as to invoke the filed rate doctrine here. In addition, they point out that it is the "elimination of competition and the fixing of over-order premiums" which is at the heart of the plaintiffs' complaints in this case, not the minimum blend prices established by the Secretary of Agriculture and they note a distinction between the minimum blend prices and the minimum class prices set by the Secretary of Agriculture. They argue that the minimum blend price is determined by the actual end uses of all four classes of Grade A milk pooled in an order and that the minimum class prices are not the prices paid for milk to dairy farmers or cooperatives, or the prices challenged by their complaints. Plaintiffs also accuse the defendants of erroneously claiming that the market administrator determines "how much milk is eligible to be pooled in each respective order" and suggest that the regulations cited by the defendants have nothing to do with how much milk may be pooled in an order. Defendants reply that the statute, 7 U.S.C. § 608c(5)(A)(B) "unquestionably" establishes that both the minimum class price and the minimum blend price for Grade A milk is established by the market administrator.[2]

### 3. Analysis

In spite of the fairly large body of case law which now exists on the subject of the filed rate doctrine, the defendants have pointed this Court to no binding or persuasive authority where the doctrine has been applied under circumstances such as those presented in this case. Defendants rely on the case of *Servais v. Kraft Foods, Inc.*, 631 N.W.2d 629 (Wis. App. 2001), *aff'd.*, 643 N.W.2d 92 (Wis. 2002). In *Servais*, dairy farmer plaintiffs filed suit under Wisconsin's antitrust law, alleging that they had been adversely affected by federal regional milk orders for the areas in which

---

[2] With all due respect to defendants' counsel, it appears to the Court that defendants' counsel do in fact misconstrue the regulations upon which they rely for their argument that the market administrator acting on behalf of the Secretary of Agriculture controls the volume of milk pooled on an order and misstate the provisions of the statute.

they produce milk. More specifically, they alleged that the defendants were able to lower the milk order's minimum prices through the manipulation of data. The court held that, because the milk orders were federally established rates, the filed rate doctrine precluded the court's substituting its judgment for that of the USDA as to what constituted a reasonable minimum milk price. *Servais*, 631 N.W.2d at 634.

The defendants' argument fails here for several reasons. As an initial matter, plaintiffs point out that even if their claim for damages were somehow barred by the filed rate doctrine, discovery should proceed because the filed rate doctrine does not bar claims for equitable relief, which they also seek in this case, citing *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439 (1945). By not responding to the argument, defendants apparently concede that the filed rate doctrine does not bar claims for equitable relief. Given that there is no basis to limit discovery, this case would go forward in any event on plaintiffs' claims for equitable relief and the motion should be denied on this ground alone.

There are, however, other bases for the denial of defendants' motion. First of all, it appears that the Supreme Court has limited the application of the filed rate doctrine to cases in which the rates or tariffs at issue were in fact filed with and meaningfully approved by the regulatory agency. Defendants in this case have not established that the minimum blend prices at issue, or the mailbox prices, are rates which were filed with or approved by a regulatory agency. Secondly, even if the *Servais* court correctly applies the filed rate doctrine, plaintiffs in this case do not appear to be challenging the minimum prices set by the Secretary of Agriculture but rather the elimination of competition and the fixing of over- order premiums paid to dairy farmers. In fact, defendants

acknowledge that those aspects of milk pricing are not regulated by the Department of Agriculture and it is these premiums which, in large part, have been eliminated or reduced based upon the alleged unlawful acts of the defendants. Although the AMAA has reduced competition in the milk industry significantly, market forces still play a substantial role in the prices actually paid to dairy farmers and cooperatives for the milk they produce. While Congress did authorize the Secretary of Agriculture to set certain minimum prices, Congress specifically left the determination of milk prices above this floor to market forces. Plaintiffs' complaints clearly assert that the defendants have stifled competition and fixed prices to the extent they are determined by market forces. In other words, plaintiffs clearly allege that the "mailbox price" is fixed at an artificially low amount because of defendants' alleged illegal conduct. These prices are neither regulated nor approved by the Department of Agriculture.

As interpreted by this Court, plaintiffs' complaints do not ask this Court to engage in judicial rate making and to substitute its judgment for that of the Department of Agriculture. It does not, for the reasons stated above, appear that the filed rate doctrine is implicated in this case. For these reasons, defendants' motion to dismiss on the basis of the filed rate doctrine will be denied.

**C. The Non-conspiracy Counts**

As noted above, SMA and Baird are not named as defendants in any of the counts of the complaints except for the conspiracy counts. It is somewhat baffling, therefore, that they seek dismissal of the other counts of the complaints. That defendants not sued are not entitled to an order of dismissal seems to be a proposition that could not be reasonably debated, except by SMA and Baird. This Court will not waste its time on such frivolous arguments.

## V. Conclusion

For the reasons set forth above, the motions of SMA and Baird to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure are **DENIED**. [Doc. 32 in 2:07-CV-188; Doc. 50 in 2:07-CV-208; Doc. 36 in 2:07-CV-248; Doc. 99 in 2:08-CV-12 and Doc. 93 in 2:08-CV- 14]. This order is also binding on the parties in No. 2:07-CV-272 and No. 2:08-CV-53.

SO ORDERED.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
