EXHIBIT VI
JULY/AUGUST 2009
VOL. 81 | NO. 6

NEW YORK STATE BAR ASSOCIATION

Journal

NYSBA

# The Caines Identities

*The Faces of America's First Official Reporter*
*by Gary D. Spivey*

## Also in this Issue

An Insider Revisits *Disney*

Arbitrating Commercial Issues: Do You Really Know the Out-of-Pocket Costs?

The New York City Civil Rights Restoration Act Grows Teeth

Case 2:08-md-01000-JRG   Document 741-7   Filed 04/02/10   Page 1 of 8   PageID #: 20712



H. STEPHEN GRACE, JR. (hsgrace@hsgraceco.com) is principal of H.S. Grace & Co. of Houston, Texas. He holds a B.S. in industrial engineering from Lamar University, an MBA from the University of Chicago, and a Ph.D. in economics from the University of Houston. Before beginning his consulting business in 1985, Grace was senior vice president of finance and CFO of Century Corporation and Century Development Corporation. Part I is adapted from Mr. Grace's article "An Insider Revisits the 'Disney Case,'" published in *Director's Monthly*, August 2008.

# Plaintiff Expert Reports: An Insider Revisits *Disney*

By H. Stephen Grace, Jr.

## Part I: The Corporate Governance "Case of the Century"

The corporate governance "case of the century," the shareholder derivative litigation in connection with Walt Disney Company's hiring and subsequent termination of Michael Ovitz, has concluded. Both the Chancery Court and Delaware's Supreme Court found in favor of the defendant directors.

The question addressed here is whether an examination of the report of the plaintiffs' compensation expert offers insights that actually support the courts' decisions for the defendants. Do the issues the expert chose to examine and those he chose not to examine speak to the factual issues of interest to the courts? Do the analyses undertaken reflect on the strengths and weaknesses of the plaintiffs' allegations?

The examination of the compensation expert's report undertaken here supports the courts' decision and, in an interesting way, responds to those critics who charge that the Delaware courts failed to see important, highly visible facts, and that their "pro-business" inclinations drove their decision.

This article draws on my involvement with the Disney case – having served as the consultant to the primary directors' and officers' (D&O) carrier and its counsel – which included gaining an understanding of Milberg Weiss's allegations, analyzing certain plaintiffs' expert reports, and examining Walt Disney's business investment decisions to hire and, subsequently, to terminate Michael Ovitz.

The article briefly reviews the Milberg allegations and sets out a summary of the findings of the plaintiffs' compensation expert. Next, Disney's decision to hire and Disney's subsequent decision to terminate Michael Ovitz are examined. These examinations provide a valuable framework for analyzing the plaintiffs' expert's report.

## The Milberg Weiss Complaint

Milberg Weiss was counsel to the plaintiffs. The Plaintiffs' Second Amended Consolidated Derivative Complaint allegations included these charges:

- Paragraph 3 – Michael Eisner, the CEO of Disney, recruited Michael Ovitz as a result of their personal friendship.
- Paragraph 3 – The hiring of Ovitz was facilitated by Irwin Russell in his role as chair of the compensation committee.
- Paragraph 4 – The compensation committee "inadequately investigated the proposed terms of the Ovitz

Reprinted with permission from the New York State Bar Association *Journal*, July/August 2009, Vol. 81, No. 6, published by the New York State Bar Association, One Elk Street, Albany, New York 12207.

Case 2:08-md-01000-JRG   Document 741-7   Filed 04/02/10   Page 2 of 8   PageID #: 20713

Employment Agreement (OEA)." The compensation committee and the old board paid insufficient attention to the terms of the OEA.
- At the September 1995 meeting, more time was spent on Russell's additional compensation for handling the negotiations than on the terms of the OEA.
- Paragraph 5 – The compensation committee and the old board "indifferently and recklessly, failed to obtain and consider all material information reasonably available to them and evaluate whether the OEA was desirable from a corporate standpoint."

The allegations throughout the complaint are highly critical of the actions of Eisner and the Disney board.

## The Plaintiffs' Expert Reports

The compensation expert compared Ovitz's expected compensation to that received by other "non-CEO presidents" and concluded:
- Ovitz's cash and total compensation were far in excess of that received in 1995 by any non-CEO president in the S&P 500;
- Ovitz's contract was unusually generous in virtually all regards;
- Ovitz's severance arrangements were unusually generous in virtually all regards;
- Ovitz's severance arrangements provided strong incentives to leave Disney early in his term, so long as his departure could be treated as a non-fault termination; and
- The total cost of the non-fault termination to Disney was approximately $130 million.

## The Hiring and Termination of Michael Ovitz: An Insider's View

This overview of the hiring and the subsequent termination of Michael Ovitz draws on Chancellor William B. Chandler's Opinion, trial-related information, other public documents and my work on this matter. Chandler's Opinion and the other documents address the well-understood risks associated with business investment decisions, including the hiring of senior executives, the factors at work that may have influenced Disney's decision to seek the services of Michael Ovitz, the hiring process, the terms of the hiring, the performance of Ovitz, the termination process, and the terms of the termination.[1]

Business investment decisions involve risk. Mergers or acquisitions, systems development, sports and entertainment undertakings, or the hiring or termination of senior executives all involve some degree of risk. Large front-end, sign-on bonuses, stock, restricted stock and stock options, periodic bonuses, lucrative back-end payments, and other provisions are often components of the contracts entered into with senior executives. Both hiring a new executive and promoting a proven executive are fraught with risk.

For an example, one has only to examine the details of the hiring of Gary Wendt to lead Conseco, Inc., where Wendt was paid a sign-on bonus of $45 million and received various other forms of compensation. Conseco and Wendt separated only a few years after Wendt took over the leadership of Conseco.

Even when a formal contract is not in place, a company may elect to make a significant payment to a departing executive. The payout that Doug Ivester, CEO of Coca-Cola, received upon his severance from the company, is one example. Coca-Cola's board determined that Ivester needed to step aside, and Ivester did not actually have an employment agreement that spoke to such an occurrence. Despite that, the severance he received was estimated to be worth $166 million.[2] (Both Warren Buffet and Herb Allen were on the Coke board at that time, and Allen chaired the compensation committee.)

## The Decision to Hire Michael Ovitz

The growth in the Disney share price from the time that Eisner and Frank Wells joined Disney in 1984 until the mid-1990s was outstanding. Ten thousand dollars invested in Disney stock in September 1984 was worth approximately $160,000 by July 1994, while a $10,000 investment in the S&P Index was worth $56,000. In a 1995 article, John Huey said, "Disney has consistently reported annual increases in profits and return on equity of more than 20%, and Wall Street has rewarded it by driving its market value up from less than $2 billion in 1984 to more than $28 billion today – bigger than Ford, for example."[3]

In 1994, Disney was hit with multiple significant personnel issues. Frank Wells's death in April 1994 was followed four months later by Eisner's quadruple bypass surgery. Jeff Katzenberg, who headed Walt Disney Studios, departed. There had been three capable executives; now there was only one, and he was recovering from major surgery.

Disney's agreement to acquire CapCities, which would add 60% to Disney's size, was a further complication. Disney's decision to seek the services of Michael Ovitz, who was widely recognized as the most powerful player in the content area, was sound.

Ovitz was "in play." Edgar Bronfman, chairman of Seagram's – which had acquired 80% of MCA from Matsushita – was estimated by *The Economist* to have placed an employment package of between $250 million and $300 million on the table to persuade Ovitz to become the entertainment group's new chairman.[4] The MCA offer recognized Ovitz's capabilities, as well as his estimated income of $20 to $25 million earned annually as CEO of Creative Artists Agency. When Ovitz declined the MCA offer, *The Economist* speculated that "it is only a matter of time before he (Ovitz) is offered yet another, more tempting media giant to run – without a young

Case 2:08-md-01000-JRG   Document 741-7   Filed 04/02/10   Page 3 of 8   PageID #: 20714

proprietor to second-guess him all the time. One would be Time Warner . . . another could be Viacom."5

### The Hiring Process

The hiring process was well structured and incorporated Disney's "pay-for-performance" culture. The employment agreements of Eisner, Wells, Katzenberg, and others reflected a careful adherence to this culture. There were no upfront signing bonuses, awards of stock, restricted stock or guaranteed annual bonuses. Base salary compensation was reasonable; one stock option was awarded per multi-year employment contract; and annual bonuses depended upon the achievement of defined performance criteria.

Disney's pay-for-performance culture was recognized as creative, forward-thinking, and beneficial to shareholders. Corporate governance observer Nell Minow, in a January 7, 2002, *Fortune* article on Eisner, said that prior to 1996 she "applauded Eisner not just for reviving Disney, but for taking a modest base salary of $750,000" in what she called a "truly credible pay plan based on escalated options."6

Initial discussions with Ovitz involved Irwin Russell, Disney's compensation committee chair; Eisner; and later on, Raymond Watson, former Disney chairman and a member of the compensation committee. Having the chair of the compensation committee and another long-term board member head the negotiations ensured both compensation committee and board awareness of these negotiations.

A highly credible consultant, Graef Crystal, was quickly involved in assisting Russell and Watson. The negotiations were lengthy and contentious. Ovitz's contract terms changed during the course of these negotiations. The evidence indicates that the changes in the compensation terms favored Disney.

The Ovitz deal was arm's length. Ovitz's advisors were capable and independent. The individuals leading the negotiations for Disney were "informed buyers of talent" who understood the parameters within which the Ovitz contract had to be structured.

### The Terms of Hiring

Both the investment community and the press responded in a strong, positive manner, pointing out the enormous synergies potentially achievable. While Eisner and Ovitz were friends, they had not come to terms on any business arrangement over the many years during which both stood as powerhouses in the industry.

Ovitz's compensation conformed to Disney's compensation structure. Ovitz received no front-end bonus, no stock awards, and no restricted stock awards. He received a stock-option grant basically equivalent to that held by Frank Wells, his COO predecessor. The non-fault termination provision was necessary to induce Ovitz to join Disney. Without this provision, Ovitz almost certainly would have refused Disney's offer, and Disney might have had to entice him by offering a sizeable, more costly front-end bonus.

Non-monetary considerations appear to have been a part of Disney's negotiations with Ovitz. At trial, Ovitz

> In comparison with other high-profile, non-Disney executives, Ovitz's compensation could not be considered excessive.

said he found interesting the opportunity to participate on the "buy side" after having been on the "sell side" for many years.

And Ovitz was strongly motivated to succeed. His employment agreement, with no signing bonus or similar guarantees, was mostly option-based, and thus created an incentive for him to succeed. Even though there was the cash-termination benefit and the fact that his options would vest in the case of a non-fault termination, in leaving CAA and declining the MCA offer, Ovitz left cash flows far larger than the Disney cash-termination benefit. Also, there was no assurance the vested options would have any value.

In comparison with other high-profile, non-Disney executives, Ovitz's compensation could not be considered excessive. Proxy data for Michael Armstrong, CEO of AT&T; Carly Fiorina, CEO of Hewlett Packard; Gary Wendt, CEO of Conseco; Robert Nardelli, CEO of Home Depot; and Larry Johnston, CEO of Albertson's; demonstrate that Ovitz's termination payments were not out of line. Assuming Ovitz and each of these executives were terminated within 15 months after hire and their respective share prices increased 25%, Michael Ovitz finished fourth in terms of total compensation received over the 15-month period.

### The Performance of Ovitz

In many respects, the story of Ovitz at Disney is the story of a clash of operating styles. Much has been written about Ovitz's operating style; it simply did not fit with Disney's culture. Certainly, Ovitz was highly motivated to succeed. He had the opportunity to exercise potentially significant influence at Disney, and personal failure was

Case 2:08-md-01000-JRG   Document 741-7   Filed 04/02/10   Page 4 of 8   PageID #: 20715

not, in his view, an option. Once the organizational problems at Disney were set out for Ovitz, he only doubled his resolve to be successful in his role, but the culture clash was too great.

### The Termination Process

A broad-based awareness developed that Ovitz did not fit well within the Disney operating structure. Ovitz appears to have been largely unaware of these fractures and continued to be committed to succeeding even after Eisner discussed with him the problems that were developing. His termination was apparently based on business considerations and contract driven. Disney made an effort to determine whether to effect a "for cause" termination and concluded that its only business option was to proceed along the non-fault termination lines set out in Ovitz's employment contract.

Eisner headed the separation negotiations. Such an arrangement is not unusual. Given that Ovitz was on the board, it was not possible to hold any discussions regarding his performance or his pending termination at a board meeting.

### The Terms of the Termination

The monetary terms of Ovitz's no-fault termination were set out in his employment contract. Ovitz received a cash termination payment of $38.9 million. His three million shares vested, and at the time of the vesting, Disney's price had risen to $71 a share (the strike price was $57 a share). At the $71 share price, Ovitz's three million shares had a value of $42 million (three million shares times $14 per share). This total is consistent with Ovitz's statement to the press regarding his termination compensation, and contrasts with reported allegations that the termination compensation paid was $140 million.[7]

### Part II: Compensation Expert Report: An Insider's View

Professor Kevin J. Murphy was the plaintiffs' compensation expert. Chandler states that

> Professor Murphy . . . presented expert testimony for plaintiffs on the issue of damages together with an economic and reasonableness evaluation of Ovitz's compensation package. Professor Murphy concluded that Ovitz's compensation package was unreasonably excessive and orders of magnitude larger than the compensation awarded to executives with arguably equivalent responsibilities. In determining the reasonableness of Ovitz's compensation, Professor Murphy chose not to consider Ovitz's past income at CAA and the effect that income would have on the remuneration he would expect from any future employment. As would be expected, Professor Murphy concluded that the most reasonable and appropriate assumptions are those that would maximize the value of the OEA (Ovitz Employment Agreement) and corresponding cost of the NFT (Non-Fault Termination). Perhaps

Professor Murphy's most pointed criticism of the OEA is that the Company was unable to reduce its potential financial exposure because the OEA did not contain any provisions for mitigation or non-compete restrictions, but that criticism is not supported by the language of the OEA.[8]

The court's analysis of Murphy's report begins with Section I, "Introduction and Executive Summary."[9] Interestingly, Murphy does not seem to have considered two basic factors to be addressed when attempting to persuade an executive to join a firm: (1) the need to make the executive "whole" relative to what he or she is currently earning; and (2) the need to create additional incentive, thereby providing a basis for the executive to leave his or her existing situation, or forgo other alternatives, and join this particular firm.

Also notable was that Murphy did not examine how Michael Ovitz's compensation fit into the Walt Disney executive compensation structure – that is, how Ovitz's package would compare to those of Michael Eisner and other senior executives. Murphy gave no reason for this decision.

> The New York Yankees' acquisition of Alex Rodriguez several years back provides an interesting analogy.

Murphy does, however, state in his report that he reviewed materials that both addressed and made clear the importance of these issues. For example, he reviewed the August 12, 1995, letter from Graef Crystal to Irwin Russell, which set out Crystal's thinking, as a leading expert on compensation, regarding the factors to be addressed in hiring and fairly compensating Michael Ovitz.[10] Among these is the compatibility of Ovitz's compensation with that of Eisner and other senior executives.

Whatever the reason, Murphy chose simply to "compare Mr. Ovitz's expected compensation to that received by other 'non-CEO Presidents'"[11] and did not consider the well-known facts that Ovitz's current position involved compensation estimated at $25 million a year, that he had enormous power, and that he had literally unlimited perks. Further, Murphy overlooked MCA's offer to Ovitz – a $250 million package.

The New York Yankees' acquisition of Alex Rodriguez several years back provides an interesting analogy. Rodriguez played shortstop for the Texas Rangers, was the American League's Most Valuable Player, and was understood to have a salary contract with the Rangers approximating $250 million. The Yankees sought the services of Rodriguez but already had a shortstop and

Case 2:08-md-01000-JRG   Document 741-7   Filed 04/02/10   Page 5 of 8   PageID #: 20716

fine team leader, Derek Jeter, in place. They inquired as to whether Rodriguez would be willing to play third base. As such, Rodriguez was being asked to take a new position, where his skills, at least in the field, were unproven.

If the Yankees followed the approach that Murphy appears to advocate in his report, their offer to Rodriguez should have been based on an average of the salaries of Major League third basemen. After all, Rodriguez was moving into a new position where his skills were unproven, both on the field as a third baseman and off in terms of being able to fit into the "Yankee" culture. It would not be difficult to imagine Rodriguez's response to such an offer. Nor is it difficult to imagine Michael Ovitz's response to a proposal under which he would move from his current position and spurn other offers (such as that from MCA) for compensation equivalent to the average of S&P 500 company presidents.

At a roundtable on corporate governance and executive compensation, Leo Strine, Vice Chancellor of the Delaware Chancery Court, had this to say about senior management compensation: "In the CEO marketplace, here is what you ought to ask a CEO that wants a big raise: Did your phone ring? Is there someone that wants you that we have not heard about? Those are the questions that real business people ask their other employees when they set compensation."[12] Strine emphasized the validity of allowing market forces to set the compensation of senior management. Murphy, apparently, chose to overlook them.

The data Murphy presents in his effort to provide a comparison between Ovitz and certain members of Disney senior management is inaccurate. Murphy shows Frank Wells (the former president of Walt Disney) as only receiving a salary of less than $1 million in 1994 and as having received no stock options in 1994.[13] In fact, Frank Wells's stock options (three million shares) received under his 1989 to 1994 contract, vested in 1994, and were worth $64 million. (Disney's policy was to give a single stock option grant at the beginning of the employment contract period.) Murphy does not mention Wells's three million shares nor that this grant was for the five-year period.

Murphy continues this tack in discussing Ovitz's stock option grant, comparing Ovitz's grant for his five-year contract period with the amount received in one year by the other CEOs, many of whom were receiving annual stock option awards.[14] Murphy refers to Ovitz receiving a grant of five million shares, when two million of those shares were defined separately and would not actually be granted until Ovitz completed five years of service at Disney.[15] These two million shares did not vest in the case of a non-fault termination during the five-year contract period.

Also, Murphy does not consider the absence of front-end incentives from Disney to Ovitz as part of his becoming employed by Disney or the potential costs associated with structuring the separation with Ovitz as, to use Murphy's words, a "resignation" or a "termination for good cause."[16] Ovitz's power and broad-based relationships with producers, directors and actors raise serious questions about the wisdom of Disney terminating its relationship with Ovitz in a confrontational manner. Disney's role as a leading content provider mandated that it evaluate carefully the quality of the relationship to be maintained with Ovitz going forward.

Murphy does not factor in the possibilities of potentially extended and costly litigation should Ovitz's termination have precipitated a confrontation. Indeed, Jeff Katzenberg's separation from Disney in late 1994 provided an important example of what can arise in the case of an unfriendly separation. Disney's litigation with Katzenberg was extensive and expensive, the settlement was large, and an ongoing bitterness continues to exist. Katzenberg's loss represented a loss of his creative talent to Disney. The alienation of Michael Ovitz could potentially have cost Disney its working relationships with numerous directors and actors.

Murphy concludes that "these arrangements provided strong incentives [for Ovitz] to leave Disney early in his term, so long as his departure could be treated as a non-fault termination."[17] Yet Murphy did not take into account the context of Michael Ovitz's decision to leave CAA and join Disney. Ovitz was highly motivated to succeed at Disney for non-monetary reasons, and his subsequent activities focused on succeeding in a different place (than CAA). As Ovitz was separating from Disney, he entered into discussions with Sony. Those discussions did not progress, and a short time later Ovitz bought Livant, a theatrical production group in Toronto, and committed significant resources to that endeavor. Subsequently, Ovitz formed a new company, Artist Management Group, in 1998.

Graef Crystal, in his August 12, 1995, letter to Irwin Russell, discusses at length the unique attributes of both Michael Eisner and Michael Ovitz, and their demonstrated records of success.[18] As Crystal states, they are unique among a small group of business leaders in their ability to command high levels of compensation. Murphy reviewed the Crystal letter; yet, he did not challenge Crystal's assessment.

Ovitz's activities are characteristic of success-oriented business leaders – success for its own sake is important to them, and they want to remain in the game. Ovitz had a very high level of monetary compensation at CAA. What Disney offered was the opportunity to direct an "empire" as opposed to the "kingdom" he headed at CAA. Ovitz could only achieve what Disney had to offer by succeeding at Disney. As an economist, Murphy understands the

Case 2:08-md-01000-JRG   Document 741-7   Filed 04/02/10   Page 6 of 8   PageID #: 20717

importance of both monetary and non-monetary compensation.

## Conclusion

The examination of the report of the plaintiffs' compensation expert revealed that (1) Murphy elected to omit discussing certain evidence he had reviewed; (2) Murphy elected to omit discussing certain issues of customary practice when hiring senior executives; and (3) Murphy developed questionable comparisons of Ovitz with other executives. The issues overlooked, as well as the analyses undertaken, appear to reflect weaknesses in the plaintiffs' allegations and, interestingly, to confirm the logic of the Delaware courts' findings.

1. See H. Stephen Grace, Jr., Ph.D., *An Insider Revisits the 'Disney Case,'* Directors Monthly, Vol. 33, No. 8, Aug. 2008.

2. Suzanne Koudsi, *Why CEOs Are Paid So Much to Beat It*, Fortune, May 29, 2000.

3. John Huey, *Eisner Explains Everything*, Fortune, Apr. 17, 1995.

4. *No smoke. (Michael Ovitz will not move to MCA)*, Economist, June 10, 1995.

5. *Id.*

6. Marc Gunther, *Has Eisner Lost the Disney Magic? The company has been walloped by terror and recession. But its problems start at the top*, Fortune, Jan. 7, 2002.

7. David Pauly, *$90 million just to quit Disney?*, Chicago Sun-Times, Dec. 16, 1996.

8. *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 742–43 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. Sup. Ct. 2006).

9. *Id.* at 743 (referencing Prof. Murphy Expert Report).

10. *Id.* at 705 (referencing Letter from Crystal to Russell of 08/12/95).

11. *Id.* at 743 (referencing Prof. Murphy Expert Report).

12. *Roundtable on Corporate Governance and Executive Pay: Problems and Solutions*, J. Applied Corp. Fin., Winter 2004, Vol. 16, No. 1, at 55.

13. *Walt Disney*, 907 A.2d at 743 (referencing Prof. Murphy Expert Report).

14. *Id.* (referencing Prof. Murphy Expert Report).

15. *Id.* (referencing Prof. Murphy Expert Report).

16. *Id.* (referencing Prof. Murphy Expert Report).

17. *Id.* (referencing Prof. Murphy Expert Report).

18. *Id.* at 705 (referencing letter from Crystal to Russell of 08/12/95).

Case 2:08-md-01000-JRG   Document 741-7   Filed 04/02/10   Page 7 of 8   PageID #: 20718

# H.S. Grace & Company, Inc.

*H. Stephen Grace, Jr., Ph.D., President*
*Steve Grace, Director of Operations*

H.S. Grace & Company, Inc. specializes in helping clients solve complex business challenges. Our team of senior executives offers unparalleled depth and breadth of experience to comprehensively analyze issues and identify optimal resolutions.

Our consulting falls into four broad areas: corporate governance; litigation; financial advisory services; and business consulting.

H.S. Grace & Company, Inc. clients draw upon the talents of founder Dr. H. Stephen Grace, Jr. and more than 30 current and former executive officers and board members of major public and private corporations. Together we offer more than 1,000 years of executive leadership experience across a broad range of industries.

We can help diagnose and resolve the complex issues companies face to enhance shareholder value, protect reputation and long-term ability to succeed, manage litigation, and successfully navigate major changes such as mergers and acquisitions or bankruptcies. H.S. Grace & Company, Inc. brings unparalleled experience, a comprehensive approach and valuable insights to the table.

## *Grace & Co. Consultancy, Inc., Board of Advisors*

**Holly A. Borkin**
*Vice President of Investor Relations (Ret.),*
*Grand Metropolitan PLC (now Diageo);*
*Board of Directors (Ret.), NYC Partnership*

**James N. Clark**
*Board of Directors, and Executive Vice President and CFO (Ret.),*
*Western & Southern Life Insurance Company;*
*Former Chairman, Financial Executives International*

**George Cox**
*Managing General Partner (Ret.), Park Central Ltd.*

**Jeffrey E. Curtiss**
*Director and Audit Committee Chairman of KBR, Inc.; Former*
*CFO, Service Corporation International and Browning-Ferris Industries;*
*Current Secretary, CFA Society of Houston;*
*Former Secretary, Financial Executives International*

**R. Hartwell Gardner**
*Board of Directors, Pioneer Natural Resources;*
*Treasurer (Ret.), Mobil Corporation;*
*Former Chairman, Financial Executives International*

**Edward A. Grun**
*Director, Gensler Worldwide*

**John E. Haupert**
*Treasurer (Ret.), The Port Authority of New York and New Jersey*

**Peter Howell**
*Direktor, Credit Risk Management (Ret.), Deutsche Bank A.G.*

**Steven B. Lilien**
*Weinstein Professor of Accounting and*
*Former Chairman of the Stan Ross Department of Accounting*
*at Zicklin School of Business, Baruch College;*
*Director of Center for Financial Integrity, Baruch College*

**Nicholas J. Lomonte**
*Vice President Finance (Ret.), ABB Lummus Global Inc.*

**Martin G. Mand**
*Executive Vice President & CFO (Ret.), Nortel Networks;*
*Vice President & Treasurer (Ret.), DuPont Company;*
*Former Chairman, Financial Executives Research Foundation, Inc.*

**Khalid S. Masood**
*Finance Director (Ret.), Hub Power Co., Karachi, Pakistan*

**S. Lawrence Prendergast**
*Executive Vice President of Finance & Director (Ret.),*
*LaBranche & Co. Inc.; Chairman & CEO (Ret.) and Director,*
*AT&T Investment Management Corp.;*
*Former Chairman, Financial Executives Research Foundation, Inc.*

**Francis C. Regnier**
*Former CEO, Montaigne Diffusion (LACOSTE), Paris, France*

**Robert S. Roath**
*Board of Directors and Audit Committee Chair, InterDigital*
*Communications Corporation; Chairman of Advisory Board, L.E.K.*
*Consulting; Former CFO, RJR Nabisco*

**The Honorable William M. Schultz**
*Former United States Bankruptcy Judge, Southern District of Texas*

**Ronald H. Wilcomes**
*Vice President and Investment Counsel (Ret.), MetLife Insurance Co.*

**Alfred L. Williams**
*Former CFO of Tenneco Gas, Arcadian Corp.,*
*Moorman Manufacturing, Global Industrial Technologies, Inc.; Director*
*of Audit Worldwide for Tenneco, Inc.*

**Walter C. Wilson**
*Former Senior Vice President and CFO, EOG Resources, Inc.;*
*Trustee, Financial Executives Research Foundation, Inc.*

---

*www.hsgraceco.com*
*Houston:* 4615 Southwest Freeway, Suite 625 • Houston, TX 77027
(713) 572-6800 • Fax (713) 572-6806

*New York:* 300 East 57th Street, #18A • New York, NY 10022
(212) 644-8620 • Fax (212) 813-1779
Email: hsgraceco@hsgraceco.com