# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

|  |  |
|---|---|
| IN RE SOUTHEASTERN MILK ANTITRUST LITIGATION | ) CASE NO. 2:08-MD-01000 ) ) ) JUDGE GREER ) MAGISTRATE JUDGE INMAN |
| THIS DOCUMENT RELATES TO: *Sweetwater Valley Farm, Inc., et al. v. Dean Foods Co., et al.*, No. 2:07-cv-208 | ) ) ) ) ) ) |

## DECLARATION OF NATHAN ROTH

I, Nathan Roth, make the following declaration based upon personal knowledge of the matters set forth here.

1.      I am a dairy farmer. I've been one all my life. I was born and raised on my parents' farm, and I farmed with my father until I was in my early-30s. Then, in 1981, I struck out on my own and started my own operation. My farm is in South-Central Missouri, in Texas County. We've got about 320 milking cows. I have been a member of Dairy Farmers of America, Inc., ("DFA") since it was created in 1998; before then, I was with DFA's forerunner, Mid-America Dairymen, Inc. As a DFA member, I have participated in various councils and other governing groups. I was a delegate, and then a district chairman, and now I'm on DFA's Southeast Area Council ("SEAC"), as the council member for my district. The dairy farmers who serve on SEAC are elected by the other dairy farmers based on where their farms are located. In my case, the local district I serve includes Texas County and the Eastern part of Wright County.

1

Case 2:08-md-01000-JRG   Document 1284-9   Filed 03/31/11   Page 2 of 8   PageID #: 31371

2. I have been aware of this lawsuit for some time now. My understanding is that DFA has been sued by a number of dairy farmers in the Southeast, some of whom are DFA members and some of whom are independents or members of other coops, who claim that DFA and other coops and bottlers have done certain things that the plaintiffs say violated the antitrust laws and led to farmers being paid less for their milk than they should have been. I understand that among other things, the plaintiffs in the lawsuit are saying that DFA's full-supply agreements, which require certain bottlers to purchase all of their milk from DFA, are part of a conspiracy that results in lower pay prices in the Southeast—to the tune of approximately $1.00/cwt. And I understand that the plaintiffs say these full-supply agreements require DFA to provide bottlers with more milk than DFA has, and that as a result, DFA is then required to ship in milk from the West to meet its obligations, which the Plaintiffs say further lowers pay prices in the Southeast. I also understand that the plaintiffs have identified DFA's investments in bottling plants as part of that supposed conspiracy to lower pay prices in the Southeast.

3. The Southeast as a whole is described as a "deficit" region, but any dairy farmer in South-Central Missouri will tell you that whatever is the case with the Southeast as a whole, we ourselves are in a surplus area: we produce a lot of milk in South-Central Missouri—which includes Texas County, Wright County, Howell County, Douglas County, and Ozark County— and we don't have nearby capacity to process or bottle all that milk. The other thing that's important to know about my area is that our dairy farms tend to be small. For example, my farm, with 320 milking cows, is probably about the third-largest farm in South-Central Missouri.

4. Given that we're in a milk surplus area and most of our farmers operate small farms, the full-supply agreements that DFA has with processors are very important to us. The bottom line is that those agreements provide a great deal of certainty and predictability for us,

and we rely very heavily on that certainty. For farmers in my situation—we don't produce a full truckload of milk for each pickup day, and we operate in local surplus areas—it's difficult and costly to get our milk to the plants that need our milk. Those plants may be far away, and it's expensive to ship less than a truckload of milk so far. But DFA always takes our milk and, because of the full-supply contracts, DFA can find a reasonable home for that milk. That means we can focus on operating our farms, purchase equipment, and make other decisions knowing that we will be able to sell our milk. That level of certainty is extremely important to us.

5. I understand that as part of the relief being sought in the lawsuit, the plaintiffs are seeking to have DFA's full-supply agreements with certain bottlers declared illegal, and that if the plaintiffs get what they are asking for, then DFA may have to stop using the type of full-supply agreements that are being challenged in the case, even if other coops still have the freedom to enter into such contracts. From my perspective, if DFA were to lose the ability to enter into these kinds of full-supply contracts, we'd have a real problem on our hands—we wouldn't have a guaranteed home for our milk. We sell a perishable product, and we need to know well in advance that when we milk our cows, that milk can be sold. We wouldn't know that without being part of a coop that has full-supply agreements with bottlers. Losing that certainty would also means we would lose the ability to plan our operations and our investments—when I know my coop is actively pursuing and acquiring strong markets for my milk, I feel a lot more comfortable about putting on a few extra cows. But if I don't have a market to sell my milk into, I'm not going to make that sort of decision. I don't know how to put it any simpler than this: stability and predictability are the name of the game, and we rely on full-supply agreements to provide that stability for us. Based on a lifetime of experience working with and talking to dairy farmers, and many years of representing dairy farmers' interests on

3

DFA's councils and other governance bodies, I can say that the same is true of most of the DFA members I know and represent.

6. That doesn't mean full-supply agreements always work out in dairy farmers' favor, all the time. Like any business deal, a full-supply agreement has benefits for both sides of the transaction. So we get stability and certainty, but the bottlers also get a sort of stability from these deals. When supply is flush, we get a better price from our bottlers than we could otherwise get, because we've got a full-supply agreement. But conversely, when supply is tight, we get paid less than we could otherwise get paid. In a full-supply agreement, we have a guarantee of being able to sell our milk at a good price, and the bottler has the guarantee of being able to buy its milk at a good price.

7. I don't understand why the plaintiffs would say that full-supply agreements are bad for DFA members because they require DFA to procure cheaper milk from the West. Full-supply agreements provide a market for my milk when I need a place for it to go, no matter what the supply situation is in the rest of the market; the flip side is that we have to provide milk to the bottler whether or not we have it. You can't get something for nothing—the bottlers are no fools, and neither are we. We both do these deals because they're in our best interests—bottlers are trying to buy milk as cheap as they can, we're trying to sell it as high as we can, and we're all trying to minimize risk.

8. I understand the plaintiffs are saying DFA's full-supply agreements are part of a conspiracy that results in the suppression of pay prices by as much as $1.00/cwt in the Southeast. I just can't imagine how that could be true. If it were true, I'd be hearing from my members, and it wouldn't take long for full-supply agreements to become a thing of the past. That's how DFA works—our governance structure enables members to change policies. People who disagree

4

Case 2:08-md-01000-JRG   Document 1284-9   Filed 03/31/11   Page 5 of 8   PageID #: 31374

with the direction of the coop have their concerns heard, and if there's support for those concerns, the policy changes. But even if the plaintiffs were correct that the conduct they are challenging in the lawsuit, including these full-supply agreements, somehow had the effect of lowering our pay prices by $1.00/cwt, I still would be in favor of keeping the full-supply agreements. I would not want the risks and uncertainties of not having a guaranteed outlet for my milk. I can't understand how any lawyer claiming to be representing DFA members could possibly think that getting rid of full-supply agreements would be in our best interests. We are fully capable of making those decisions on our own. Maybe independent farmers have different views—maybe they can earn a little more in their milk checks, but forego the stability they'd get if they were with DFA or another coop that has full-supply agreements. That may be a good choice for some farmers, but that's not the choice that I and my fellow DFA members made. We choose the stability that DFA offers. I can also see how members of other coops might think it's a good idea to prevent DFA from continuing to use full-supply agreements while their coop continues to use them without restriction. But a lawyer who represents independent farmers and members of other coops shouldn't also claim to be representing DFA members—we very obviously have very different interests.

9. I'd also be opposed to any effort to force DFA to stop making investments in milk processing plants. From my perspective, those investments serve two very important purposes. First, they help guarantee the stability of the market for our milk. The fact that we own interests in processing plants adds another level of protection for us—if we've fulfilled our obligations under our full-supply agreements and we still have milk that needs a home, owning our own processing plants means we have a place for our milk when all else fails. Second, we see returns on those investments. Of course, not every investment makes money all the time, but

5

overall these investments do very well, and when times are really tough—as they were in 2009—DFA is able to pass earnings along to us to supplement our milk income, or to help us improve our own financial situations by increasing the value of our equity in DFA. But the proof is in the pudding—the fact that so many other coops also invest in processing plants shows that most farmers think this is a good thing for them. Speaking for myself and the DFA farmers I represent, I can say we'd be very unhappy if we were forced to stop making those investments.

10. Finally, I am concerned about where the money to pay for a judgment or settlement in this lawsuit would come from. If DFA has to pay damages or a settlement amount, that money is coming straight from DFA's members. DFA is owned by its farmer-members—DFA's assets are its members' assets. So whether the source of that money is an additional levy on our milk checks, or a cut of the profits from our manufacturing plants, or the proceeds of the sale of some of our assets, it's all coming out of the pockets of DFA's farmer-members, period. And I certainly don't want the same plaintiffs' lawyers who represent independents and members of other coops to claim they also represent DFA members—after all, those lawyers will get to decide whether and to what extent to seek money from DFA in any judgment or settlement, which means lawyers who supposedly represent DFA members would be deciding how much money their own DFA-member clients should have to pay in this lawsuit.

11. As someone who's been in dairy farming my whole life, and who has been a DFA member since the beginning, I very strongly believe that I and other DFA members would be seriously harmed—and our competitors in other coops would benefit—if DFA were forced to stop using full-supply agreements with bottlers and to stop making investments in bottling plants, and if DFA were forced to pay money in a judgment or settlement in this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on March 30, 2011, in Mtn. Grove, Mo

_____
Nathan Roth

7