UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

IN RE: SOUTHEASTERN MILK )
ANTITRUST LITIGATION )
) Master File No. 2:08-MD-1000
)
THIS DOCUMENT RELATES TO: ) Judge J. Ronnie Greer
*Sweetwater Valley Farm, Inc., et al. v.* )
*Dean Foods Co., et al., No. 2:07-CV 208.* )
)

**FINAL PRETRIAL ORDER**

Pursuant to individual proposed general nature of the claims of the parties submitted by the parties and the joint pleading in regard to all admissions and stipulations filed by the parties, the final pretrial order in this cause is entered as follows:

(1) *JURISDICTION*: Jurisdiction is predicated on 28 *U.S.C.* § 1331 and is not contested.

(2) *ADMISSIONS AND STIPULATIONS*:

The following facts are established by admissions in the pleadings or by stipulations of counsel at the pretrial conference:

1. Dean Foods Company ("Dean") is a holding company based in Dallas, Texas.

2. Suiza Foods Corporation acquired and merged with legacy Dean Foods Company, and continued to do business under the Dean Foods Company name.

3. Gregg Engles ("Engles") was the Chief Executive Officer and Chairman of Dean's predecessor company – Suiza Foods Corporation – from the time of its formation in 1993

until the formation of the current Dean in 2001.

4. Engles is the Chief Executive Officer and Chairman of Dean.

5. Dean, through its operating subsidiaries, purchases raw Grade A milk and then processes that milk into consumable dairy products.

6. National Dairy Holdings, LP ("NDH") was a holding company based in Dallas, Texas.

7. NDH was established on April 5, 2001 to acquire dairy processing plants, including the potential acquisition of plants that might be divested by Suiza and legacy Dean in connection with the Dean-Suiza merger.

8. NDH was initially created as a venture by and between Dairy Farmers of America, Inc. ("DFA"), and three individuals - Allen Meyer, Tracy Noll and Cletes "Tex" Beshears.

9. NDH, through its operating subsidiaries, purchased raw Grade A milk and then processed that milk into consumable dairy products.

10. DFA was formed on January 1, 1998 through the merger of four dairy cooperatives: Mid-America Dairymen, Inc.; Milk Marketing, Inc.; and Western Dairymen Cooperative, Inc.; and the southern region of Associated Milk Producers, Inc.

11. DFA has ownership interests in some joint venture processing plants that acquire raw Grade A milk and then process that milk into consumable dairy products.

12. Mid-Am-Capital LLC ("Mid-Am") is a limited liability corporation based in Kansas City, Missouri.

13. Gary Hanman ("Hanman") was President and Chief Executive Officer of DFA from January 1, 1998 to December 30, 2005.

14. Hanman entered into a consultant agreement with DFA on January 1, 2006, that had a term of three years.

15. Dairy Marketing Services, LLC. ("DMS") was established on October 1, 1999 by DFA and Dairylea Cooperative Inc.

16. The relevant product market for purposes of assessing Plaintiffs' claims is raw Grade A milk.

17. For purposes of assessing Plaintiffs' claims, the challenged activity by Defendants occurred in or affected interstate commerce.

    (4)  *<u>GENERAL NATURE OF THE CLAIMS OF THE PARTIES</u>*:

`      (*a) <u>PLAINTIFFS' CLAIMS</u>*:

This is a civil lawsuit, one or more parties, called plaintiffs, bring a lawsuit against another party or parties, called defendants, and seek monetary damages or other relief from those defendants for alleged wrongs. there are 18 plaintiffs in this case. They are dairy farmers located in the Southeast United States.

This also is a class action lawsuit, which means that the 18 plaintiff dairy farmers represent a group or entire class of approximately 7,500 current and former Southeast dairy farmers.

The defendants in this case are (1) milk processors that buy raw milk from dairy farmers and the process it into bottled milk for drinking by consumers, cheese, or other dairy products; (2) milk marketers, such as dairy cooperatives, that gather milk from many dairy farmers and market it to processors; and (3) individuals who have worked with or for one of the defendant processors or marketers.

The three defendant milk processors in this case are: Dean Foods Company, known

as "Dean," which is a corporation based in Dallas, Texas; Dairy Farmers of America, often called "DFA," which is a dairy cooperative that also owns interests in Southeast milk processing facilities; and National Dairy Holdings, referred to as "NDH," which is based in Dallas, Texas.

The three defendant milk marketers are: DFA, a milk cooperative with approximately 2,800 member dairy farms in the Southeast; Southern Marketing Agency, referred to as SMA," an association of several Southeast milk cooperatives, including DFA; and Dairy Marketing Services, referred to as "DMS," a milk marketing agent partially owned by DFA. In the Southeast, Dairy Marketing Services is managed by DFA. A related defendant is Mid-Am Capital, an entity owned by DFA which has funded some of defendants' alleged unlawful action.

The two defendant individual are: Gary Hanman, the former president and CEO of DFA; and James Baird, the general manager of SMA.

There also are several additional entities and individuals, identified as "Conspirators," who plaintiffs claim to have assisted defendants undertake the acts that plaintiffs alleged to be unlawful. These conspirators are: The Kroger Co., a company that purchases and processes raw milk; Prairie Farms Dairy, a dairy cooperative that also owns milk processing facilities; Dairy.Com, a company that performs milk marketing services for defendants and others; and seven individuals who have engaged in business dealings with defendants; Robert W. Allen, Jay Bryant, Herman Brubaker, Gregg L. Engles, Michael J. McCloskey, Allen A. Meyer, and Pete Schenkel.

Raw milk is a perishable product that must be shipped to its destination to be processed shortly after being produced. The price for raw milk produced by dairy farmers is regulated in part by the federal government's minimum prices that processors must pay for milk. Dairy farmers or cooperatives, however, can negotiate prices above the minimum price. The amount

Case 2:08-md-01000-JRG   Document 1602   Filed 07/12/11   Page 4 of 11   PageID #: 37506

by which the prices paid by processors exceed the minimum is sometimes referred to as the "over-order premium." The amount that dairy farmers actually receive from the sale of his or her milk is called the "mailbox price," which, after deductions for certain costs, such as hauling, can include some portion of the over-order premiums paid by processors.

Plaintiffs claim that defendants have violated Section 1 of the Sherman Act, which prohibits contracts, combinations and/or conspiracies to unreasonably restrain trade, and Section 2 of the Sherman Act, which prohibit conspiracies to monopolize and/or monopsonize. Plaintiffs also claim that defendants violated these laws within the geographic area known as Federal Milk Marketing Orders 5 and 7. This area, also called the "Southeast," covers all of Alabama, Arkansas, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, and parts of Florida, Indiana, Kentucky, Missouri, Virginia, and West Virginia.

While plaintiffs allege that there are many overt acts undertaken by defendants to carry out their violation of federal antitrust laws, in general, plaintiffs alleged that defendants violated these laws by unlawfully conspiring to eliminate competition for the marketing, sale and purchase of raw milk within the Southeast. Plaintiffs claim that defendants and their alleged conspirators eliminated competition by, among other ways, agreeing that Dean would exit the market for milk procurement, agreeing to stop competing with each other to market the milk of Southeast dairy farmers, entering into full-supply agreements that required Southeast farmers to market milk through, or sell milk to, defendants or their alleged conspirators in order to access Southeast processing plants, and entering into "outsourcing agreements" that converted previously "independent" dairy farmers into DFA-controlled farmers, without the authorization of those independent farmers.

5

Case 2:08-md-01000-JRG   Document 1602   Filed 07/12/11   Page 5 of 11   PageID #: 37507

Plaintiffs also claim that defendants have violated the antitrust laws by unlawfully conspiring to fix and suppress prices paid to Southeast dairy farmers. Plaintiffs claim that defendants and their conspirators unlawfully fixed prices by agreeing on the amount of over-order premiums that would be charged to competing Southeast processors, and that defendants and their conspirators further suppressed prices by unlawfully "flooding" the Southeast through excessive importation and diversion of milk produced in other areas of the United States.

Plaintiffs further claim that defendants have violated federal antitrust laws by conspiring to dominate the marketing and sales of milk to Southeast processors, referred to as "monopolization," by conspiring to dominate the purchase of milk from Southeast farmers, referred to as "monopsonization." Plaintiffs claim that defendants and their co-conspirators control about 90% of the milk marketed in the Southeast, defendants and their co-conspirators control about 88% of the milk processed in the Southeast, and that defendants obtained and maintain their control of Southeast milk marketing and processing through the unlawful acts described above, as well as other acts.

Plaintiffs claim that defendants' violation of antitrust laws has resulted in Southeast farmers receiving prices for their milk that are lower than they would have been in a competitive market. This lawsuit seeks monetary damages to recover the difference between the prices received by Southeast farmers and the prices they would have received but for the alleged illegal conduct by defendants.

### *(B) DEFENDANTS' CLAIMS:*

Defendants deny that they conspired to reduce the prices dairy farmers received for their milk. The dairy farmers in Orders 5 and 7 are among the highest paid in the nation, and the
6

prices they have received for their milk have generally increased during the time period at issue. Defendants DFA, DMS and SMA also have made efforts to obtain higher prices for milk in Orders 5 and 7 and surrounding areas. If the prices paid to farmers in Orders 5 and 7 are not as high as Plaintiffs would like them to be, the evidence shows that those prices are the result of normal supply and demand factors, not an elaborate antitrust conspiracy.

By way of background, Defendants in this case may be grouped into two general categories. The first category contains marketing cooperatives or marketing agencies that market the milk of dairy farmers. The companies and people in this category are Dairy Farmers of America (called "DFA"), Dairy Marketing Services (called "DMS"), Southern Marketing Agency (called "SMA"), James Baird, Gary Hanman, and Mid-Am Capital.

- DFA is a non-profit dairy farmer cooperative. All of DFA's members are dairy farmers. The cooperative is owned by its dairy farmer members and controlled by a Board of Directors that is comprised entirely of dairy farmers. DFA provides services for its members; the most important service is that DFA markets the raw milk produced by its dairy farmer members and distributes the net proceeds to those farmers. In other words, DFA ensures that the raw milk from each of its members' farms is picked up on schedule, tested to make sure it passes all the quality tests, and hauled to a processing plant, and then DFA makes sure that its members get paid for their milk. DFA also markets milk on behalf of some nonmembers. When it markets milk, DFA does not purchase and resell the milk—it acts as the agent for the dairy farmers. Over the years, DFA also has made investments in some processing plants.

- DMS is a common marketing agency that markets raw milk on behalf of independent dairy farmers. DMS also performs other milk marketing services for some milk

7

processors under contracts called outsourcing agreements.

• SMA is a non-profit common marketing agency that is made up of seven dairy farmer-owned cooperatives. SMA was formed in 2002 in order to make milk marketing in the Southeastern United States more efficient; in other words, to help reduce the costs of marketing milk so that dairy farmers could receive higher prices for their milk. SMA assists in marketing raw milk on behalf of these seven members. The dairy cooperative members of SMA are Lone Star Milk Producers, Inc., Maryland & Virginia Milk Producers Cooperative Association, Inc., DFA, Arkansas Dairy Cooperative Association, Inc., Dairymen's Marketing Cooperative, Inc., Premiere Milk, Inc., and Lanco Pennland Quality Milk Producers Cooperative, Inc. SMA is managed by a dairy farmer Board of Directors that is comprised of dairy farmer representatives from each of SMA's dairy cooperative members and whose sole purpose is to ensure that all revenues (after the deduction of reasonable marketing costs) are paid back to the dairy farmer cooperative members each month. Although SMA collectively markets milk for its dairy farmer cooperative members, SMA has nothing to do with the setting of over order prices charged to dairy processors—an entirely separate and distinct dairy marketing organization, Dairy Cooperative Marketing Agency, Inc., performs that function. Additionally, SMA does not set or calculate the mailbox prices paid to dairy farmers by each of SMA's dairy cooperative members—that function is held exclusively and independently by each of SMA's dairy cooperative members.

• James Baird is the president of Lone Star Milk Producers, a dairy cooperative based in Texas. In April 2006, Mr. Baird was elected by SMA's dairy farmer Board of Directors as the interim General Manager for SMA until the dairy farmers could hire a private management company.

8

• Gary Hanman was the president and chief executive officer of DFA from DFA's formation in 1998 until he retired in 2005.

• Mid-Am Capital is a corporation that used to facilitate DFA's financing with affiliates, but it has been inactive for several years.

The second category of defendants is dairy processors. They are companies that purchase raw milk from dairy farmers and process it into dairy products for consumers, such as milk, yogurt, ice cream, and cheese. These defendants are Dean Foods Company (called "Dean") and National Dairy Holdings (called "NDH").

• Dean is a holding company whose operating subsidiaries purchase raw milk from dairy farmers and dairy cooperatives and process that raw milk into dairy products for consumer use.

• NDH was a holding company that owned processing plants. Through its operating subsidiaries, it purchased raw milk from dairy farmers and processed it into dairy products for consumer use. NDH was bought by another company in May 2009, and NDH no longer exists.

Plaintiffs' claims require Plaintiffs to prove that the alleged conspiracy to suppress farmers' pay prices harmed competition in a certain geographic area called a "relevant market." The relevant geographic market is the area of "effective competition," which must "correspond to the commercial realities of the industry." If Plaintiffs fail to define the correct relevant market, then there is no way to measure whether Defendants' conduct harmed competition, and Plaintiffs' claims must fail. Here, Plaintiffs argue that the relevant market is defined by the geographic boundaries of Orders 5 and 7. Defendants argue that the evidence shows otherwise, and that the relevant market is actually much larger than Orders 5 and 7. Plaintiffs' claims fail for additional reasons as well. Plaintiffs must prove their case through either direct or circumstantial evidence. Plaintiffs have no

direct evidence that Defendants conspired to reduce pay prices to dairy farmers in Orders 5 and 7. Nor do they have circumstantial evidence to prove their case. Plaintiffs have not shown that there was any suppression in the prices paid by processors for raw milk. The evidence shows that the prices paid by dairy processors for raw milk have in fact increased during the time period at issue. Without a decrease in price, Plaintiffs cannot explain why processors, such as Dean and NDH, would be motivated to participate in the alleged conspiracy. Plaintiffs also cannot explain why the entities and persons who market milk—DFA, SMA, Baird, Hanman, and DMS—would participate in a conspiracy that would harm their own members.

Defendants state there was no conspiracy to harm dairy farmers in Orders 5 and 7. The conduct about which Plaintiffs complain—from supply agreements between cooperatives and processors, to cooperatives' acquisition of raw milk to fulfill those supply agreements, to the decision by certain cooperatives to invest in processing plants, and more—were sound business decisions made by dairy farmer cooperatives and processors competing in a difficult marketplace. They used business strategies that have been used for decades by cooperatives and processors that are not accused of any wrongdoing. The Defendants' actions were legitimate business conduct and each of the Defendants, by taking the actions it did, was exercising its own business judgment about what was best for the dairy farmers it served, including the dairy farmers in Orders 5 and 7 and the surrounding areas (in the case of DFA, SMA, DMS, Baird, or Hanman) or its shareholders (in the case of Dean or NDH).

(5) *CONTESTED ISSUES OF FACT*:

The contested issues of fact remaining for decision are:

1. What is the relevant geographic market?

2. Did the defendants violate Section 1 of the Sherman Act, which prohibits contracts, combinations and/or conspiracies to unreasonably restrain trade?

3. Did the defendants violate Section 2 of the Sherman Act which prohibits conspiracies to monopsonize?

4. If so, what are the amount of damages that the plaintiffs are entitled to recover?

(6) *CONTESTED ISSUES OF LAW*:  None.

(7) *OTHER TRIAL INFORMATION AND OTHER MATTERS*:

a. This pretrial order shall supplant the pleadings and be binding on all parties at trial. A copy of this order will not be furnished to the jury. The parties will have up to an including July 22, 2011, to file any objection to this order.

b. The estimated length of trial is 6 to 7 weeks.

c. The possibility of settlement prior to trial is poor.

ENTER:

s/J. RONNIE GREER<br>UNITED STATES DISTRICT JUDGE