**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: SOUTHEASTERN MILK | ) | |
| ANTITRUST LITIGATION | ) | |
| | ) | **Master File No. 2:08-MD-1000** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | **Judge J. Ronnie Greer** |
| *Food Lion, LLC., et al. v. Dean Foods*, | ) | **Magistrate Judge Dennis H.** |
| *et al., No. 2:07-CV 188* | ) | **Inman** |

<u>**MEMORANDUM OPINION**</u>

This matter is before the Court on the retailer plaintiffs' objection to the December 8, 2010

order of the Magistrate Judge, [Doc. 1191], granting in part defendants' motion to exclude the

testimony of plaintiffs' expert Professor Luke Froeb, [Doc. 1206]. The defendants have responded

to the objection, [Doc. 1229], and plaintiffs have filed a reply, [Doc. 1249] [1]. For the reasons which

follow, the objection of the plaintiffs is overruled and the Magistrate Judge's order, [Doc. 1191], is

AFFIRMED and ADOPTED by this Court and made the order of the Court.

**I. Plaintiffs' Objection to December 8, 2010 Order**

Professor Luke Froeb ("Professor Froeb") is an associate professor of entrepreneurship and

free enterprise at Vanderbilt University. Prior to his work at Vanderbilt, he was director of the

Bureau of Economics at the Federal Trade Commission and an economist with the Antitrust Division

of the Department of Justice. Professor Froeb was retained as an expert witness by plaintiffs to offer

opinions on the relevant geographic and product markets and defendants' market power. The

---

[1] Defendants' underlying *Daubert* motion to exclude the testimony of Professor Froeb and the supporting memorandum are Docs. 1088 and 1089; plaintiffs' response is Doc. 1159; and defendants' reply is Doc. 1172.

defendants moved to exclude Professor Froeb's testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharm.*, 509 U.S. 579 (1993).

Relying on the undersigned's prior decision concerning Professor Froeb's opinions in the context of the motion of all defendants for summary judgment, [Doc. 461], as the law of the case, the Magistrate Judge granted defendants' motion as to Professor Froeb's opinion as to the relevant geographic markets and market power and denied the motion as to his opinion on the relevant product market, [Doc. 1191]. Plaintiffs now object to that order, arguing that it "suffers from clear errors of both procedure and substance." Plaintiffs seek, alternatively, to have the matter resubmitted to the Magistrate Judge for a *de novo* ruling[2] or for the Court to reconsider the merits of the *Daubert* motion itself.

Although plaintiffs have not sought reconsideration of the Court's summary judgment order[3], they do argue that the Court's finding with respect to Professor Froeb's testimony is "clear error." Specifically, plaintiffs contest the Court's finding that Professor Froeb's testimony that he used the same methodology that he would have instructed his staff to employ at the FTC or DOJ does not establish "that such methodology is legally acceptable based on existing precedent." They reason that since DOJ and FTC jointly developed the "Horizontal Merger Guidelines," which Professor Froeb purported to use, he therefore used the very "methodology mandated by the Supreme Court precedent." Plaintiffs also criticize the Court for making findings regarding Professor Froeb "without full briefing on the *Daubert* issues that defendants' attack raise."

Rule 72(a) requires the district judge to "consider timely objections and modify or set aside

---

[2] This case is no longer assigned to a Magistrate Judge.

[3] In fact, plaintiffs have advised the Court that they do not intend to seek such reconsideration.

any part of the order [of a magistrate judge] that is contrary to law or clearly erroneous." Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(d)(1)(A). Plaintiffs' procedural approach to this matter is puzzling. In reality, it is the prior ruling of this district judge which they challenge, not that of the magistrate judge. The magistrate judge did not opine as to the correctness of the district judge's finding; he simply held, and correctly so, that the ruling [4], right or wrong, was the law of the case and that he could not reconsider the ruling. As the plaintiffs properly acknowledge, the "Magistrate Judge did not conduct any independent analysis of Professor Froeb's opinions."

Plaintiffs claim that the undersigned's August 14, 2010 memorandum opinion and order "contains four clear errors of law, stemming from [a] flawed procedure and exacerbated by defendants' misrepresentations." Those four claimed errors are: (1) the district judge in reality ruled on a *Daubert* motion "without proper notice and inadequate record;" (2) Professor Froeb did consider the necessary "commercial realities" and never admitted he did not do so, contrary to the Court's finding; (3) Professor Froeb did not consider only a "single customer" but properly applied the smallest market principle to all milk purchasers, contrary to the Court's finding; and (4) that

---

[4] The Magistrate Judge's order, in sum, merely held that this Court's prior ruling in connection with defendants' motion for summary judgment that Professor Froeb's methodology did not comply with applicable Supreme Court standards and was thus inadmissible was the law of the case. In that, the Magistrate Judge was correct and plaintiffs do not explicitly challenge that holding. They merely argue that the Magistrate Judge's conclusion was procedurally flawed because the Court did not rule "on whether Professor Froeb's proposed testimony on geographic market complies with the applicable *Daubert* standard, with the benefit of full briefing on a complete record." It is not clear that plaintiffs can properly challenge the undersigned district judge's ruling through the mechanism of an objection to the order of the Magistrate Judge. In essence, plaintiffs complain that the Magistrate Judge did not make independent findings regarding the merits of this Court's prior opinions, which they now assert were based on findings that were clearly erroneous. That is confirmed by plaintiffs' argument that the Magistrate Judge's order "was contrary to law because it accepted as the 'law of the case' an opinion that was not based on a complete record and was issued after the Court rejected retailer plaintiffs' request to await full *Daubert* proceedings. [Doc. 1206 at 13]. Nevertheless, retailer plaintiffs "advise the Court that they do not intend to seek reconsideration of the Court's dismissal of Counts II-IV of the complaint."

3

Professor Froeb performed his analysis in the same way he would have done it at the DOJ or FDC demonstrates that he applied the correct Sixth Circuit and Supreme Court methodology.

With respect to plaintiffs' objections to the magistrate judge's order, the Court will discuss only the first of these claimed errors in this section, as the others go, not to the merits of the objections, but to the merits of the *Daubert* motion itself which will be discussed below. Plaintiffs rely on *Jahn v. Equine Services*, 233 F.3d 382, 387 (6th Cir. 2000) to support their argument that the Court made its rulings with regard to Professor Froeb's testimony "without proper notice and inadequate record." In *Jahn*, a veterinary malpractice case involving the death of a champion Hackney pony, all defendants moved for summary judgment after completion of discovery. The motions turned on causation and the district court, *sua sponte* and without allowing additional briefing, held that the testimony of Jahn's expert veterinarian witness was inadmissible under *Daubert*. Without the testimony, Jahn could not prove causation and summary judgment was granted. Although the Sixth Circuit found substantive reasons for reversing the district court, it also found "that the record was insufficient in order to make a proper *Daubert* determination." *Id.* at 393. "A district court should not make a *Daubert* ruling prematurely, but should only do so when the record is complete enough to measure the proffered testimony against the proper standards of liability and relevance." *Id.*

As pointed out in *Jahn*, "[t]he district court is not obligated to hold a *Daubert* hearing," *id.* (quoting *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000)), when the record is "adequate to the task."[5] *Id.* The *Jahn* opinion does not specifically address the question of what must be in

---

[5] Although plaintiffs now request a hearing, they cannot make any serious argument that the record is not adequate for the Court to now decide admissibility without a hearing, were it to choose to do so.

4

the record for the record to be adequate; however, the expert reports, pathologist reports, and depositions of most of those involved, including the expert's depositions, were deemed insufficient in that case. *Id.* at 393. Usually, the record upon which the trial court will make an admissibility decision without a hearing will consist of the expert reports, affidavits, depositions, briefs of the parties, and the like.

Plaintiffs argue that as of August 4, 2010, the date of the Court's order on the motion for summary judgment, "[t]his case was in about exactly the same procedural posture as *Jahn*." They claim that the issue related to Professor Froeb's methodology was raised for the first time in a supplemental pleading filed by defendants and that their ability to respond was limited. They specifically argue that the Court based its opinion "on an incomplete reading of Professor Froeb's deposition testimony, which retailer plaintiffs were able to complete by filing a supplemental declaration by Professor Froeb (as well as by explaining precisely how Professor Froeb had conducted his analysis)." Plaintiffs cite several other materials, now in the complete *Daubert* record, which were not in the original record prior to August 4, 2010, [*see* Doc. 1206, pp. 14-15].

Defendants, on the other hand, assert that "the only difference between the record [prior to August 4, 2010] and now" is Professor Froeb's "eleventh-hour declaration" which they characterize as Professor Froeb's attempt to say "what he really meant" by his deposition responses. They argue, with relation to this declaration, that "Professor Froeb's say-so that he applied the [horizontal merger] guidelines does not make it so." As an exhibit to their opposition to plaintiffs' objection to the magistrate judge's order, defendants have prepared a "pertinent procedural time line" to illustrate their argument, [*see* Doc. 1229, Ex. D].

Although the Court will consider defendants' *Daubert* motion anew (see discussion below),

it does so only out of an abundance of caution in light of plaintiffs' claims that the Court "jumped the gun" and decided the issue related to Professor Froeb prematurely, and, the Court does so alternatively. On the first issue raised by plaintiffs, the only one which goes to the merits of their objection to the Magistrate Judge's order, however, the Court largely agrees with the defendants. As to the issues related to Professor Froeb's opinions decided by the Court in its summary judgment order, the record was complete and the items referred to by plaintiffs add little or nothing to the Court's analysis, except for the supplemental declaration of Professor Froeb himself. With respect to the procedural objections made by plaintiffs that they informed the Court that the matters were not ripe for resolution and that their response was somehow limited (presumably by the Court), that is simply not the case.

During a hearing on July 1, 2009, the Court specifically inquired of plaintiffs' counsel whether plaintiffs could respond to an anticipated motion for summary judgment. Counsel responded that he thought they could. Then, on November 5, 2009, plaintiffs "advised the Court that they did not believe that the record was complete and that they needed Professor Froeb's report to oppose defendants' motion for summary judgment." [6] Thereafter, the Court did not immediately rule on the motion for summary judgment but withheld ruling until August, 2010, nine months later, and then only after allowing the plaintiffs oral argument on the motion for summary judgment, permitting the filing of numerous replies and supplemental briefs and holding the matter in abeyance until after the close of all discovery of fact witnesses, the filing of expert reports, expert depositions and supplementation of the record with Professor Froeb's full report. In this Court's view, any

---

[6] Plaintiffs' response to the motion for summary judgment, [Doc. 538], was filed on November 5, 2009. Attached to the response was the Rule 56(e) affidavit of counsel. Document 538 was subsequently stricken from the record by the Magistrate Judge and refiled as Document 669 on January 22, 2010.

suggestion by plaintiffs that the Court ruled on an incomplete record or denied them adequate time to fully respond is disingenuous and self-serving. Likewise, their claim that the Court limited them to a five-page brief is also disingenuous. Plaintiffs never, at any time prior to the instant objection, asked the Court to permit further briefing or to extend the number of pages allowed.

Finally, plaintiffs' suggestion that the Court based its opinions on "an incomplete reading of Professor Froeb's deposition testimony," which they were able to cure through the filing of his supplemental declaration, is also somewhat hypocritical. First, they do not even suggest that Professor Froeb's declaration was unavailable prior to its filing on November 15, 2010, or that it could not have been filed when defendants first raised the issue of the methodology used by Professor Froeb, citing his deposition testimony and before the Court's ruling on the summary judgment motion on August 4, 2010.

Plaintiffs could have easily have filed the affidavit of Professor Froeb long before the Court's August 4, 2010 decision on the motion for summary judgment. Professor Froeb was deposed on April 26, 2010, and plaintiffs served defendants with Professor Froeb's errata sheet on June 7, 2010.[7] And, had plaintiffs done so, the Court could have considered it in connection with its consideration of the motion, despite defendants' suggestion that the supplemental motion is simply an effort by Professor Froeb and plaintiffs to "get a mulligan."

Although "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the

---

[7] It is not suggested by plaintiffs that Professor Froeb noted any of his November 14 "clarifications" on the errata sheet.

contradiction or attempting to resolve the disparity," *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999), that rule does not extend to a non-party witness. *See Hanson v. City of Fairview Park*, 349 Fed. App'x 70, 2009 WL 3351751 (C.A. 6 (Ohio)). Even if the rule applied, Professor Froeb's supplemental declaration does not flatly contradict his earlier deposition testimony but merely attempts to clarify or explain it. [8]

## II.  The *Daubert* Motion

Professor Froeb was retained by plaintiffs for the purpose of rendering an expert opinion on the relevant product and geographic markets for purposes of this litigation. His opinion as to the relevant product market is not at issue; the motion challenges his opinions as to the definition of the relevant geographic market. For purposes of plaintiffs' conspiracy claim, Professor Froeb defines

---

[8]  As noted elsewhere, plaintiffs have not asked the Court to reconsider its prior summary judgment ruling and the dismissal of certain counts of the complaint because of plaintiffs' inability to establish the relevant market. If plaintiffs had asked for reconsideration, the Court would be well justified in refusing to consider Professor Froeb's supplemental declaration. *See Sommer v. Davis*, 317 F.3d 686 (6th Cir. 2003) (holding that a district court's refusal to consider evidence produced for the first time on a motion to reconsider will not be reversed absent an abuse of discretion).

Secondly, and more fundamentally, however, plaintiffs attempt to explain Professor Froeb's deposition testimony through a supplemental declaration is misplaced. Professor Froeb's deposition testimony is what it is. While there might arise a situation where it would be necessary and appropriate for a witness to explain or clarify deposition testimony, this is not such a case. This is not a situation where Professor Froeb misspoke or gave an incomplete response. This is a situation where he attempts, through his supplemental declaration, to "clarify," unambiguous testimony about the methodology he used, *e.g.*, an effort to explain "what he really meant" by his answer, as defendants argue. The supplemental declaration adds nothing of substance to the Court's inquiry. Indeed, the practice of allowing witnesses to endlessly explain or clarify their prior testimony, depending on how it was interpreted, would undermine the utility of the summary judgment procedure and needlessly prolong litigation.

As set forth above, the plaintiffs' procedural objection to the Magistrate Judge's order based on *Jahn* is not well taken and thus the Magistrate Judge's holding that the Court's prior ruling with respect to Professor Froeb's opinion is the law of the case must be affirmed. For the reasons already mentioned, and because exclusion of Professor Froeb's opinion may result in a grant of summary judgment on Count V and on plaintiffs' rule of reason claim in Count I, the Court will, alternatively, although it is not necessary to do so, revisit the question of the admissibility of Professor Froeb's testimony.

8

the relevant geographic market as Federal Milk Market Orders 5 and 7. Federal Order 5 includes

North Carolina, South Carolina and parts of Georgia, Indiana, Kentucky, Tennessee, Virginia and

West Virginia. Federal Order 7 includes Alabama, Arkansas, Louisiana, Mississippi, the rest of

Georgia and Tennessee, and parts of Florida, Kentucky and Missouri. For purposes of plaintiffs'

monopolization claims, Professor Froeb defines the relevant geographic market as North Carolina,

South Carolina, Virginia, Georgia and Eastern Tennessee.

In general, defendants argue that Professor Froeb's market opinions are based on the use of

a theoretical model inconsistent with the applicable legal standards and based on assumptions, not

real world facts. More specifically, defendants claim that Professor Froeb's opinions are based on

a theoretical model constructed for the purpose of his analysis in this case, a model he characterizes

as an application of the "hypothetical monopolist" or "SNNIP" test utilized by the DOJ/FTC as set

forth in their Horizontal Merger Guidelines.

Plaintiffs respond that Professor Froeb applied the SNNIP test, a valid and accepted

methodology, and that the test, "by its very definition," complies with Supreme Court dictates on

definition of the relevant market, as well as relevant Sixth Circuit analysis. They further argue that

Professor Froeb captured "appropriate 'market realities,'" such as transportation costs, locations of

milk plants within Orders 5 and 7 and actual consumer locations. Plaintiffs accuse defendants of

a "purposeful misconstruction" of Professor Froeb's deposition testimony on these subjects.

1. **The *Daubert* Standard**

The starting point for determining the admissibility of expert testimony in federal courts is

Federal Rule of Evidence 702. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to determine a

fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702

This Rule reflects the standards enunciated in the Supreme Court's decisions in *Daubert v. Merrill Dow Pharm.*, Inc., 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Fed. R. Evid. 702 advisory cmte. notes, 2000 Amend. ("In *Daubert* the court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testing based in science."). Under the Rule, a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education." Second, the testimony must be relevant and "assist the trier of fact to understand the evidence or to determine a fact in issue." Third, the testimony must be reliable. Fed. R. Evid. 702.

Rule 702 requires an expert witness to base his opinions upon "sufficient facts and data," rely on "reliable principles and methods," and apply "the principles and methods reliably to the facts of the case." *Id.*; see also Fed. R. Evid. 702 advisory cmte. notes, 2000 Amend. ("[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.") (internal quotation marks omitted). But, "rejection of expert testimony is the exception, rather than the rule." *Id.*

Generally, if an expert's opinion amounts to "mere guess or speculation," it should be excluded. *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993). Even though "shaky," however, opinions based on facts in the record are admissible and challenges merely go

to the accuracy of the conclusions rather than the reliability of the testimony. *Jahn*, 233 F.3d at 390-93. "An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quoting *Cooke*, 991 F.2d 342) (internal citations omitted).

The gatekeeper inquiry under Rule 702 and *Daubert* is a flexible determination, allowing the district court to exercise discretion. *Kumho Tire*, 526 U.S. at 157-58. *Daubert* provides a non-exclusive checklist for trial courts in evaluating the reliability of expert testimony that must be tailored to the facts of a particular case. *Id.* at 150 (citing *Daubert*, 309 U.S. at 593). Those factors include: testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community. *Daubert*, 509 U.S. 593-94. The *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony." *Gross v. Comm'r.*, 272 F.3d 333, 339 (6th Cir. 2001).

## 2. Analysis and Discussion

The relevant antitrust geographic market has been defined by the United States Supreme Court as "the region in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). The relevant geographic market must both "correspond to the commercial realities of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962); *Tampa Elec.*, 365 U.S. at 327.

11

To facilitate the analysis in the context of horizontal acquisitions and mergers, the Department of Justice and Federal Trade Commission established the Horizontal Merger Guidelines ("Merger Guidelines") which describe the "analytical framework and specific standards normally used" by them in analyzing mergers. Merger Guidelines, § 0. The Merger Guidelines define the geographic market as "a region such that a hypothetical monopolist that was the only present or future producer of the relevant product at locations in that region would profitably impose at least a 'small but significant and non-transitory' ["SNNIP"] increase in price, holding constant the terms of sale for all products produced elsewhere." Merger Guidelines, § 1.21. If buyers would respond to the SNNIP by shifting to products produced outside the proposed geographic market, and this shift were sufficient to render the SNNIP unprofitable, then the proposed geographic market would be too narrow. *Id.*

The Sixth Circuit has acknowledged that the use of the SNNIP test "has been recognized in antitrust case law." *Kentucky Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908 (6th Cir. 2009) (citing *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) (recognizing the SNNIP test as a ***valid diagnostic tool***) (emphasis added)). So far as this Court can tell, however, neither the United States Supreme Court nor the Sixth Circuit have specifically equated the SNIPP test, or any variation of it, with the standard enunciated in *Tampa Electric*. More specifically, the Sixth Circuit has not, as claimed by plaintiffs, held that "[t]he SNIPP test applied by Professor Froeb is the law of this circuit." [Doc. 1159 at 2]. The parties in this case do, however, acknowledge that the SNIPP test is an accepted method of analyzing the geographic market in this antitrust case. The real question for the Court then is whether the methodology employed by Professor Froeb, by whatever

12

name it is labeled, complies with the standard enunciated by the Supreme Court.[9]

Perhaps the best indication of the methodology used by Professor Froeb in formulating his opinions as to the relevant geographic market is his own description of the methodology. He has provided four declarations in the case and has been deposed extensively. His declarations are dated November 5, 2009 (offered in support of plaintiffs' response to defendants' motion for summary judgment), March 5, 2010 (his expert report), June 28, 2010 (his rebuttal report) and November 14, 2010 (clarifying his deposition testimony). Professor Froeb was deposed on April 26, 2010.

In the first declaration, Professor Froeb declares that he has "begun the process of constructing an economic model of competition among bottling plants and the effects of that competition on processed milk customers." [¶ 4]. He quotes the definition of an antitrust market from the Merger Guidelines and opines that the "hypothetical monopolist test is an appropriate paradigm to delineate a relevant market." [¶ 8]. Professor Froeb claims that defendants' "use of shipment data to critique Plaintiffs' proposed market is a well known fallacy for market delineation." [¶ 10]. He further opines that "[m]arket delineation is a fact intensive inquiry." [¶ 14].

In the second declaration, Professor Froeb sets out his conclusions as to the relevant markets and states that he "appl[ies] the methodology of the U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines to identify a group of products, and the area in which they are produced or consumed, over which market power could be exercised." [¶ 8]; *see* also ¶ 30 (. . . "I use the hypothetical monopolist paradigm to delineate a relevant market."). He states his opinions and conclusions about the relevant product market and the relevant geographic markets for

---

[9]  Professor Froeb acknowledged in his deposition that he was "not aware of any specific court decisions" that have allowed the use of the model used by him in this case in a non-merger antitrust case. Likewise, plaintiffs have cited no case where Professor Froeb's theoretical model has been specifically approved for use in determining the relevant market.

13

the conspiracy and monopolization claims and Dean's market power as follows:

10. My conclusions regarding market definition are the following: First, I conclude that fresh white fluid milk is a relevant product market. I base this conclusion on the unique properties of milk and the inelastic demand for the product. Inelastic demand means that following a price increase, few consumers would substitute to other products outside the product market. The less elastic is demand, the more a hypothetical monopolist, who eliminates competition among the products in the relevant market, would increase price.

11. Second, following the principle that market delineation should inform the theory of the case, I conclude that there are two relevant geographic markets related to two of Plaintiffs' claims. For the claim that defendant Dean Food Company ("Dean") monopolized the market for fresh fluid white milk, I conclude that the relevant geographic market consists of North Carolina, South Carolina, Virginia, Georgia, and the eastern part of Tennessee. For the claim that all defendants conspired to raise price to retail customers, I conclude that the combined region of Federal Orders Nos. 5 and 7 is a relevant geographic market.

12. I conclude that the scope of the relevant geographic market differs for each of the two claims because the goal of market definition is to inform the theory of the case. A claim of monopolization should consider the region where milk is sold by the Defendants and bought by the Plaintiffs. The region should be large enough to allow a hypothetical monopolist over all plants in the region profitably to increase price by a significant amount. Based on my analysis, I conclude that a hypothetical monopolist over all the plants in North Carolina, South Carolina, Virginia, Georgia, and the eastern part of Tennessee would find it profitable to raise price by about 10 percent relative to an industry of independently owned plants. A claim of coordinated action, on the other hand, should begin with a candidate market that includes representative plants owned by the firms in question. Based on my analysis, I conclude that a hypothetical monopolist controlling all the plants in Orders 5 and 7 would find it profitable to raise price by about 15 percent relative to an industry of independently owned plants. This implies that the milk processing plants in Orders 5 and 7 constitute a relevant geographic market for the purposes of evaluating a conspiracy claim.

13. For the monopolization claim, I also asked whether

Dean has the ability to exercise market power over the consumers in the relevant market. I conclude that Dean's control over a significant number of plants would allow it to raise price by about nine percent in North Carolina, South Carolina, Virginia, Georgia and the eastern part of Tennessee. Therefore, Dean has the ability to monopolize the relevant market.

[March 5, 2010 Declaration, ¶¶¶¶ 10, 11, 12, 13]. He further states that his conclusions "are based on an economic model that relies on estimates of the demand elasticity for milk and the economic cost of transporting milk from producers to consumers." These estimates are a range which, according to Professor Froeb, "reflects a reasonable range of assumptions regarding how customers respond to price changes and a reasonable range of measures of the cost of transporting bottled milk." [¶ 15].

Professor Froeb further states that he constructed an economic model of competition between milk producers and "ask[s] whether a hypothetical monopolist of the plants in a candidate market would find it profitable to raise price by a small but significant amount (e.g. five percent). If not, then the geographic area is not a relevant antitrust market, and must be increased by adding the next-closest plants and then re-tested." [¶ 33]. Professor Froeb's report gives considerable detail about the methods by which he reached his conclusions and describes how he performed his hypothetical monopolist test. "To perform the hypothetical monopolist test, it is first necessary to characterize competition among milk processors in this industry, and then to determine how a hypothetical monopolist would eliminate competition among commonly-owned milk processors." [¶ 52]. Professor Froeb developed an economic model which he used "to predict how much a hypothetical monopolist would raise price." [¶ 63]. Professor Froeb's conclusions are all couched in terms of the hypothetical monopolist. He "conclude[s] that a hypothetical monopolist of all milk-bottling plants in Federal Orders Nos. 5 and 7 would find it profitable to impose a price increase of at least five

15

percent." [¶ 78]. As a result, he concludes that Orders 5 and 7 "is an area over which market power could be exercised" for the purpose of Plaintiffs' concerted action claim. [¶ 85].

With respect to plaintiffs' monopolization claim, Professor Froeb states that he follows the "methodology of the *Horizontal Merger Guidelines*," begins with a relatively small geographic candidate market, and concludes that a hypothetical monopolist over the entire state of Georgia, or North Carolina or Virginia "controls too small an area to render a significant price increase profitable." [¶ 86]. Based on an analysis "motivated by including regions where Dean and Food Lion engage in the sale and purchase of milk," Professor Froeb concludes "a relevant antitrust market consists of North Carolina, South Carolina, Virginia, Georgia and the eastern part of Tennessee." [¶¶ 87, 88]. He further concludes "that a hypothetical monopolist over the relevant market could profitably raise price approximately 10 percent." [¶ 89].

So far, so good for plaintiffs at least as to how Professor Froeb characterizes his own work in the declarations. That, however, is where the puzzle becomes more challenging. Defendants deposed Professor Froeb on April 26, 2010. His deposition testimony is problematic. Professor Froeb was asked twice during the deposition whether his market analysis considered "the area in which the seller operates and to which the purchaser can practicably turn for supplies," *i.e.* the *Tampa Electric* standard. The relevant testimony is as follows:

> Q.     Would you agree that a relevant geographic market is the area in which the seller operates and to which the purchaser can practically turn for supplies?
>
> MR. STENERSON:   Object to the form.
>
> THE WITNESS:      That's a different– that's not how I would put it. I clearly lay out the principles of market delineation in my– in my report. And based on those principles, that led me to the relevant geographic

16

market that– and that I'm looking at. I'm looking at an area over which a hypothetical monopolist has the potential to eliminate competition and to raise price. That's how I delineated the relevant market.

MS. FEENEY:

Q.    Do you disagree with that statement I just made, that a relevant geographic market is the area in which the seller operates and to which the purchaser can practically turn for supplies?

MR. STENERSON:    Object to the form.

THE WITNESS:    For the purposes of informing the theory of the case, I don't think that characterizes well what I've done here, or my conclusions here. And I've taken a different approach.

[Doc. _____, Ex. 2, p. 48 ll. 16-24–p. 49, ll 1-16].

Plaintiffs and defendants offer widely different interpretations of this testimony. One thing is clear, however; it is the *Tampa Electric* standard enunciated by the Supreme Court which controls this Court's evaluation of the admissibility of Professor Froeb's testimony. Unless and until the *Tampa Electric* standard is repudiated or modified by the Supreme Court, this Court is bound to apply it, and, although the parties agree that the SNNIP test mirrors the *Tampa Electric* standard,[10] neither the Supreme Court nor the Sixth Circuit has explicitly said so,[11] plaintiffs' reading of the *Kentucky Speedway* opinion notwithstanding. The Court accepts, however, for the purposes of

---

[10]  Plaintiffs refer to the SNNIP test and *Tampa Electric* as "one and the same." Defendants agreed at oral argument on their *Daubert* motion that the SNNIP test is the proper test, but argue that it was not properly applied by Professor Froeb.

[11]  Some courts have in fact recognized that the Merger Guidelines are not binding on the courts. *See Chicago Bridge & Iron Co. v. F.T.C.*, 534 F.3d 410, 432 FN11 (2008) ("Merger Guidelines are often used as persuasive authority when deciding if a particular acquisition violates anti-trust laws.") (citing *United States v. Kinder*, 64 F.3d 757, 771 (2d Cir. 1995)). *See also Chicago Bridge*, 534 F.3d at 434, FN13 and cases collected therein.

deciding this *Daubert* motion, that proper application of the SSNIP test meets the necessary standard.

The relevant question, therefore, is whether Professor Froeb defines the relevant geographic market as "the area in which the seller operates, and to which the purchaser can practicably turn for supplies." [12] If the analysis done by Professor Froeb applies that standard, whether referred to as "SNIPP," "hypothetical monopolist," or some variation of that, then it is admissible. Otherwise, it is not. Defendants accuse Professor Froeb of giving lip-service to the Merger Guidelines, which, according to plaintiffs, are synonymous with the Supreme Court standard, but in reality using a theoretical model (*i.e.* his own version of the SNIPP test) constructed solely for the purpose of this litigation.

On the basis of Professor Froeb's sworn deposition testimony, this Court has to agree with defendants. When asked if he applied the appropriate standard his answer was quite clear. Asked about whether he delineated the relevant geographic market using the standard enunciated by the Supreme Court, using language which tracks the Court's language precisely, Professor Froeb responded that that description was "not how [he] would put it" but rather that he considered the "area over which a hypothetical monopolist has the potential to eliminate competition and to raise prices." When asked the second time, he was even clearer. "I don't think [the *Tampa Electric* standard] . . . characterizes well what I've done here, or my conclusions here . . . . I've taken a different approach." Taking his words at face value then, Professor Froeb took a "different approach" to market definition than the one dictated by the Supreme Court. That "different

---

[12] Professor Froeb futher muddies the water by his statement in his supplemental declaration that he performed his "economic analysis to address the question of where customers 'can practically' turn for supplies," omitting any mention of the rest of the *Tampa Electric* standard. This further illustrates the fact that clarifying declarations may themselves raise questions which in turn require further clarification.

approach" renders his methodology–his theoretical model–inadmissible.

Plaintiffs make several arguments in an effort to salvage Professor Froeb's testimony. First, they point to Professor Froeb's deposition testimony that he would have instructed his employees at DOJ/FTC to apply the same methodology he applied as establishing that he in fact applied the Merger Guidelines. This Court previously rejected that testimony as establishing that he did so, a position the Court does not retreat from. Proof that Professor Froeb would have instructed his employees to use the same methodology he has now used proves only that, not that the methodology complies with binding Supreme Court precedent.

Secondly, plaintiffs seem to suggest that Professor Froeb was somehow tricked by defendants' counsel at the deposition because the premise of counsel's questions to Professor Froeb was not identified as having come from the *Tampa Electric* case, pointing out that he is not a lawyer. The Court also rejects this argument. It is ludicrous for plaintiffs to suggest that an expert witness on the relevant antitrust market would not be familiar with Supreme Court pronouncements on the subject, especially given his background at DOJ/FTC. The assertions especially lack credibility when one looks at the reports of Professor Froeb, throughout which he cites or relies upon applicable legal principles in the antitrust field. For instance, in footnote 3 of Professor Froeb's report, he parrots plaintiffs' argument that they need not prove a relevant geographic market for their conspiracy claim because "to the extent Plaintiffs claim that Defendants' conduct was illegal *per se*, no market definition is necessary." He also cites the "*Cellophane* fallacy," citing *United States v. E.I. DuPont deNemours & Co.*, 351 U.S. 377 (1956), affirming 118 F.Supp. 41 (D. Del. 1953).

Most significantly, however, plaintiffs rely in large part on Professor Froeb's November 14, 2010 declaration which purports to "clarify" his deposition testimony which he claims defendants

have "misconstrued."[13]  He declares that the "different approach" he referred to "was precisely the hypothetical monopolist test," and points out that he notes in his report that he "consider[ed] the region where milk is sold by the defendants and bought by the plaintiffs."[14]  Even if the filing of the clarifying declaration is appropriate, plaintiffs cannot create an issue where none otherwise existed by providing a witness's "clarifying," after the fact statements.  As noted above, the clarifying declaration sheds little light on Professor Froeb's testimony that he used a "different approach" than the one required by *Tampa Electric*.

To paraphrase Professor Froeb's deposition testimony, clarified by his declaration: "I would not say that a relevant geographic market is the area in which the seller operates and to which the purchaser can practically turn for supplies.  That's not how I would put it.  I don't think the *Tampa Electric* standard characterizes well what I've done here, or my conclusions here.  I've taken a different approach.  The different approach I have taken is that  I implement the Supreme Court's guidance through the use of the hypothetical monopolist test".  Professor Froeb never explained how the "same approach" can be a "different approach."  The Court will not speculate about the methodology used by Professor Froeb nor will it attempt to ferret out what he really did (i.e. the methodology used) without reference to what he said he did.  The plaintiffs, as the parties seeking to have Professor Froeb's testimony admitted, bear the burden of showing "that the expert's findings are based on sound science" and this requires an "objective independent validation of the expert's

---

[13]  Plaintiffs accuse defendants of attempting to "spin" Professor Froeb's deposition responses and suggest "his answer does not and cannot change what he actually did do."  In other words, it appears that plaintiffs invite the Court to ignore what Professor Froeb said he did, and instead find that he used an appropriate method.

[14]  So far as the Court can determine, this reference, in paragraph 12 of Professor Froeb's report, is the only one that even approximates the standard enunciated in *Tampa Electric*.

methodology." *Daubert v. Merrill Dow Pharmaceuticals, Inc.* (on remand), 43 F.3d 1311, 1316 (9th Cir.), *cert. denied*, 516 U.S. 869 (1995) (quoted by *Smelcer v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) *abrogated on other grounds* by *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997). ["T]he expert's bold assurance of validity is not enough." *Id.* Furthermore, the court's focus is on the expert's methodology, not the correctness of his conclusions. *Id.* at 1318 (cited by *Smelcer*, 185 F.3d at 303). Plaintiffs have not validated Professor Froeb's methodology and his opinions are inadmissible for that reason alone.

Plaintiffs also take issue with the Court's statements in its August 4, 2010 opinion related to the requirement, set forth in *Tampa Electric*, that determination of the relevant antitrust geographic market requires an assessment of the "commercial realities" facing buyers and sellers in the market place, *Tampa Electric*, 365 U.S. at 327, a concept explicitly recognized by the Merger Guidelines. *See* Merger Guidelines §§ 1.0, 1.2. While plaintiffs do not contest the Court's statement of the applicable standard, they do argue that the following finding was clear error:

> Professor Froeb admits that he did not assess the 'commercial realities,' Id., but rather relied solely on his theoretical model. Such an approach may be academically acceptable; it does not, however, comply with the Supreme Court's dictates with respect to construction of the relevant geographic market.

[Doc. 863 at 29].

Plaintiffs are puzzled by the Court's use of "Id." in the first sentence quoted above and suggest that the defendants "[b]y putting 'commercial realities' in quotes [in their supplemental reply] may have misled the Court into believing that the words were spoken by Professor Froeb." [Doc. 1206 at 20]. While the "Id." reference does appear to have been misplaced, the Court was not misled by defendants' conduct or by any "false representation" by defendants that the commercial

reality not considered by Professor Froeb had to do with milk supply movement from outside the candidate market. In support of their position, plaintiffs point to Professor Froeb's report which states that Professor Froeb "employ[s] the Cournot model of competition" and "takes into account the geographic location of existing milk bottling plants in Federal Order No. 5 of milk bottling plants that compete for customers in Federal Orders Nos. 5 and 7." [Froeb declaration, March 5, 2010, ¶ 64]. He further states that his analytical model takes as input "[e]very non-captive plant in Orders 5 and 7 operating in December, 2008" and "every regulated, non-captive plant within 300 miles of Orders 5 and 7." [15] [*Id*. at ¶ 75]. In short, plaintiffs argue that "Professor Froeb did not ignore 'commercial realities,' much less admit to doing so, and the Court's finding on this point is in error." [Doc. 1206 at 21].

Whether the phrasing of the Court's statement was technically accurate or not, the fact remains that Professor Froeb does acknowledge that he did not generally consider certain facts relating to actual behavior within the market, what the Court would characterize as "commercial realities." He did not consider or find relevant, for instance, data or materials concerning Food Lion, Fidel Breto, or any other retailer's purchasing behavior or the sales or pricing data of Dean or other milk processors; he did not consider relevant information about where retailers <u>actually</u> turn for supplies currently; nor did he consider relevant information about how purchasers have <u>actually</u> reacted to actual price increases. Although Professor Froeb states in his declaration, generically speaking, that he reviewed "documents produced by the parties in discovery," there is a paucity of support in this record for a conclusion that he based his opinions in the case on the evidence in the

---

[15] As discussed below, however, that appears to be contradicted by Professor Froeb's statement that his "analysis [for analyzing the monopolization claim] is motivated by including regions where Dean and Food Lion engage in the sale and purchase of milk." [Froeb declaration, March 5, 2010, ¶ 87].

record but rather that he constructed a theoretical economic model which relied on "estimates" and "assumptions." [Froeb declaration, March 5, 2010, ¶ 15].

Two other things illustrate that Professor Froeb largely ignored the commercial realities. First, plaintiffs identify in their objection two pieces of economic literature which they claim were necessary for the Court to have a complete *Daubert* record. Both illustrate how Professor Froeb's approach is divorced from actual economic realities. The first is an article written by Gregory J. Werden, an economist in the Antitrust Division of the Department of Justice.[16] [Doc. 1159, Ex. 4]. Plaintiffs characterize the import of the article thusly: "The test must use as 'inputs' facts that would exist in this *hypothetical* world which are not necessarily observable in the real world." [*Id*. at 6]. While acknowledging that the law requires that these fact inputs take into account commercial realities, plaintiffs claim that "the economist's job is to figure out how to appropriately take the necessary realities into account in an exercise that is, by definition, hypothetical." [*Id*. at 7]. The second article, not directly related to the antitrust issues in this case, [Doc. 1159, Ex. 7], notes the "widely used *Cournot* model of oligopoly," a model used by Professor Froeb and one used by the Federal Energy Regulatory Commission "as a screening device for evaluating a pipeline's market power." Interestingly, the article deals with the "assumptions underlying the *Cournot* model" and "standard assumptions used in textbook exposition of the *Cournot* game."

Secondly, however, is the testimony of Professor Froeb himself. When questioned about his model, Professor Froeb gave the following testimony:

BY MS. FEENEY:

Q.      The hypothetical monopolist is a construct used for

[16] This article expressly disclaims that its views reflect those of the Department of Justice.

purposes of this hypothetical experiment, correct?

A. It's an analytical tool used by economists to determine whether or not there is the potential for the exercise of market power in the relevant market.

Q. And it's generally counterfactual, right,

A. Counterfactual, you mean by – what do you mean by counterfactual?

Q. It's a hypothetical. It's not based on real world facts?

MR. STENERSON:

Object to the form. Mischaracterizes his model in his report and his testimony.

THE WITNESS: Yeah. So I'm not trying to say anything about how are people currently behaving in the market. I'm trying to say: I'm just trying to identify an area in which there is potential for the exercise of market power.

. . . .

BY MS. FEENEY:

Q. Would you agree that if a model doesn't fit the significant facts, it can result in misleading predictions?

MR. STENERSON: Object to the form.

THE WITNESS: So models are tools. They are designed to capture the significant features of competition and predict how certain actions change that competition. They can–they can give misleading answers, yes.

BY MS. FEENEY:

Q. Would you agree that assumptions or predictions used in a model can be refuted by evidence?

MR. STENERSON: Object to the form.

24

THE WITNESS: If a model doesn't capture the significant features of competition, then its predictions may be misleading.

BY MS. FEENEY:

Q. So the answer to my question is, yes, you would agree that assumptions or predictions of a model can be refuted by evidence?

MR. STENERSON: Object to the form.

THE WITNESS: That's not what I said. I said, look, a model is a tool, and it's appropriate for some uses, and inappropriate for others. And what I would – what I would say is that if a model can capture the significant features of competition in an industry, then it can be used – or if a model misses significant features of an industry, and significant features of competition, then it may give misleading predictions.

[Froeb deposition, April 26, 2010, p. 80, l. 5-81, 1. 1; p. 84, l. 20-86, l. 2]. So, whether you characterize Professor Froeb's statements as an "admission" that he did not consider actual commercial realities or not, Professor Froeb did clearly say he was not "say[ing] anything about how are people currently behaving in the market."

Next, plaintiffs take issue with the Court's finding that Professor Froeb had constructed his model with reference to a single customer, Food Lion, in violation of applicable legal requirements. [Doc. 863 at 29]. Plaintiffs incorrectly identify the origin of that conclusion as defendants' supplemental reply. Rather, the conclusion comes directly from Professor Froeb's declaration, where he states: "My analysis is motivated by including regions where Dean [sells] and Food Lion [purchases] milk." [Froeb declaration, March 5, 2010, ¶ 87]. Plaintiffs accuse the Court of misconstruing the language in Professor Froeb's declaration, but they do not quarrel with the legal principle underlying the Court's finding. As the Court stated in its prior memorandum, "A

geographic market cannot ordinarily be defined by reference to a single customer." [Doc. 863 at 29] (citing *Apani Southwest Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 632-33 (5th Cir. 2002)). *See also Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1249 (11th Cir. 2002) ("the law is clear, however, that a geographic market cannot be drawn simply to coincide with the market area of a specific company").

Likewise, plaintiffs don't really dispute that Professor Froeb did not consider the location of any other retailers, including the other named plaintiff, Fidel Breto. What they do argue is that Professor Froeb analyzed all purchasers of milk in the market, i.e., people who buy milk, by considering "population census data to determine where people live as a proxy for demand for milk" and "assum[ing] that population density would mimic demand for milk, and that Food Lion and other retailers will be set up to efficiently serve the milk drinking population." While the argument has some logical appeal on the surface, it confuses the retail purchasers of milk with the retailers who purchase milk from processors. It is Food Lion's purchase of milk from processors which is relevant and where it purchases milk may be completely unrelated to population census data. That is further support for defendants' argument that Professor Froeb's model is disassociated from the commercial realities, as defendant suggest.

Finally, plaintiffs argue with that the Court's previous finding that Professor Froeb's assertion that he would have instructed staff at the Department of Justice and Federal Trade Commission to employ the same methodology he has employed in this case established "only that," i.e. that he would have instructed his staff to do so, and does not establish that the methodology complied with Supreme Court dictates. Plaintiffs claim that Professor Froeb's assertion, indeed, does prove "that he applied the standard mandated by the Sixth Circuit" rather than a special test

employed for this litigation. The Court continues to disagree, largely for the reasons discussed above. Accepting that the standards of *Tampa Electric* and the Merger Guidelines are equivalent, Professor Froeb must still properly apply the Merger Guidelines and the fact that he might have instructed staff hundreds of times to apply the methodology he applied in this case simply does not prove the proposition plaintiffs suggest. In fact, Professor Froeb's own testimony suggests that he did not apply the Merger Guidelines, in total, to his work in this case. He testified:

> THE WITNESS:       . . . I've done this for hundreds of industries and hundreds of merger cases at the FTC and DOJ.
>
> And that the–the basic methodology that I'm using here, *except* I'm applying it to industry of independently owned firms relative to a hypothetical monopolist.

[Froeb deposition, April 26, 2010, p. 77, ll. 18-24] (emphasis added). In other words, it appears that Professor Froeb, by his own admission, modified what he had done "for hundreds of industries and hundreds of merger cases" in applying his model in this case.

As the above illustrates, even if the Court were to grant plaintiffs a full *Daubert* hearing and oral argument in the case, there are fundamental reasons why Professor Froeb's testimony does not meet the applicable standards and would be inadmissible. Thus, the Magistrate Judge's order would be subject to being adopted and approved on that ground as well.

For the reasons set forth herein, plaintiffs' objection, [Doc. 1206], is OVERRULED and the Magistrate Judge's order, [Doc. 1191], is AFFIRMED AND ADPOTED by the Court and made the ORDER of the Court.

So ordered.

ENTER:                                              s/J. RONNIE GREER
                                          UNITED STATES DISTRICT JUDGE