# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### GREENEVILLE DIVISION

|  |  |
|---|---|
| _____ ) | |
| IN RE SOUTHEASTERN MILK ) | |
| ANTITRUST LITIGATION ) | **Master File No. 2:08-MD-1000** |
| _____ ) | |
| ) | **Judge J. Ronnie Greer** |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| *Sweetwater Valley Farm, Inc., et al. v.* ) | |
| *Dean Foods, et al.*, No. 2:07-CV-208 ) | |
| _____ ) | |

## PLAINTIFFS' MOTION FOR FINAL APPROVAL
## OF CLASS ACTION SETTLEMENTS WITH DEAN, SMA, AND BAIRD

# TABLE OF CONTENTS

**Page**

I.  BACKGROUND ................................................................................................ 2

    A.  The Dean and SMA/Baird Settlements ................................................. 2

    B.  Preliminary Approval of the Settlements ............................................. 4

    C.  Notice of Settlements and Response by Class Members ...................... 5

II.  THE PROPOSED SETTLEMENTS SHOULD BE GIVEN FINAL APPROVAL BECAUSE THEY ARE FAIR, REASONABLE AND ADEQUATE ............................ 7

    A.  The Likelihood of Plaintiffs' Success on the Merits Weighed Against the Amount and Form of Relief Offered in the Settlements Supports Approval ........ 8

    B.  The Complexity, Expense and Likely Duration of Continued Litigation Favor Approval .................................................................... 10

    C.  The Recommendations of Experienced Counsel and Class Representatives Strongly Favor Approval .................................................... 11

    D.  The Extensive Case Analysis by Plaintiffs Supports Final Approval ................. 11

    E.  The Positive Reaction of the Class Supports Approval ...................... 12

    F.  The Settlement Was the Product of Informed, Non-Collusive Negotiations ....... 14

    G.  There Is a Strong Public Interest in the Settlements ........................... 14

III.  THE "OBJECTION" PROVIDES NO BASIS NOT TO GRANT FINAL APPROVAL .................................................................................................. 15

IV.  CONCLUSION ............................................................................................... 16

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bailey v. Great Lakes Canning Inc.*,
908 F.2d 38 (6th Cir. 1990) ...................................................................................7

*Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)....................................................................................8

*Granada Invs., Inc. v. DWG Corp.*,
962 F.2d 1203 (6th Cir. 1992) ..........................................................................8, 15

*In re Cardizem CD Antitrust Litig.*,
218 F.R.D. 508 (E.D. Mich. 2003) ............................................................... *passim*

*In re Packaged Ice Antitrust Litig.*,
2011 U.S. Dist. LEXIS 150427 (E.D. Mich. Dec. 13, 2011)........................... *passim*

*In re Telectronics Racing Sys., Inc.*,
137 F. Supp. 2d 985 (S.D. Ohio 2001) ......................................................... *passim*

*In re Warfarin Sodium Antitrust Litig.*,
212 F.R.D. 231 (D. Del. 2002) ...............................................................................8

*Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. GMC*,
497 F.3d 615 (6th Cir. 2007) ............................................................................7, 8

*Kogan v. AIMCO Fox Chase, L.P.*,
193 F.R.D. 496 (E.D. Mich. 2000) ..........................................................11, 12, 14

*Lazy Oil Co. v. Witco Corp.*,
95 F. Supp. 2d 290 (W.D. Pa. 1997)........................................................................8

*Leonhardt v. Arvinmeritor, Inc.*,
581 F. Supp. 2d 818 (E.D. Mich. 2008).................................................................11

*Lonardo v. Travelers Indem. Co.*,
706 F. Supp. 2d 706 (N.D. Ohio 2010)......................................................... *passim*

*Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*,
381 U.S. 311 (1965)...............................................................................................15

*Pillsbury Co. v. Conboy*,
459 U.S. 248 (1983)...............................................................................................14

# TABLE OF AUTHORITIES

**Page**

**OTHER AUTHORITIES**

4 Newberg & Conte, *Newberg on Class Actions* § 11.41 ............................................................12

Federal Rule of Civil Procedure 23(e) ........................................................................................1, 7

Pursuant to Federal Rule of Civil Procedure 23(e), Plaintiffs respectfully move the Court for final approval of the class action settlements with Defendants Dean Foods Co. ("Dean") Southern Marketing Agency, Inc. ("SMA") and James Baird ("Baird") (collectively "Settlements").

After four years of hard-fought litigation and extensive negotiations, Plaintiffs reached the Settlements on the eve of trial scheduled for July 2011. Finding the Settlements "sufficiently fair, reasonable and adequate," the Court preliminarily approved the SMA/Baird Settlement on July 28, 2011, and the Dean Settlement originally on July 14, 2011 and then again on February 14, 2012 following appointment of separate counsel for the DFA sub-class. The Settlements remain fair, reasonable and adequate and should be given final approval because, as shown below, they satisfy each of the Sixth Circuit's approval factors.

Following the Court's preliminary approval of the Settlements, Plaintiffs caused notice of the Settlements to be provided in accordance with procedure approved by the Court. Rust Consulting sent notice packages to 7,452 potential class members and published notice in the March 2012 issue of *Hoard's Dairymen*. Over 7,060 settlement claims were received by the May 1, 2012 deadline. Significantly, only one response is titled "objection" to the Settlements,[1] although, as explained below, the "objection" provides no legitimate basis to deny final approval of the Settlements.

Plaintiffs thus request the Court grant this Motion and (1) finally approve the Settlements with Dean and SMA/Baird, and (2) enter final order of judgment dismissing claims against Dean

---

[1] Six additional requests to speak at the fairness hearing were received, but none of these requests constitute objections to the Settlements (as required by Paragraph 14 of the Court's preliminary approval Order). (*See* Preliminary Approval Order, ¶ 14, Dkt No. 1782.)

and SMA/Baird.[2]

## I.    BACKGROUND

### A.    The Dean and SMA/Baird Settlements

After four years of intense litigation and over one year of pre-filing investigation, Plaintiffs' counsel, on behalf of Southeast farmers, successfully negotiated settlements in the amount of $140,000,000 with Dean and $5,000,000 and substantial structural changes with SMA and Baird.  Plaintiffs believe this is the largest and most substantial antitrust settlement ever obtained in this District.  (*See, e.g.,* 4/2/12 Pltfs' Mot. for Attorney Fees, Dkt. No. 1808 (reviewing Plaintiffs' efforts leading to Settlements).)  The basic terms of the Settlements follow.[3]

***The Settlements' Monetary and Structural Relief.***  The Settlement with Dean provides that Dean will pay $140,000,000 into a settlement fund over approximately four years.  (Ex. 2, Dean Settlement Agreement ¶ 7.1.)[4]  Dean made an initial payment of $60,000,000 into an escrow account after the Court entered the preliminary approval order on February 14, 2012, and it will then pay up to $20,000,000 each year for four years within five business days of the anniversary of the Court's final approval of the settlement and entry of judgment and dismissal of all claims as to Dean.  (*Id.*)  These deferred payments are backed by a letter of credit.  (*Id.*)

The SMA/Baird Settlement provides for payment of $5,000,000 into a settlement fund, along with certain structural changes to the manner in which SMA is operated and managed, the

---

[2]  Plaintiffs attach a Proposed Order as Exhibit 1 for the Court's consideration.

[3]  The settlement agreements were posted in full on the class action website last year.

[4]  The Dean Settlement provides that the $140,000,000 settlement amount shall be reduced by the *pro rata* milk sales of class members who timely and validly request exclusion from the class as of the exclusion date (May 1, 2012) and have not applied to opt back into the class.  (Ex. 2, Dean Settlement Agreement ¶ 9.1.)

2

way milk is marketed in the Southeast, and how SMA interacts with Southeast dairy farmers.

(Ex. 3, SMA/Baird Settlement Agreement ¶ 7.)  This structural relief includes:

- SMA will undergo a broad annual audit of its activities conducted by an independent auditor, the results of which shall be made available to SMA's Board of Directors and the managers of SMA's member cooperatives. In addition, a summary report of the independent auditor's annual audit will be posted on SMA's website. (*See id.* at ¶ 7.3.)

- SMA agrees to use its best efforts to increase Class I utilization percentages in Federal Orders 5 and/or 7 by reducing milk supply commitments to certain manufacturing plants currently operating in Federal Orders 5 and/or 7. Defendant SMA estimates that this change alone, if achieved, may generate value to Southeast dairy farmers of approximately $0.10 to $0.12 per hundredweight of milk. (*See id.* at ¶ 7.4.)

- SMA and Baird will establish and maintain, for a minimum of three (3) years, a production incentive program for the dairy farmer members of SMA's member cooperatives in Federal Orders 5 and/or 7 designed to increase prices paid to these farmers for the purpose of increasing their local production of milk. (*See id.* at ¶ 7.5.)

- SMA agrees to certain changes in the procedures for the election of its board of directors, the implementation of term limits for most directors, and the required disclosure of potential and actual conflicts of interest. (*See id.* at ¶ 7.6.)

- SMA will no longer handle, pool, or otherwise be involved with milk marketed by Dairy Marketing Services, LLC ("DMS") for independent farmers. (*See id.* at ¶ 7.8.)

- SMA and Baird agree that the management agreement between SMA's member cooperatives and VFC Management, LLC (Baird's management company)—to the extent it relates to the management of SMA—will be terminated without cause and a competitive bidding process, as set forth in the Settlement Agreement, will be implemented for the selection of SMA's General Manager. (*See Id.* at ¶ 7.6.)

- SMA and Baird agree to the establishment of a Dispute Resolution Committee consisting of three independent parties authorized to hear and resolve complaints and disputes from dairy farmer members of SMA's member cooperatives over Defendants' compliance with certain provisions of the Settlement Agreement. (*See id.* at ¶ 7.7.)

    ***Release.***  In exchange for the above consideration from Dean and SMA/Baird, Plaintiffs

agreed for themselves and on behalf of the Independent Farmer and DFA Member Subclasses to

3

release and discharge Dean, SMA and Baird from any and all claims against Dean, SMA or Baird arising out of, or related to, the facts or circumstances alleged in Plaintiffs' Consolidated Amended Complaint dated August 4, 2008. (Ex. 2, Dean Settlement Agreement ¶¶ 6.1, 6.2; Ex. 3, SMA/Baird Settlement Agreement ¶¶ 1.17, 1.18, 1.19, 1.22, 6.1, 6.2.) The Settlements do not release any class member's claim against the remaining Defendants or release the claims of class members who timely and validly requested exclusion from the class, unless they opt back into the class. (Ex. 2, Dean Settlement Agreement ¶¶ 4.3, 9.1; Ex. 3, SMA/Baird Settlement Agreement ¶¶ 1.17, 1.18, 1.19, 1.22, 9.1.)

*Settlement Subclasses.* The Settlements are applicable to members of both of the Subclasses previously certified by the Court. The Independent Farmer Subclass, certified September 7, 2010 (Dkt No. 934), includes:

> All independent dairy farmers and independent cooperative members (whether individuals or entities) who produced Grade A milk within Orders 5 or 7 and sold Grade A milk directly or through an agent to Defendants or Co-Conspirators in Orders 5 or 7 during any time from January 1, 2001 to the present. The terms "independent dairy farmer" and "independent cooperative member" refer to Southeast dairy farmers who were not members of DFA at the time of their Grade A milk sales.

The DFA Member Subclass, initially certified on September 7 (*see id.*) and reinstated February 14, 2012 (Dkt No. 1782) for purpose of settlement, includes:

> All DFA members (whether individuals or entities) who produced Grade A milk within Orders 5 or 7 and sold Grade A milk directly or through an agent to Defendants or Co-Conspirators in Orders 5 or 7 during any time from January 1, 2001 to the present. The term "DFA member dairy farmer" refers to Southeast dairy farmers who were members of DFA at the time of their Grade A milk sales.

At Defendants' request, on January 19, 2011 the Court excluded from the Subclasses all "former and current officers and directors of DFA and SMA." (Dkt No. 1255 at 14.)

## B. Preliminary Approval of the Settlements

On July 12, 2011, Plaintiffs filed a motion for preliminary approval of the settlement

4

between Dean and the Independent Farmer and DFA Member Subclasses. (Dkt No. 1603.) The Court granted the motion, finding the settlement "sufficiently fair, reasonable and adequate" (7/14/11 Order, Dkt No. 1641). Plaintiffs then moved, on July 27, 2011, for preliminary approval of the settlement between SMA/Baird and the Independent Farmer and DFA Member Subclasses (Dkt No. 1676), which the Court also granted after finding the settlement "sufficiently fair, reasonable and adequate" (Dkt No. 1681).

The Court subsequently vacated preliminary approval of the Dean settlement and took the motion for approval under advisement based on the Court's finding of an inter-class conflict between the Subclasses. (8/31/11 Order, Dkt No. 1735.) Thereafter, on February 14, 2012, the Court preliminarily approved the Settlements with the DFA Subclass (Dkt No. 1782) after the Court appointed Gary Brewer as interim counsel for the DFA Member Subclass (10/5/11 Order, Dkt No. 1752) and DFA Plaintiffs moved to reinstate that Subclass, appoint Subclass counsel and reinstate preliminary approval of the settlement with Dean (12/27/11 Motion, Dkt No. 1765).

## C.     Notice of Settlements and Response by Class Members

The Court's February 14 Order also approved the content and manner of dissemination of notice of the Settlements and set dates and procedures for submission of claims, requests for exclusion from the Subclasses, and requests for class members who had opted out of the Subclasses to be reinstated for purposes of participating in the Settlements. (Dkt No. 1782.) Notice was thereafter provided to the Subclasses in accordance with the Court's Order. (*See* 5/8/12 Young Decl. ¶ 4.) Specifically, on February 24, 2012 Rust Consulting sent the Court-approved notice via U.S. Mail, postage prepaid, to 7,452 distinct names and addresses of potential class members identified from Defendant and third-party information (*see id.* ¶ 4), published notice in the March 2012 issue of *Hoard's Dairymen*, a dairy farm trade magazine, (*see id.* ¶ 5), maintained a class notice website with documents and information pertinent to the

5

Settlements (*see id.* ¶ 7), established a toll-free telephone number (*see id.* ¶ 8), and acted as a repository for Class member inquiries and communications (*see id.* ¶ 9).

The Court established May 1, 2012 as the deadline for receipt of: claims forms, requests to opt out of the DFA Subclass or to opt back into the Subclasses for purpose of settlement, objections to the Settlements. (Dkt No. 1782.) As of May 7, Rust Consulting had received 7,060 claims[5] (*see id.* ¶ 12), 23 requests to opt out of the DFA Subclass – some of which appear to be duplicates – (*see id.* ¶ 11), and 12 requests to opt back into the Subclasses for purpose of settlement (*see id.* ¶ 10).[6] Rust previously received 364 opt out requests. (*See id.* ¶ 11.) Therefore, a total of 375 Class Members elected to opt out. Each of the 7,060 claim forms included the signature of the Class Member attesting the information was true under penalty of perjury.

On March 23, 2012 Rust Consulting ("Rust") conferred with counsel for Plaintiffs and Defendants regarding claims processing and availability of milk marketing related data. (*See id.* ¶ 17.) Following that conference, both Plaintiffs and Rust requested that Defendants provide their milk marketing data to Rust, and Rust expects to receive that data. (*See id.* ¶ 17.) Since that conference, Rust executed and returned a confidentiality agreement requested by Defendants authorizing the release of Defendants' data to Rust. (*See id.* ¶ 17.) Rust has also been in communication with the USDA Market Administrator for Orders 5 and 7 regarding the availability and production of milk marketing-related data. (*See id.* ¶ 17.) Also, Defendants

---

[5] The numbers of claims, opt outs, and opt ins is current as of May 7, 2012. Because Rust continues to process the claim forms, a report will be provided prior to the Fairness Hearing on May 15, 2012.

[6] The sole "objection" and six requests to appear were received by Plaintiffs through United States Mail or the Court's ECF system, not through Rust Consulting.

recently agreed to a limited release of their data by the Market Administrator for use by Rust. (*See id.* ¶ 17.) Rust will review, consider, and utilize any relevant data received from Defendants, the Market Administrator, or third parties consistent with industry standard practices.[7] (*See id.* ¶ 17.)

## II. THE PROPOSED SETTLEMENTS SHOULD BE GIVEN FINAL APPROVAL BECAUSE THEY ARE FAIR, REASONABLE AND ADEQUATE

It is well-settled in the Sixth Circuit that courts favor and encourage settlements of lawsuits. *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. GMC*, 497 F.3d 615, 632 (6th Cir. 2007) ("*UAW*") (noting "the federal policy favoring settlement of class actions"); *In re Telectronics Racing Sys., Inc.*, 137 F. Supp. 2d 985, 1008 (S.D. Ohio 2001) ("Being a preferred means of dispute resolution, there is a strong presumption by courts in favor of settlement"). "This policy applies with equal force whether the settlement is partial, involving only some of the defendants, or complete." *In re Packaged Ice Antitrust Litig.*, 2011 U.S. Dist. LEXIS 150427, at **42-43 (E.D. Mich. Dec. 13, 2011).

Under Rule 23(e), a class action shall not be "dismissed or compromised with[out] the court's approval." In evaluating a settlement, the Court must ultimately determine whether the settlement is "fair, adequate, and reasonable." *Bailey v. Great Lakes Canning Inc.*, 908 F.2d 38, 42 (6th Cir. 1990). The Sixth Circuit assesses seven factors in making this determination: [A] the likelihood of success on the merits weighed against the amount and form of relief in the settlement; [B] the complexity, expense and likely duration of the litigation; [C] the opinions of class counsel and class representatives; [D] the amount of discovery engaged in by the parties;

---

[7] Plaintiffs will submit a proposed plan of allocation of settlement proceeds for Court approval after all claims have been processed and distributions to individual farmers calculated by Rust Consulting.

[E] the reaction of absent class members; [F] the risk of fraud or collusion; and [G] the public interest. *See UAW*, 497 F.3d at 631 (quoting *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)). Because this Court previously determined that the Settlements are "fair [and] reasonable" (8/31/11 Order, at 2, Dkt No. 1735; 2/14/12 Order, at 1, Dkt No. 1782), the Settlements are viewed as "presumptively reasonable." *Telectronics*, 137 F. Supp. 2d at 1026. Each of the seven factors weighs in favor of final approval.

<blockquote>

A.    **The Likelihood of Plaintiffs' Success on the Merits Weighed Against the Amount and Form of Relief Offered in the Settlements Supports Approval**

</blockquote>

The Settlements offer Subclass members substantial and certain benefits. The Settlements combined create a common fund of $145 million in cash. In addition, the SMA/Baird Settlement delivers important and valuable structural relief. For instance, it is estimated that SMA/Baird's commitment to reduce milk supply commitments to certain manufacturing plants will result in savings of $.10-.12/cwt., which, if achieved, will deliver Southeast farmers an estimated $11 million to $13 million each year based on the average milk volume (11 billion pounds) annually marketed by SMA. These are remarkable benefits for Subclass members. This recovery, with the monetary payment alone representing one-third of the total amount of damages most recently calculated by Plaintiffs' expert (*see, e.g.*, Supp. Rpt. of Rausser, 9), is well within the range of reasonableness in relation to claimed damages. *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 258 (D. Del. 2002) (approving settlement of 33% of maximum recovery); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) ("[C]ourts have determined that a settlement can be approved even if the benefits amount to a small percentage of the recovery sought . . . . '[T]here is no reason . . . why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.'") (quoting *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974)).

In addition, the average monetary recovery to each class member is substantial. In addition to the value of the structural relief, the $145 million settlement fund will provide an estimated average payment of $13,000 per class member.[8] (2/14/12 Order, at Ex. A ¶ 15, Dkt No. 1782-1.) Courts routinely approve significantly lower per-member recoveries. *See Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 706, 781(N.D. Ohio 2010) (approving "meaningful recovery" where class members would receive "on average, in excess of $36").

The substantial benefits and certainty of recovery provided by the Settlements far outweigh the risks of continued litigation, a fact previously noted by the Court. (8/31/11 Order, at 2, Dkt No. 1735 ("alternative for [the DFA member subclass] is to receive nothing" and "all parties face enormous risk if the case is tried.")) It is well established that class action antitrust litigation has "undeniable inherent risks, such as whether the class will be certified and upheld on appeal, whether the conspiracy as alleged in the Complaint can be established, whether Plaintiffs will be able to demonstrate class wide antitrust impact and ultimately whether Plaintiffs will be able to prove damages." *Packaged Ice*, 2011 U.S. Dist. LEXIS 150427, at *56. Further, "[e]xperience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation." *Id.* at *55-56.

There is no question that continued litigation of this case would be fraught with risk. Although Class Counsel are confident Plaintiffs' claims are meritorious, there is a risk of recovering little or nothing at trial due to the inherent uncertainties in this type of litigation. *See In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003) (risk of no recovery supports approving settlement); *Packaged Ice*, 2011 U.S. Dist. LEXIS 150427, at *55-56.

---

[8]   As reflected in the Class notice, the average payment of $13,000 assumes the Court awards attorneys' fees and expenses as requested by Counsel in their Fee Petition.

9

## B.    The Complexity, Expense and Likely Duration of Continued Litigation Favor Approval

It is undisputed that antitrust litigation, such as this case, is complex and expensive, *see Cardizem*, 218 F.R.D. at 533 – a fact acknowledged by this Court when it noted that "[t]his is an incredibly complex case."  (12/8/10 Order, Dkt No. 1193; *see also* 1/6/09 Hearing Tr. at 13, Dkt No. 214 ("I don't think in the years I practiced law I was ever involved in a case that is quite this complicated"); 8/17/10 Order, at 23, Dkt No. 934 ("This litigation is complex.").)  These cases by their nature also consume vast resources and time to litigate.  Defendants have vigorously defended every facet of this case, and absent settlement, Defendants would undoubtedly continue to do so through trial, requiring Class Counsel to expend significant amounts of time and resources.  *See Lonardo*, 706 F. Supp. 2d at 781 (favoring approval of settlement because "there is no reason to believe that either party would litigate the remainder of the case less vigorously").

The immediate recovery of the substantial monetary and structural relief provided by the Settlements far outweighs the risk and time inherent in further litigation of this complex matter. *See Cardizem*, 218 F.R.D. at 525 (finding that the benefits of the settlement "outweigh[ed] the possibility of obtaining a better result at trial, particularly when factoring in the additional expense and long delay inherent in prosecuting this complex litigation through trial and appeal); *Telectronics*, 137 F. Supp. 2d at 1013 (settlements "eliminat[e] the costs and time attendant to continued litigation").  Indeed, preparing and then trying this case for nearly two months, as scheduled, would require substantial additional efforts and expenses, including preparing for the examination of live witnesses, preparing video clips of depositions for taped witnesses, drafting and responding to trial motions, consulting with experts and preparing experts to testify, preparing exhibits, and maintaining a trial site and team in Greeneville.  (*See* 5/8/12 Abrams Decl., ¶ 2.)  In addition, this case has been pending for almost five years and the "complex

10

procedural and substantive issues would, if litigated, result in extensive trials and numerous appeals." *Telectronics*, 137 F. Supp. 2d at 1013; *Lonardo*, 706 F. Supp. 2d at 781 (noting that rejecting the settlement could "add[] years and costs to an already aged and expensive case").

C.   **The Recommendations of Experienced Counsel and Class Representatives Strongly Favor Approval**

The judgment of experienced counsel and class representatives regarding the Settlements should be given significant weight. *See, e.g., Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 502 (E.D. Mich. 2000); *Packaged Ice*, 2011 U.S. Dist. LEXIS 150427, at *58; *Leonhardt v. Arvinmeritor, Inc*., 581 F. Supp. 2d 818, 837 (E.D. Mich. 2008). Counsel for Plaintiffs are well qualified with extensive experience litigating and settling antitrust actions, and the class representatives are experienced Southeast dairy farmers. They collectively determined that settling the claims against Dean, SMA and Baird is in the best interest of Subclass members because the Settlements provide an immediate and substantial cash benefit to Subclass members along with structural relief, and avoid the inherent risks of trial and subsequent appeals. This endorsement of the Settlements by experienced class counsel and representatives, coupled with their investigation and analysis in this action, weighs heavily in favor of the Court's approval. *See Telectronics*, 137 F. Supp. 2d at 1015 (heeding the recommendation of "extremely qualified and experienced" counsel); *Lonardo*, 706 F. Supp. 2d at 781 (accepting "enthusiastic[] endorse[ment]" of counsel).

D.   **The Extensive Case Analysis by Plaintiffs Supports Final Approval**

That these Settlements were reached after extensive case analysis by Plaintiffs further supports final approval. *See Telectronics*, 137 F. Supp. 2d at 1015 (factor in favor of settlement where "[t]he advanced stage of the proceedings and the substantial amount of concluded discovery in this case, means that the Parties have been able to perform a realistic assessment of

11

the factual and legal strengths and weaknesses of the claims and defenses arising from this case. . . ").    Plaintiffs conducted substantial factual, legal and economic investigation in the year prior to the filing of the complaint.    During discovery, Plaintiffs reviewed, analyzed and organized over 5,000,000 pages of documents produced by Defendants, in addition to the over 95,000 pages produced by third parties.  (*See* Abrams Decl., ¶ 3.)  Plaintiffs also took 80 depositions of fact witnesses, and defended or otherwise attended 30 depositions taken by Defendants.  (*See id.* ¶ 4.)  Plaintiffs also conducted extensive expert discovery involving class certification (Drs. Beyer and Morrison-Paul), and merits (Drs. Scott, Rausser, Kalt, Elzinga and Messrs. Peterson, Ortego and Herbein).  (*See id.* ¶ 5.)  Both sides engaged in extensive motion practice, including discovery motions, class certification, summary judgment, and *Daubert*.  (*See id.* ¶ 6.)  As the Court recently recognized, "the parties' claims and defenses ha[ve] been subject to an intense three-year long adversarial process."   (8/31/11 Order, at 2, Dkt No. 1735.)  Plaintiffs thus have more than sufficient information to form a well-grounded belief that the Settlements are fair, reasonable and adequate, and this supports final approval.  *See, e.g., Kogan*, 193 F.R.D. at 502; *Cardizem*, 218 F.R.D. at 525 ("the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered") (internal quotations omitted).

### E.    The Positive Reaction of the Class Supports Approval

The high settlement participation rate and virtual absence of objections is indicative of the adequacy of the Settlements and further supports approval of them.  *See, e.g., Lonardo*, 706 F. Supp. 2d at 783; *Cardizem*, 218 F.R.D. at 527 ("A certain number of opt-outs and objections are to be expected in a class action."); 4 Newberg & Conte, *Newberg on Class Actions* § 11.41 ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").

Plaintiffs fully complied with the notice procedures set forth in the Court's February 12, 2012 Order. *See* Part I.C., *supra*. Notice was mailed to 7,452 potential class members, in addition to the published notice in *Hoard's Dairyman*. (Young Decl., ¶¶ 4-5.) As of May 7, 7,060 class members – over 90% of the potential class members – submitted claims for processing by Rust (Young Decl., ¶ 12), well over the usual response rate, *see Packaged Ice*, 2011 U.S. Dist. LEXIS 150427, at *61-63 (approving settlement even though claim response rate was under 1% and collecting cases with response rates under 10%); *Cardizem*, 218 F.R.D. at 526 (holding 13.8% response rate a favorable class reaction).

More importantly, only one "objection" was submitted, which demonstrates the fairness of the Settlements. *See Lonardo*, 706 F. Supp. 2d at 783 (finding that few objectors can be viewed as indicative of the adequacy of the settlement); *Cardizem*, 218 F.R.D. at 527 (same). In addition, only 375 total requests for exclusion were submitted. (*See* Young Decl., ¶¶ 10-11.) This is a small exclusion rate in its own right, and an exceptionally small rate when considering the reasons for many of the exclusions.[9] These facts weigh heavily in favor of finally approving the Settlement Agreements. *See Cardizem*, 218 F.R.D. at 527 (finding "[t]hat the overwhelming majority of class members have elected to remain in the Settlement Class, without objection, constitutes the 'reaction of the class,' as a whole, and demonstrates that the Settlement is 'fair, reasonable, and adequate.'").

---

[9] The 375 requests for exclusion do not reflect disagreement with Plaintiffs' allegations by 375 class members. Rather, 67 exclusions were submitted by an attorney in Mississippi who represents DFA farmers bringing their own lawsuit against DFA and others. (*See* Abrams Decl., ¶ 7.) The Mississippi lawsuit contains broader allegations than in Plaintiffs' complaint here, including a RICO claim against DFA. (*See id.*, ¶ 7.) Thus, those DFA farmers are not opting out because they disagree with suing DFA and others, but because they believe DFA and others committed fraud, as well as antitrust violations, and want to assert that additional claim. In addition, it is class counsel's belief that many of the remaining farmers opted out because of religious beliefs.

13

**F. The Settlement Was the Product of Informed, Non-Collusive Negotiations**

"There certainly is no evidence of any collusive negotiations or that the negotiations process was anything other than a fair one" (8/31/11 Order, at 2, Dkt No. 1735), which supports approval of the Settlements. Settlement negotiations between Plaintiffs and Dean, SMA and Baird come after almost five years of vigorous litigation and were conducted over many months. *See Kogan*, 193 F.R.D. at 503 ("It is clear that the decision to settle was not a snap judgment on plaintiffs' counsels' part . . . it as [*sic*] the product of long and thorough negotiations"). The negotiations and ultimate Settlements included W.J. Michael Cody, the mediator in this case. It is clear given the intensity of the negotiations and the professional reputations of counsel and the mediator, that there was absolutely no collusion at the bargaining table, and that counsel for both sides negotiated in good faith. "Courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." *Packaged Ice*, 2011 U.S. Dist. LEXIS 150427, at *63 (internal quotations omitted); *Telectronics*, 137 F. Supp. 2d at 1016 ("We conclude that this case has been hard-fought, no stone has been left unturned, and there is simply no evidence suggesting collusion or illegality.").

**G. There Is a Strong Public Interest in the Settlements**

The Settlements also should be approved because there is a strong public interest in settling private antitrust litigation. *See Cardizem*, 218 F.R.D. at 530 ("there is a strong public interest in encouraging settlement of complex litigation"); *see also Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This Court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws."). The public has an interest in encouraging settlement of complex litigation and class action suits because they are "'notoriously difficult and unpredictable' and settlement conserves judicial resources." *Cardizem*, 218 F.R.D. at 530 (quoting *Granada*, 962 F.2d at

1205).   The Settlements serve the public interest in that they provide a significant monetary award to the Class that is a substantial portion of the actual damages calculated by Dr. Rausser and will be distributed fairly to all class members.   Settlements like these serve to curb similar anti-competitive behavior by others in the marketplace.   *Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co*., 381 U.S. 311, 318-19 (1965) (noting that "private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws").

### III.   THE "OBJECTION" PROVIDES NO BASIS NOT TO GRANT FINAL APPROVAL

Only one document that might be an "objection" was filed with the Court prior to the May 1, 2012 deadline,[10] but it provides no reason not to grant final approval.   Although that document, submitted by Sam P. Galphin – a class member who also submitted a claim form, does not provide the "specific reasons" for any objection as required by the notice (Class Notice, ¶ 21, Dkt No. 1782-1), it does specify that he intends to:

> [P]ropose changes to the settlement which will fully inform the affected dairymen and take the burden of resolution out of the courts and eventually place the resolution of these matters back in the hands of the dairy producers.   Additionally [he] will propose market changes that will allow dairymen to opt out of the present corrupt market system which has devastated the Southeastern dairy producer industry.

Galphin Notice, Dkt No. 1827.   This general proposal concerning "market changes" does not articulate any specific disagreement with the Settlements.[11]   (Galphin Notice, Dkt No. 1827.) While Plaintiffs do not object to the appearance of Sam P. Galphin, his general statement does not satisfy the "heavy burden" of showing the Settlements are unreasonable.   *See Telectronics*, 137 F. Supp. 2d at 1027 (after a court grants preliminary approval, a "settlement is presumptively

---

[10]   Plaintiffs also received six notices of intent to appear at the Fairness Hearing, but they do not use the word "object" or otherwise indicate the reason for the request to appear.

[11]   Sam P. Galphin does not appear to object to the monetary terms of the Settlements or the request for attorneys' fees, expenses, and class representative awards.

15

reasonable, and an individual who objects has a heavy burden of proving the settlement is unreasonable").

## IV.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion and enter the proposed Judgment and Final Order attached hereto as Exhibit 1.

Dated:  May 8, 2012

Respectfully submitted,

Thomas C. Jessee, Esq.
412 East Unaka Ave.
Johnson City, TN 37601
jjlaw@jesseeandjessee.com
*Liaison Counsel for Dairy Farmer*
*Plaintiffs*

/s/ Robert G. Abrams
Robert G. Abrams, Esq.
Gregory J. Commins, Jr., Esq.
Terry L. Sullivan, Esq.
Baker & Hostetler LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, DC  20036
abramsr@bakerlaw.com
comminsg@bakerlaw.com
sullivant@bakerlaw.com
*Lead Counsel for Dairy Farmer Plaintiffs*

/s/ Gary Brewer
Gary E. Brewer, Esq. (BPR #000942)
BREWER & TERRY, P.C.
1702 W. Andrew Johnson Hwy.
Morristown, TN 37816-2046
robin@brewerandterry.com
*Counsel for DFA Subclass*

**CERTIFICATE OF SERVICE**

I certify that on the 8th day of May, 2012, a true and correct copy of ***Plaintiffs' Motion for Final Approval of Settlement with Dean, SMA, and Baird*** was served by operation of the electronic filing system of the U.S. District Court for the Eastern District of Tennessee upon all counsel who have consented to receive notice of filings in the matters styled *In re Southeastern Milk Antitrust Litigation*, MDL No. 1899.

/s/ Robert G. Abrams
Robert G. Abrams

1