IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: SOUTHEASTERN MILK ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) | Master File No. 2:08-MD-1000 |
| THIS DOCUMENT RELATES TO: *Sweetwater Valley Farm, Inc., et al.* *v. Dean Foods Company, et al.*, No. 2:07-CV-208 | | Judge J. Ronnie Greer |

# **MEMORANDUM OPINION**

This matter is before the Court to address the "Plaintiffs' Motion for Final Approval of Class Action Settlements with Dean, SMA, and Baird." [Doc. 1856].[1] In this motion, the Plaintiffs seek final approval of the class action settlements with Defendants Dean Foods Co. ("Dean"), Southern Marketing Agency, Inc. ("SMA") and James Baird ("Baird") pursuant to Federal Rules of Civil Procedure 23(e).

After finding that the proposed settlements were "sufficiently fair, reasonable and adequate," this Court preliminarily approved the Dean Settlement on July 14, 2011, and then again on February 14, 2012, following appointment of separate counsel for the DFA sub-class, i.e., Gary E. Brewer, Esq. The Court preliminarily approved the SMA/Baird Settlement on July 28, 2011.

---

[1] Also pending before the Court is a motion for an award of attorney's fees, reimbursement of expenses, and incentive awards for class representatives. That motion will be addressed in a separate memorandum and order.

Following the Court's preliminary approval of the settlements, Plaintiffs caused notice of the settlements to be provided in accordance with the procedure approved by the Court. Rust Consulting sent notice packages to 7,452 potential class members and published notice in the March 2012 issue of *Hoard's Dairymen*. Pursuant to these notices, the Court conducted a fairness hearing on May 15, 2012, and the matter is now ripe for disposition. For the reasons which follow, the motion will be granted.

## I. BACKGROUND

Under the terms of the settlement agreement, Dean agreed to pay $140,000,000 into a settlement fund over approximately four years. Dean has made an initial payment into escrow of $60,000,000 and will pay $20,000,000 each year for four years on or about the anniversary of the Court's final approval of the settlement agreement and entry of judgment dismissing the claims as to Dean.

The SMA/Baird settlement requires SMA/Baird to pay $5,000,000 into a settlement fund and make certain structural changes in the way SMA is operated and managed and the way milk is marketed in the Southeastern United States. The structural relief includes:

- An audit of SMA's activities by an independent auditor with the results made publically available.

- Efforts by SMA to increase Class I utilization percentages in Federal Orders 5 and/or 7 by reducing

2

> milk supply commitments to certain manufacturing plants in Federal Orders 5 and/or 7 (it is estimated that this change may generate value to Southeast dairy farmers of approximately $0.10 to $0.12 per hundredweight of milk).

- Establishment of a production incentive program for dairy farmer members of SMA's member cooperatives for a minimum of three years.

- Changes in the procedures for the election of SMA's board of directors, implementation of term limits, and disclosure of conflicts of interest.

- SMA will no longer handle, pool, or otherwise be involved with milk marketed by Dairy Marketing Services, LLC.

- The management agreement between SMA's member cooperatives and VFC Management, LLC (Baird's management company) will be terminated and a competitive bidding process implemented for the selection of SMA's general manager.

- The establishment of a dispute resolution committee to hear and resolve certain complaints and disputes from dairy farmer members of SMA's member cooperatives.

## II. ANALYSIS

In order to approve a proposed settlement, the Court must first determine if that settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2). Relevant factors to be considered by the Court in that approval process include: (a) the

3

likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement; (b) the risks, expense, and delay of further litigation; (c) the judgment of experienced counsel who have competently evaluated the strength of their proofs; (d) the amount of discovery completed and the character of the evidence uncovered; (e) whether the settlement is fair to the unnamed class members; (f) objections raised by class members; (g) whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining; and (h) whether the settlement is consistent with the public interest. *Williams v. Vukovich,* 720 F.2d 909, 922-23 (6th Cir.1983) *In re Cardizem CD Antitrust Litigation,* 218 F.R.D. 508, 522 (E.D.Mich.,2003); (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir.1992) *Kogan v. AIMCO Fox Chase, L.P.,* 193 F.R.D. 496, 501-02 (E.D.Mich.2000); *Steiner v. Fruehauf Corp.,* 121 F.R.D. 304, 305-06 (E.D.Mich.1988)).

When evaluated under the foregoing standards, the Court FINDS that the proposed settlement is a "fair, reasonable, and adequate" resolution of this very complex class action case for the reasons that follow.

**(A)   The Likelihood of Success on the Merits Weighed Against the Amount and Form of the Relief Offered in the Settlement**

The fairness of each settlement turns in large part on the strength of the parties' legal dispute. "Although this inquiry understandably does not require [the court] to

4

'decide the merits of the case or resolve unsettled legal questions,' [the court] cannot 'judge the fairness of a proposed compromise' without 'weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement.'" *International Union, United Auto., Aerospace, and Agr. Implement Workers of America v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (quoting *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14 (1981)).

In this case, the settlements provide for specific cash relief which averages about $13,000.00 per class member or approximately 1/3 [2] of the actual damages calculated by Dr. Rausser, plaintiffs' damages expert, in August of 2011. If the 10 to 12 cents per hundredweight of milk representing about eleven million to thirteen million dollars a year offered by the SMA/Baird Structural Relief Settlement is included, the amount of recovery approaches 50% of the damages calculated by Dr. Rausser. Obviously, any adverse finding in regard to the relevant market in this case, which has been hotly contested, poses a substantial risk to the recovery of any portion of the damages calculated by Dr. Rausser. Thus, weighing the amount and form of the relief offered in the settlements against plaintiffs' likelihood of success on

---

[2] While there is no benchmark for the percentage of the total potential recovery represented by the settlement amount, courts can, and do, approve settlements representing a much smaller percentage of the potential recovery. *See Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974).

5

the merits[3] preponderates in favor of the fairness of the proposed settlements.

**(B) The Risks, Expense, and Delay of Further Litigation**

In general, "[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them." *In re Telectronics Pacing Sys., Inc.,* 137 F.Supp.2d 985, 1013 (S.D. Ohio 2001) (quoting *In re Austrian and German Bank Holocaust Litig.,* 80 F.Supp.2d 164, 174 (S.D.N.Y.2000)). This case is no different and its complexity was enhanced by somewhat novel factual and legal issues which have been hotly contested and aggressively litigated by all parties. Here, the possible difficulties Plaintiffs would encounter in proving their claims, the substantial litigation expenses, and the assured delay in recovery due to the appellate process, provide justification for this Court's approval of the proposed settlements. *Wess v. Storey* , 2011 WL 1463609, * 3 -4 (S.D.Ohio,2011).

**(C) The Judgment of Experienced Counsel Who Have Competently Evaluated the Strength of Their Proofs**

**(D) The Amount of Discovery Completed and the Character of the Evidence Uncovered**

In this case, there have been years of extensive discovery where counsel

---

[3] This Court has previously observed that the "parties face enormous risk if the case is tried," [Doc. 1735 at 2], and, given the complexity of the issues in this litigation and their hotly contested nature, as well as the inherently unpredictable nature of a jury trial, there is clearly risk of recovery of little or nothing at trial.

reviewed, analyzed, and organized five million pages of documents from the defendants and ninety-five thousand pages from third parties. Hundreds of hours were spent negotiating with defendants regarding discovery, and thousands of pages of discovery were produced by the plaintiffs. Plaintiffs took eighty (80) depositions and defendants took thirty (30). There was extensive discovery involving multiple experts. The case has been settled, in other words, at a time when the class representatives and their counsel were thoroughly familiar with the evidence and the issues in the case and could realistically evaluate the strengths and weaknesses of their case.

"[W]hen significant discovery has been completed, the Court should defer to the judgment of experienced trial counsel who has evaluated the strength of his case." *Bronson v. Board of Educ.,* 604 F.Supp. 68, 73 (S.D.Ohio 1984)(citing *Williams,* 720 F.2d at 922–23 (6th Cir.1983)). Obviously, there has been extensive discovery in this case involving experienced trial counsel. Based upon that discovery, plaintiffs' counsel have made a judgment that the settlements are fair, reasonable, and adequate. Accordingly, this Court will give substantial weight to the opinion of plaintiffs' experienced trial counsel, and concur that the settlements are fair, reasonable and adequate.

7

### (E) Whether the Settlements Are Fair to the Unnamed Class Members

In this case, out of seven thousand four hundred and fifty- two (7,452) notices that were mailed, six thousand eight hundred and fifty-six (6,856) claim forms were received. An additional twenty-one (21) opt-outs were received to add to the three hundred and sixty- four (364) opt -outs which had previously been received, for a total of three hundred and eighty-five( 385) opt-outs. There were also thirteen (13) requests to opt-in.[4] Significantly, there was only one objection and over 90% of the potential class members have submitted claim forms, a very high response rate for a class action settlement. This Court finds that the overwhelming positive class response highlights the fairness of the settlements to unnamed class members and weighs heavily in favor of approval of the settlements. *Kogan v. AIMCO Fox Chase, L.P.,* 193 F.R.D. 496, 502 (E.D.Mich.2000).

### (F) Objections Raised by Class Members

As previously noted, there was only one objection filed in this case. The lack of objections by class members in relation to the size of the class also highlights the fairness of the settlements to unnamed class members and supports approval of the settlements. *In re Cardizem,* 218 F.R.D. at 527. See also *In re NASDAQ Market-*

---

[4] All these numbers differ slightly from the numbers in the motion for final approval, though not significantly so. These numbers were announced at the fairness hearing on May 15, 2012. [Doc. 1874 at 10].

8

*Makers Antitrust Litig.,* 187 F.R.D. 465, 478 (S.D.N.Y.1998) (observing that "[i]n litigation involving a large class, it would be 'extremely unusual' not to encounter objections."). The small number of objections received can be viewed as indicative of the adequacy of the settlement. *Id.* at 478-79.[5] Once preliminary approval has been granted, a class action settlement is presumptively reasonable, and an objecting class member must overcome a heavy burden to prove that the settlement is unreasonable. *Williams*, 720 F.2d at 921.

Dr. Sam Galphin filed the sole objection to the settlements in this case and spoke at the fairness hearing. He did not dispute the reasonableness of monetary settlement that counsel have carved out; he, in fact, opined that it was fair and reasonable. He argued, however, that various elements of "structural" relief should be included in the settlement. Rule 23(e) does not give the court the power, in advance of trial, to modify a proposed consent decree and order its acceptance over either party's objection. The options available to this Court are essentially the same as those available to the settling parties: it can accept the proposed settlement; it can

---

[5] The number of objections here is miniscule when compared to the number of objections usually received. *See, e.g., Stoetzner v. U. S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (10% of the class objected-a fact that "strongly favors settlement"); *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1325 (2d Cir. 1990) (approval appropriate despite objections by majority of class representatives); *Maywalt v. Parker & Parsley Pet. Co.*, 864 F. Supp. 1422, 1426-33 (S.D. N.Y. 1994), *aff'd,* 67 F.3d 1072 (2d Cir. 1995) (approval appropriate despite objections from 2700 class members, including class representatives); *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 624 (N.D. Cal. 1979) (that only 16% of class objected "persuasive" of adequacy of settlement).

9

reject the proposal and postpone the trial to see if a different settlement could be achieved; or it can decide to try the case. *Evans v. Jeff D.*, 475 U.S. 717, 727 (1986). Thus, this Court does not have the authority to grant the relief sought by the sole objector, and based upon the other factors set out herein, the Court finds that the settlements are "fair, adequate, and reasonable" in spite of the objection of Dr. Galphin.

### (G) Whether the Settlement Is the Product of Arm's Length Negotiations as Opposed to Collusive Bargaining

The Court must also make sure that any settlement is the product of arm's length negotiations as opposed to collusive bargaining. *Bronson,* 604 F.Supp. at 73. In this case, this Court has previously found that "[t]he settlement agreement was arrived after the parties' claims and defenses had been subject to an intense three-year long adversarial process." There is no evidence whatsoever that negotiations were not made at arm's length or that there was any collusive bargaining.[6]

### (H) Whether the Settlement Is Consistent with the Public Interest

Generally speaking, there is a public interest in settlement of disputed cases that require substantial federal judicial resources to supervise and resolve. In the instant case, the proposed settlements end potentially long and protracted litigation among

---

[6] Another factor which supports the Court's conclusion on this point is that the negotiations which led to this settlement have included the participation of the Court appointed mediator, W.J. Michael Cody, a former Attorney General and Reporter for the State of Tennessee. General Cody is well respected for both his knowledge and ability and his integrity.

10

these parties and frees the Court's valuable judicial resources. *In re Broadwing, Inc. ERISA Litigation*, 252 F.R.D. 369, 376 (S.D.Ohio,2006). The Court finds that this factor weighs in favor of approving the proposed settlements because the public interest is served by resolution of this action.

**CONCLUSION**

After reviewing the relevant factors, the Court FINDS that the settlement agreements are "fair, adequate, and reasonable, as well as consistent with the public interest." *Bailey v. Great Lakes Canning, Inc.,* 908 F.2d 38, 42 (6th Cir.1990). Therefore, the Court hereby GRANTS plaintiffs' motion and APPROVES the settlement agreements.

A separate order will issue and the Clerk is DIRECTED to enter final judgment.

**ENTER:**

s/J. RONNIE GREER<br>UNITED STATES DISTRICT JUDGE