**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**GREENEVILLE DIVISION**

| | |
|---|---|
| _____ ) | |
| **IN RE SOUTHEASTERN MILK** ) | |
| **ANTITRUST LITIGATION** ) | **Master File No. 2:08-MD-1000** |
| _____) | |
| ) | **Judge J. Ronnie Greer** |
| **THIS DOCUMENT RELATES TO:** ) | |
| ) | |
| *Sweetwater Valley Farm, Inc., et al. v.* ) | |
| *Dean Foods, et al.*, No. 2:07-CV-208 ) | |
| _____) | |

**DAIRY FARMER PLAINTIFFS' MOTION FOR AN ORDER APPROVING
AND AUTHORIZING THE DISTRIBUTION OF THE DEAN AND
SMA/BAIRD SETTLEMENT FUNDS AND APPLICATION FOR CLAIMS
<u>ADMINISTRATOR FEES AND EXPENSES</u>**

I.  BACKGROUND ........................................................................................................... 3

A.  The Dean and SMA/Baird Settlements................................................................ 3

B.  The Approval and Dissemination of Settlement Notices and Claim Forms.......... 3

C.  The Settlement Claims Administration Process .................................................... 4

1.  Receipt and initial processing of claim forms by Rust ............................. 4

2.  Rust sought additional information from claimants as appropriate .......... 4

3.  Rust's supplementary audit of claim forms .............................................. 6

D.  Rust's Identification of Claimants Eligible for Settlement Payments .................. 7

1.  Eligible claims for settlement payments ................................................... 7

2.  Ineligible claims for settlement payments ................................................ 8

E.  Rust's Calculation of the Distribution of the Net Settlement Fund ...................... 9

II.  THE PROPOSED PLAN FOR DISTRIBUTION OF THE SETTLEMENT
FUNDS IS FAIR, REASONABLE AND ADEQUATE ................................................. 10

A.  The Proposed Plan Is Fair, Reasonable and Adequate Because It Is Based
on Class Member Milk Production and Sales...................................................... 10

B.  The Proposed Distribution of the Settlement Funds on a Pro Rata Basis Is
Fundamentally Fair ............................................................................................. 11

C.  Rust's Scrutiny and Supplemental Audit of the Claim Forms Ensures the
Proposed Distribution Will Be Fair and Equitable ............................................. 12

1.  The sworn claim forms are sufficient proof of class member claims ...... 12

2.  Rust's scrutiny of claim forms, follow ups with claimants, and
identification of claims to be excluded from (and included in) the
distribution further ensures it will be fair and equitable ......................... 13

3.  Rust's supplementary audit of claim forms confirms the proposed
distribution will be fair and equitable ..................................................... 15

III.  THE COURT SHOULD APPROVE AND AUTHORIZE PAYMENT OF THE
CLAIMS ADMINISTRATOR'S FEES AND EXPENSES ........................................... 16

IV.  CONCLUSION............................................................................................................ 17

1

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs respectfully move the Court for an order approving and authorizing the distribution of funds from the class action settlements with Defendants Dean Foods Co. ("Dean") Southern Marketing Agency, Inc. ("SMA") and James Baird ("Baird").

Rust Consulting ("Rust") has completed its scrutiny of each of the 7,363 claim forms seeking payments from the Dean and SMA/Baird settlements. After extensive analysis and work with class counsel and claimants, including 2,235 follow up letters, 4,821 telephone calls and full audits of hundreds of claims, Rust has calculated the *pro rata* payment to each of the claimants determined to be eligible to participate in the settlements, and is prepared to distribute the settlement funds upon the Court's authorization to do so.

Plaintiffs, therefore, request that the Court approve the plan outlined herein for the distribution of the Dean and SMA/Baird settlement funds to eligible claimants based on their *pro rata* share of the class-eligible milk volume. The Court should approve the plan as reasonable, fair and adequate because it reimburses class members according to their share of injury and damages. The sworn claim forms submitted by claimants, as well as Rust's extensive analysis and follow ups with claimants, ensures the distribution will be fair and equitable. And, Rust's supplementary audit further ensures the settlement funds will be equitably distributed.

Plaintiffs accordingly request entry of the Proposed Order, attached as Exhibit 1, which approves the distribution plan and authorizes the following actions by class counsel, Rust and JPMorgan Chase Bank (the "Escrow Agent") to distribute the settlement funds:

1.      Approve Plaintiffs' proposal to distribute the Dean and SMA/Baird settlement funds to each class member on a *pro rata* basis as determined by each class member's reported production of class-eligible milk as fair, reasonable and adequate;

2.      Approve the claims listed in Exhibit E-3 to the December 20, 2012 Affidavit of Charlene Young, attached as Exhibit 2, as eligible, valid and authorized to participate in the distribution of the Dean and SMA/Baird settlement funds;

3.      Approve the claims listed in Exhibits D-1 and D-2 to the Young Affidavit as disallowed as invalid, incomplete and/or otherwise ineligible to participate in the distribution of the Dean and SMA/Baird settlement funds;

4.      Authorize Rust to effect the payment and distribution of the Dean and SMA/Baird settlement funds directly to the eligible claimants listed in in Exhibit E-3 to the Young Affidavit in their *pro rata* portions based on each claimant's reported production of class-eligible milk as calculated and determined by Rust and specified in Exhibit E-3;

5.      Authorize class counsel at Baker Hostetler LLP to direct the "Escrow Agent to transfer the Net Settlement Amount of $35,458,613.64, which is the total amount in the Dean and SMA/Baird settlement funds for the first installment payment with interest, net attorneys' fees and expenses approved by the Court and requested herein for Rust as well as $150,000 previously awarded as incentive payments to the class representatives, to the bank account designated by Rust in the escrow agreements to facilitate its distribution of the funds to the eligible class members;

6.      Authorize class counsel at Baker Hostetler LLP to direct the Escrow Agent to disburse attorneys' fees in the amount of $48,333,333 (which will be disbursed over four years proportionally with Dean's payments into the settlement fund) to the bank account designated by Baker Hostetler in the escrow agreements to facilitate its distribution of the attorneys' fees and expenses among counsel; and

2

7.     Grant the request to pay Rust $212,634.63 out of the Dean and SMA/Baird settlement funds, in addition to the previously-approved $100,000, for services and expenses to date in administering the settlements and claims processes as explained in the Young Affidavit.

## I.     BACKGROUND

### A.  The Dean and SMA/Baird Settlements

As the Court is aware, Dean's settlement requires Dean to pay $140,000,000 into a settlement fund over approximately four years. (*See* 7/14/11 Mot. for Prelim. Approval, Ex. A at ¶ 7.1, Dkt. 1603-1.)  Dean made an initial payment of $60,000,000 in February 2012, and Dean will pay $20,000,000 each of the next four years. (*See id.*)  The SMA/Baird settlement provides for payment of $5,000,000 into a settlement fund. (*See* 7/27/11 Mot. for Prelim. Approval, Ex. A at ¶ 7.1, Dkt. 1678-1.)  SMA/Baird made that payment in August 2012.

### B.  The Approval and Dissemination of Settlement Notices and Claim Forms

The Court's Orders preliminarily approving the Dean and SMA/Baird settlements, among other things, confirmed the certification of the subclasses for settlement purposes, approved the settlement claim forms, appointed Rust as class action and claims administrator, and set May 1, 2012 as the deadline for receipt of claims forms and requests to opt into the subclasses or opt out of the DFA Subclass for purpose of settlement.[1] (*See, e.g.*, 2/14/12 Order at ¶¶ 3, 9, 15 and 21.)

Following the Court's preliminary approvals, Rust sent settlement notices and claim forms to 7,452 potential subclass members, published notice in the March 2012 issue of *Hoard's Dairymen*, maintained a class notice website with documents and information pertinent to the

---

[1]   As explained in Plaintiffs' July 20, 2012 report, 270 individuals and entities timely sought exclusion from the subclasses in connection with the Dean and SMA/Baird settlements. (*See* Dkt. 1900.)  These opt outs are identified in the September 13, 2012 Order. (*See* Dkt. 1902.)

settlements, established a toll-free telephone number, and acted as a repository for subclass member inquiries and communications. (*See* Young Aff. at ¶¶ 6-7.)

The Court held a fairness hearing on May 15, 2012, after the deadline for receipt of claim forms or to otherwise respond to the class settlement notice. The Court granted final approval of the Dean and SMA/Baird settlements on June 15, 2012. (*See* Dkt. 1890.)

## C. The Settlement Claims Administration Process

### 1. Receipt and initial processing of claim forms by Rust

Rust received and processed 7,363 claim forms. (*See* Young Aff. at ¶ 17.) Rust input the claims information into a database capable of compiling, sorting and analyzing individual and aggregate claims data. (*See id*.) To ensure the accuracy of inputted information, Rust utilized a "double blind" system, meaning each claim form's information was inputted twice by two individuals working independently, and any discrepancy in the inputted information triggered further review and verification. (*See id*.)

Rust reviewed each claim form received to determine whether it was timely, complete and valid. (*See id*. at ¶ 19.) Specifically, Rust reviewed each claim form to confirm it contained the name of the claimant, farm address, and the amount of eligible milk claimed and tax withholding information, and that it was signed under oath by the claimant. (*See id*.) Rust also analyzed each claim form to confirm whether it was duplicative of another claim filed and/or there were multiple claims submitted by the same claimant. (*See id*.) If Rust identified any claim form that appeared to be incomplete, invalid or otherwise deficient, the form was flagged for follow-up. (*See id*.)

### 2. Rust sought additional information from claimants as appropriate

Between July 10, 2012 and December 17, 2012, Rust sent follow-up letters to claimants

who submitted claim forms missing information. (*See id*. at ¶ 20.) Rust's letters identified the missing information, *e.g*., farm addresses, amounts of class-eligible milk, tax information and/or signatures, and requested that the claimants cure the deficiency. (*See id*.) The letters explained the claims may be disallowed unless the claimants provided the missing information. (*See id*.)

Also, between July 10, 2012 and December 17, 2012, Rust mailed follow-up letters to claimants who did not appear to be eligible to participate in the settlements. (*See id*. at ¶ 21.) These letters explained the claims do not appear to be eligible because they are duplicative, they are for members of the boards of directors of DFA or SMA, or the farms claimed are not in Federal Milk Marketing Orders 5 or 7. (*See id*.) These letters explained claims would be disallowed unless the claimants demonstrated their eligibility. (*See id*.)

In addition, between July 10, 2012 and August 16, 2012, Rust mailed follow-up letters to claimants who appeared to need adjustments made to the amount of eligible milk claimed. (*See id*. at ¶ 22.) These letters explained that certain Virginia counties did not became part of Federal Milk Marketing Order 5 until November 2005, and requested confirmation that the claims did not include milk produced prior to that month. (*See id*.) These letters also explained the claims may be disallowed unless the claimants confirmed their claims. (*See id*.)

For claimants who did not respond to Rust's follow up letters, Rust sent a *second round* of letters that again explained the deficiency and allowed additional time to cure or respond. (*See id*. at ¶ 25.) Rust also sent a *third round* of letters that reviewed the deficiency, identified the information needed, and explained that Rust would disallow the claims unless the claimants cured the identified deficiency prior to the letter's deadline. (*See id*. at ¶ 27.) For those Virginia claims that appeared to need adjustments, the third letter explained that Rust would reduce the amount of class-eligible milk by .569343 unless the claimant responded otherwise by the

5

deadline.[2] (*See id.*)

### 3. Rust's supplementary audit of claim forms

Rust also conducted an audit of the amount of raw Grade A milk stated in the claim forms, even though the claims submitted under oath (as here) are ordinarily adequate proof of claim (*see id.* at ¶ 29). Based on its experience with the Dean settlement in Vermont, Rust audited every submission that claimed more than 50,000,000/lbs., less than 100,000/lbs., and a random selection of 3% of the other claims. (*See id.* at ¶ 32.) The claim forms selected for audit represent 11% of the eligible claims – a rate that is more than double the percentage of claims Rust typically audits in antitrust settlements when an audit is conducted. (*See id.*)

Between September 34, 2012 and November 15, 2012, Rust required each claimant selected for audit to provide "adequate documentation" that the amount of milk claimed was produced within Orders 5 or 7 and sold directly or through an agent to Defendants or Co-Conspirators in Orders 5 and/or 7 during the class period. (*Id.* at ¶¶ 33-34.) The audit letters stated that "adequate documentation" consists of "(1) written confirmation from the Milk Marketing Administrator (2) written confirmation from your cooperative or milk marketer or (3) production records, statements, invoices or checks that support the amount of raw Grade A milk

---

[2] Rust explained the adjustment in the third follow-up letters:

> As explained in the claim form, only milk produced in Federal Milk Order 5 and/or 7 is eligible to participate in the settlement class. The counties and cities that are considered to be in Order 5 changed on November 1, 2005. The farm address you provided has been identified as not being in Order 5 prior to this date. To account for this, the amount of raw Grade A milk you claimed has been adjusted downward by .569343, which represents the portion of time your farm was in Order 5 (November 1, 2005 through May 1, 2012) during the period for settlement class claims.

Young Aff. at ¶ 27 and n.1.

provided on your Settlement Claim Form." (*Id.* at 33.)[3]

Rust reviewed each response to the audit letters to verify the amount claimed with the documentation submitted. (*See id.* at ¶ 34.)  Rust then mailed a *second* round of audit letters to claimants who had not responded. (*See id.*)  Those letters informed claimants they needed to provide adequate documentation for their claim by the deadline, or their claims would be disallowed if they did not respond. (*See id.*)

Rust's supplementary audit confirmed the integrity of the claims administration process. (*See id.* at ¶¶ 35-36.)  The documentation provided by the randomly-selected claimants varied by less than 5% (up or down) from the class-eligible milk volume submitted in the claim forms. (*See id.* at ¶ 36.)  This amount of variance is well within the acceptable range, based on Rust's experience, and indicated no reason to conduct further audits. (*See id.*)

**D.  Rust's Identification of Claimants Eligible for Settlement Payments**

Utilizing the database described above, Rust identified the claimants (and their milk volumes) eligible and ineligible for Dean and SMA/Baird settlement payments.

**1.  Eligible claims for settlement payments**

Rust's review, analysis and audit of claim forms identified 6,165 claims eligible for settlement payments.  As explained in the Young Affidavit, 5,884 claims were timely, complete

---

[3]  For Rust's audit, Plaintiffs asked Defendants to provide certain milk production and sales data. DFA and DMS provided nothing.  Dean and SMA gave authorizations for the release of data by USDA's administrators for Federal Milk Marketing Orders 5 and 7.  NDH provided limited data, which Rust considered. (*See id.* at ¶ 30.)

Rust also asked USDA's administrators for Federal Milk Marketing Orders 5 and 7 to provide data showing the production of raw Grade A milk by each farm in Orders 5 and 7, and data showing the volume of milk those farms sold to each milk processor in Orders 5 and 7 for 2001 forward. (*See id.* at ¶ 31.)  After several telephone conferences and written communications, Rust confirmed the administrators would not provide the requested information for two reasons. (*See id.*)  First, the administrators are not authorized to release farmer-level data to Rust (and the authorizations provided by Dean and SMA were deemed inadequate to do so). (*See id.*)  Second, the administrators do not maintain complete farmer-level data requested by Rust. (*See id.*)

and valid, and the claimants adequately responded to the audit, if requested to do so. (*See id*. at ¶ 37.) Rust recommends that these claims be deemed eligible to participate in the Dean and SMA/Baird settlements. (*See id*.) These claimants are listed in Exhibit E-1 of the Young Affidavit.

In addition, Rust identified 281 claims received late, but which are otherwise complete and valid and the claimants adequately responded to the audit, if requested to do so. (*See id*. at ¶ 38.) Rust believes there would be no delay in the settlement administration due to accepting and processing these claims, and it is Rust's ordinary practice to process such claims. (*See id*. at ¶ 40.) Rust recommends that these claims be permitted to participate in the Dean and SMA/Baird settlements. (*See id*.) These claimants are identified in Exhibit E-2 of the Young Affidavit.[4]

Assuming the Court permits the timely and late claims described above, there will be a total of 6,165 claims identified by Rust as eligible for settlement payments. These claimants are listed in Exhibit E-3 of the Young Affidavit.

## 2. Ineligible claims for settlement payments

Rust's review, analysis and audit of claim forms also identified 1,198 claims that Rust determined to be ineligible for Dean and SMA/Baird settlement payments for various reasons. As explained in the Young Affidavit: 43 claim forms were missing information and the claimants never provided the information in response to Rust's follow-up letters; 1,065 claims are deemed ineligible because they are duplicative, they are for members of the boards of directors of DFA or SMA, the farms claimed are not in Federal Milk Marketing Orders 5 or 7, or the claims were withdrawn; and 90 claims are deemed ineligible because the claimants failed to

---

[4] If the Court permits the late but otherwise eligible claimants to participate in the settlements as requested, Rust will revise the list of 270 opt outs from the settlements (*see* fn. 1, *supra*) to remove any permitted late claimants because they will no longer be opt outs from the settlements (*see* Young Aff. at ¶ 40, n. 2).

respond to Rust's audit requests. (*See, e.g., id.* at ¶ 38.)  The claims determined to be ineligible are listed in Exhibits D-1 and D-2 to the Young Declaration.[5]  Rust recommends that these claims be disallowed. (*See id.* at ¶¶ 28, 35 and 38.)

### E. Rust's Calculation of the Distribution of the Net Settlement Fund

Rust estimates that the "Net Settlement Fund," for purposes of the first settlement distribution,[6] is $35,458,613.64. (*Id.* at ¶ 43.)  Rust calculated the Net Settlement Fund by subtracting from Dean and SMA/Baird settlement proceeds held in escrow the following Court-approved payments:  (1) attorneys' out-of-pocket reimbursement of expenses in the amount of $7,408,920.39; (2) incentive awards of $10,000.00 to each of the 15 class representatives; (3) attorneys' fees in the amount of $21,666,666.66;[7] (4) payments totaling $4,000 to the Escrow Agent for fees; and (5) payment to Rust in the amount of $100,000.00 for prior settlement administration expenses and fees. (*See* 2/14/12 Order, Dkt. 1782; 7/11/12 Order Dkt. 1897.)  Rust also subtracted an additional payment to Rust, in the amount of $212,634.63, for recent settlement administration expenses and fees requested herein.[8]

Rust has calculated the payment to each claimant based on their *pro rata* share of the Net Settlement Fund.  This calculation assumes the Court approves Rust's recommendation to exclude the ineligible claimants described above and identified in Exhibits D-1 and D-2, and

---

[5]  D-2 lists 684 (of the 1,198 claimants) whose claims are deemed ineligible only because the claimants submitted duplicates of the same claim.  The claimants in D-2 will participate in the settlement payments, but they will be paid on only one claim. (*See id.* at ¶ 38.)

[6]  The Dean settlement funds will be paid in five installments. (*See* § I.A., *infra*.)

[7]  Rust calculated the attorneys' fees for disbursement as one-third of the amount of the Dean Foods and SMA/Baird settlement funds to be distributed in the initial payment, consistent with the Court's recognition that class counsel would seek fees over four years proportionally with Dean's payments into the settlement fund. (*See* 7/11/12 Order at 9, n.5, Dkt. 1897.)

[8]  Rust will, of course, reverse or modify the subtraction of the requested fees and expenses to accord with the Court's ruling.

9

permit the late but otherwise eligible claims identified in Exhibit E-2.  Exhibit E-3 is a schedule of each claimant's *pro rata* portion of the Net Settlement Fund.  For privacy reasons, the claimants are identified by claim number only.

## II.  THE PROPOSED PLAN FOR DISTRIBUTION OF THE SETTLEMENT FUNDS IS FAIR, REASONABLE AND ADEQUATE

The Court should approve Plaintiffs' proposed distribution plan because it is "fair, reasonable and adequate."  Fed. R. Civ. P. 23(e); *see also In re Packaged Ice Antitrust Litig*., 2011 U.S. Dist. LEXIS 150427, at *1, *65 (E.D. Mich. Dec. 13, 2011) ("'Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole; the distribution plan must be fair, reasonable and adequate.'") (quoting *Meijer Inc. v 3M*, 2006 U.S. Dist. LEXIS 56744, at *1, *8 (E.D. Pa. Aug. 14, 2006)).

### A.  The Proposed Plan Is Fair, Reasonable and Adequate Because It Is Based on Class Member Milk Production and Sales

Plaintiffs' proposed distribution plan is fair, reasonable and adequate because it will reimburse class members based on the type and extent of their injuries. *See Packaged Ice*, 2011 U.S. Dist. LEXIS 150427, at *65 ("'Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable'") (quoting *In re Aetna, Inc*., 2001 U.S. Dist. LEXIS 68, at *1, *36 (E.D. Pa. Jan. 4, 2001)).

Plaintiffs allege class members would have been paid more for their milk produced and sold in Orders 5 and 7 during the class period absent Defendants' anticompetitive conduct. (*See, e.g.*, 8/4/08 Complaint at ¶¶ 1-4, Dkt. 111.)  The amount of price suppression sustained by each class member, therefore, is directly proportionate to the amount of the class member's milk produced and sold in Orders 5 and 7.  Thus, Plaintiffs' proposal to distribute the settlement funds according to milk volume will reimburse class members based on the type and extent of their

10

injury, *i.e.*, suppressed-price milk production and sales.

Courts routinely approve distribution plans when, as here, they distribute settlement funds based on class member sales or purchases of the alleged fixed-price goods. *See, e.g., Packaged Ice*, 2011 U.S. Dist. LEXIS 150427, at *66 (approving plan to distribute settlement funds based on class member purchases of fixed-price ice); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (S.D. Mich. 2003) (approving distribution plan based on class member purchases of fixed-price generic drugs); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1999 U.S. Dist. LEXIS 12936, at *1, *9 (N.D. Ill. Aug. 17, 1999) (approving plan to distribute settlement funds based on class member purchases of fixed-price prescriptions).

### B. The Proposed Distribution of the Settlement Funds on a *Pro Rata* Basis Is Fundamentally Fair

Plaintiffs' proposal to distribute the settlement funds on a *pro rata* basis, *i.e.*, based on each class member's proportionate share of the damages based on milk volume, is fundamentally fair because it corresponds with each class member's share of injury and damages. *See, e.g., Packaged Ice*, 2011 U.S. Dist. LEXIS 150427, at *65 (explaining *pro rata* distribution is fair and reasonable because it distributes settlement funds in proportion to each class member's share of injury and damages).

As explained in § I.E., Rust calculated the settlement payment to each eligible class member based on each class member's eligible milk volume as a percentage of the total milk volume of all eligible class members. This *pro rata* calculation is "fundamentally fair" because it distributes the settlement fund to eligible class members in direct proportion to their eligible sales of fixed-price milk. *In re Airline Ticket Com'n Antitrust Litig.*, 953 F.Supp. 280, 284-85 (D. Minn. 1997) (approving *pro rata* distribution of settlement fund based on number of alleged fixed-price tickets as "cost-effective, simple and fundamentally fair"). Accordingly, courts have

11

endorsed this type of *pro rata* calculation as the "most appropriate" way to distribute settlement

funds in antitrust price fixing cases. *Brand Name Prescription Drugs*, 1999 U.S. Dist. LEXIS

12936 at *9; *see also Packaged Ice*, 2011 U.S. Dist. LEXIS 150427, at **64-65 (approving *pro*

*rata* distribution based on each claimant's percentage of total purchases); *Thacker v. Chesapeake*

*Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 534 (E.D. Ky. 2010) (approving pro rata distribution

based on "each class member's percentage interest in the net settlement fund").

Plaintiffs' proposal to treat all class members equally reinforces the fairness of the *pro*

*rata* distribution.  Plaintiffs' proposal treats members of the DFA and Independent Farmer

Subclasses the same:  All subclass members who submitted valid claims will receive *pro rata*

shares of the settlement funds in the proportion of their eligible milk sales. (*See* § I.E., *supra*.)

This equal distribution to members of both subclasses is consistent with Dr. Gordon Rausser's

opinion that members of both subclasses were equally harmed (*see* 6/1/12 Order at 4-5, Dkt.

1878) (reviewing Dr. Rausser's opinion), and his opinion is a further basis for the equal

allocation of settlement funds to the subclasses, *see Cardizem CD*, 218 F.R.D. at 531 (approving

allocation of settlement funds consistent with expert damages calculation).[9]

### C. Rust's Scrutiny and Supplemental Audit of the Claim Forms Ensures the Proposed Distribution Will Be Fair and Equitable

#### 1. The sworn claim forms are sufficient proof of class member claims

The Court-approved claim form required class members submitting claims to sign and

"certify under penalty of perjury" that their claims are "true and correct." (*See* 2/14/12 Order at

---

[9]  The recommendation by counsel for the subclasses to equally allocate settlement funds to the
subclasses further supports approval of Plaintiffs' proposed plan.  *See, e.g., Maley v. Del Global
Tech. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002) (explaining allocation plan formulated
by competent counsel familiar with subclass claims need only have a rational basis); *In re Telik,
Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 580 (S.D.N.Y. 2008) (same).

12

¶¶ 9 and Ex. A, Dkt. 1782.) The claim forms also informed class members that submission of false information may result in "civil and/or criminal penalties." (*Id.*)

The sworn claim forms constitute sufficient proof of class member milk production and sales for purpose of distributing the settlement funds. In fact, it is Rust's ordinary practice to rely on sworn claim forms when administering class action claims. (*See* Young Aff. at ¶ 29). Rust's practice is consistent with case law recognizing sworn claim forms can be sufficient proof of claims in class action settlements. *See, e.g., Uhouse v. U.S. DOI*, 2011 U.S. Dist. LEXIS 145114, at *1, (D. Nev. Nov. 15, 2011) (approving distribution plan based on information in sworn claim forms); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 2011 U.S. Dist. LEXIS 40843, at *1, *27, n.22 (D. Me. April 13, 2011) (explaining sworn claim forms is a reasonable requirement to assure truth and reliability of claims submitted); *Barkman v. Wabash, Inc.*, 1992 U.S. Dist. LEXIS 10878, at *1, *15 (N.D. Ill. July 22, 1992) (ruling sworn claim forms are recognized "as true" absent contradictory evidence).

Thus, Plaintiffs' proposed distribution of the settlement funds based on information in the claim forms is fair, reasonable and adequate, especially when, as here, there is no evidence disproving the claimants' sworn forms.

### 2. Rust's scrutiny of claim forms, follow ups with claimants, and identification of claims to be excluded from (and included in) the distribution further ensures it will be fair and equitable

Rust's extensive analysis and multiple rounds of follow ups with claimants identified claims that should be excluded (and included) in the distribution further ensures it will be fair, reasonable and adequate. As explained above, Rust reviewed every claim form received to confirm it was timely, complete, valid, submitted by class members and not duplicative other claims. (*See* Young Decl. at ¶ 19.) If Rust identified any claim forms that appeared to be incomplete, invalid or otherwise deficient, the form was flagged for follow-up by Rust. (*See id.*)

Rust then sent multiple rounds of follow-up letters requesting various information necessary to confirm the validity of the claim forms. (*See id*. at ¶¶ 20-28.)

Rust's efforts identified 1,198 claim forms that are not eligible to participate in the settlements. These claims are ineligible because they are duplicative, they are for members of the boards of directors of DFA or SMA, or the farms claimed are not located in Federal Milk Marketing Orders 5 or 7, or because the claimants failed to respond to Rust's multiple requests for information needed to demonstrate the claimants' eligibility. (*See id*. at ¶ 38.) The Court should approve Rust's recommendation, and Plaintiffs' request, to exclude these claims from participating in the settlements in order to assure the distribution is fair and equitable. *See, e.g., Beecher v. Able,* 575 F.2d 1010, 1016 (2d Cir. 1978) (explaining district courts should exercise their "broad supervisory powers" over the administration of class action settlements to assure class action settlements are equitably distributed to class members).[10]

In addition, Rust's efforts identified 281 late but otherwise eligible claim forms. (*See* Young Aff. at ¶ 40.) Many of these claims missed the submission deadline by a few days, and were submitted late by third-parties retained by farmers to process claims on their behalf. (*See id*.) There would be no delay in the settlement administration due to accepting and processing these claim forms, and it is the standard practice of Rust to process such claims. (*See id*.) It is well within the Court's broad equitable power to approve Rust's recommendation, and Plaintiffs' request, to allow these claims to participate in the settlements when, as here, the dairy farmers are not at fault for many of the late claims and accepting them will not delay the distribution or meaningfully affect other claimants. *See, e.g., In re Orthopedic Bone Screw Prods. Liability*

---

[10] For the same reason, the Court should approve Rust's recommendation, and Plaintiffs' request, to reduce the amount of claimed milk by .569343 for claimants who never responded to Rust's multiple requests for additional information about farms in the Virginia counties that did not became part of Federal Milk Marketing Order 5 until November 2005. (*See id*. at ¶ 38.)

*Litig.*, 246 F.3d 315, 320 (3d Cir. 2001) (explaining Rule 23 gives district courts broad equitable power over class settlement administration, and reversing district court's refusal to allow late claims that would not have meaningfully affected settlement administration); *In re Gilat Satellite Networks, Ltd.*, 2009 U.S. Dist. LEXIS 25109, at *1, *19 (E.D.N.Y. Mar. 25, 2009) (permitting "untimely but otherwise authorized claims" to participate in settlement distribution).[11]

### 3. Rust's supplementary audit of claim forms confirms the proposed distribution will be fair and equitable

Even though sworn claim forms are adequate proof of claims, Rust conducted a supplementary audit of the amount of class-eligible milk stated in the claim forms which further confirms the proposed distribution will be fair and equitable. (*See* Young Decl. at ¶¶ 29-36.)

Rust's supplementary audit was a reasonable means to verify claims in this case to ensure the settlement distribution will be fair and equitable. *See* Fed. Judicial Center, *Manual on Complex Litigation* (4th) at § 21.661 ("Audit and review procedures will depend on the nature of the case.") Here, Rust selected 11% of the eligible claims for audit, consisting of every submission claiming more than 50,000,000/lbs., less than 100,000/lbs., and 3% of the other claims. (*See id.* at ¶ 32.) Rust compared the amount of class-eligible milk stated in the claim forms with actual milk production and sales records or written confirmation of the same provided to farmers by USDA market administrators or their cooperatives, which were the best available records.[12] (*See id.* at ¶ 34.) Rust also made repeated follow-ups with claimants selected for audit to obtain adequate documentation. (*See id.* at ¶ 35.) Rust's supplementary audit exceeds any standard for auditing settlement claims. *See Manual on Complex Litigation* at § 21.661

---

[11]  It is not inconsistent for the Court to permit late settlement claims while elsewhere enforcing the opt-out deadline because opt out deadlines, unlike claim deadlines, are necessary for the finality of settlements and judgments. *See, e.g., Orthopedic Bone Screw Prods.*, 243 F.3d at 326.

[12]  As noted in § I.C.3., Dean, DFA, DMS and SMA did not provide data to Rust for its audit, and the USDA market administrators do not keep the farm-level data Rust requested.

(explaining modest claims are frequently accepted on basis of verified claim forms; medium claims may be checked by random sampling, telephone inquiries or records crosschecks; and large claims may warrant a field audit); Conte & Newberg, *Newberg on Class Actions*, at § 10:12 (4th 2011) (explaining a statement or affidavit may be sufficient verification for small claims or claims that are not amendable to ready verification)

Rust's supplementary audit confirms the integrity of the claims administration process: The documentation provided by the randomly-selected claimants varied by less than 5% (up or down) from the class-eligible milk volume submitted in their claim forms, which is variance well within the acceptable range, based on Rust's experience, and indicated no reason for Rust to conduct further audits. (*See* Young Aff. at ¶ 36.)

## III. THE COURT SHOULD APPROVE AND AUTHORIZE PAYMENT OF THE CLAIMS ADMINISTRATOR'S FEES AND EXPENSES

The Court should approve an additional payment to Rust, in the amount of $212,634.63, for its fees and expenses to date in administering the settlements and claims processes as explained in the Young Affidavit.

The settlement agreements provide for the payment of Rust's fees and expenses from the settlement funds. (*See* 7/14/11 Mot. for Prelim. Approval, Ex. A at ¶ 8.5, Dkt. 1603-1; 7/27/11 Mot. for Prelim. Approv., Ex. A at ¶ 8.5, Dkt. 1678-1.) And, litigation expenses, including claims administration expenses, are routinely paid from settlement funds. *See, e.g., In re F & M Distrib., Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 11090, at *1, *20 (E.D. Mich. June 29, 1999) ("Expense awards are customary when litigants have created a common settlement fund for the benefit of a class"); *Gilat Satellite Networks,* 2009 U.S. Dist. LEXIS 25109 at *19 (authorizing $657,754 payment from settlement fund to claims administrator).

16

The additional amount of fees and expenses requested by Rust is reasonable given its extensive work in administering the settlements. As mentioned above, Rust processed, reviewed and analyzed 7,363 claims. (*See* Young Aff. at ¶ 17.) Rust prepared and sent 2,235 follow up letters to claimants. (*See id.* at ¶ 19.) Rust conducted full audits of hundreds of claims. (*See id.* at ¶¶ 29-35.) And, Rust fielded 4,821 telephone calls and 255 emails from claimants. (*See id.* at ¶ 52.) An invoice reflecting Rust's specific charges is attached as Exhibit G to the Young Affidavit.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion and enter the proposed Order attached as Exhibit 1.

Dated: December 21, 2012          Respectfully submitted,

/s/ Gary E. Brewer

Gary E. Brewer, Esq.
BREWER & TERRY, P.C.
1702 W. Andrew Johnson Hwy.
Morristown, TN 37816-2046
robin@brewerandterry.com
*Counsel for DFA Subclass*

Thomas C. Jessee, Esq.
JESSEE & JESSEE
412 East Unaka Ave.
Johnson City, TN 37601
Tel: 423-928-7175
jjlaw@jesseeandjessee.com
*Liaison Counsel for Dairy Farmer Class*

/s/ Robert G. Abrams

Robert G. Abrams, Esq.
Robert J. Brookhiser, Esq.
Gregory J. Commins, Jr., Esq.
Terry L. Sullivan, Esq.
BAKER HOSTETLER LLP
1050 Connecticut Ave., NW, Suite 1100
Washington, DC 20036
Tel: 202-861-1500
rabrams@bakerlaw.com
rbrookhiser@bakerlaw.com
gcommins@bakerlaw.com
tsullivan@bakerlaw.com
*Counsel for Independent Farmer Subclass*

## CERTIFICATE OF SERVICE

I certify that on the 21st day of December, 2012, a true and correct copy of ***Dairy Farmer Plaintiffs' Motion for an Order Approving and Authorizing the Distribution of the Dean and SMA/Baird Settlement Funds and Application for Claims Administrator Fees and Expenses*** was served by operation of the electronic filing system of the U.S. District Court for the Eastern District of Tennessee upon all counsel who have consented to receive notice of filings in the matters styled *In re Southeastern Milk Antitrust Litigation*, MDL No. 1899.

/s/ Robert G. Abrams
Robert G. Abrams

1