# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## GREENEVILLE DIVISION

|  |  |  |
|---|---|---|
| _____ | ) | |
| IN RE SOUTHEASTERN MILK | ) | |
| ANTITRUST LITIGATION | ) | Master File No. 2:08-MD-1000 |
| _____ | ) | |
|  | ) | Judge J. Ronnie Greer |
| THIS DOCUMENT RELATES TO: | ) | |
|  | ) | |
| *Sweetwater Valley Farm, Inc., et al. v.* | ) | |
| *Dean Foods, et al.*, No. 2:07-CV-208 | ) | |
| _____ | ) | |

**DAIRY FARMER PLAINTIFFS' MOTION FOR AN ORDER APPROVING AND AUTHORIZING THE SECOND DISTRIBUTION OF THE DEAN SETTLEMENT FUNDS, RESPONSE TO LETTERS FILED BY A.C. KNIGHT, NATHAN ROTH, AND NORRIS SLOAN, AND APPLICATION FOR ADDITIONAL CLAIMS ADMINISTRATOR FEES AND EXPENSES**

# TABLE OF CONTENTS

**Page**

I.      BACKGROUND ............................................................................................... 5

     A.      The Dean Settlement Payments ................................................................ 5

     B.      The Preparation of the Distribution Plan ............................................... 5

     C.      The Court Approved the Distribution Plan as Fair, Reasonable, and Adequate ...................................................................................................... 6

     D.      The Calculation of the Proceeds for Distribution from the Second Dean Settlement Payment ........................................................................... 6

II.      DISTRIBUTION OF THE SECOND DEAN SETTLEMENT PAYMENT ACCORDING TO THE PREVIOUSLY APPROVED DISTRIBUTION PLAN, WITH ADJUSTMENTS, IS FAIR, REASONABLE, AND ADEQUATE ..................... 8

     A.      The Proposed Adjustments to the Distribution Plan ............................... 8

     B.      The Proposed Adjustments Should Be Approved Pursuant to the Court's Inherent Authority to Administer Class Action Settlements ............................... 12

III.      THE COURT SHOULD CONFIRM THE CONTINUED EXCLUSION OF CLAIMANTS WHO DID NOT TIMELY RESPOND TO RUST'S AUDIT AND CLAIMANTS WHO ARE ALTERNATE DIRECTORS OF THE DFA OR SMA BOARDS ....................................................................................................... 15

IV.      THE COURT SHOULD APPROVE AND AUTHORIZE PAYMENT OF THE CLAIMS ADMINISTRATOR'S FEES AND EXPENSES ........................................... 17

V.      CONCLUSION ............................................................................................... 18

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs respectfully move the Court for an order approving and authorizing the distribution of funds from the second class action settlement payment by Defendant Dean Foods Co. ("Dean").

On January 8, 2013, the Court approved a plan that specified each eligible claimant's *pro rata* share of the Dean settlement funds ("Distribution Plan"). (*See* Dkt. 1921.)  Thereafter, Rust Consulting ("Rust"), the claims administrator, distributed the proceeds from the initial Dean settlement payment in accordance with the Distribution Plan.  Plaintiffs request that the Court approve and authorize the distribution of the proceeds from the second Dean settlement payment consistent with the previously approved Distribution Plan.[1]

In addition, Plaintiffs request that the Court approve minor adjustments to the Distribution Plan to account for information received and confirmed after the Plan was approved and the initial Dean settlement payment proceeds were distributed.  As explained below, Plaintiffs request adjustments to authorize Rust to distribute payments to:  Two claimants whose claim forms inadvertently were not included in the Distribution Plan, 24 claimants based on their corrected milk volumes, 12 claimants whose claim forms inadvertently were excluded because they appeared to be duplicates, three claimants who mistakenly withdrew their claim forms, and 32 claimants who submitted claim forms after the applicable deadline.  Plaintiffs also request an adjustment to stop payments to six claimants confirmed to be ineligible SMA board members.

Also, Plaintiffs request that the Court confirm the continued exclusion of seven claimants whose claims were excluded for failure to respond to Rust's audit requests prior to the Court's approval of the Distribution Plan.  Similarly, Plaintiffs request that the Court confirm the

---

[1]  Dean made an initial payment of $60,000,000 which was distributed, and will make "deferred payments" in 2013, 2014, 2015, and 2016. (*See* § I.A., *infra*.)

continued exclusion of former and current SMA and DFA board members, including "alternates," from the subclasses.

Plaintiffs' requests for confirmation address the outstanding claims related letters filed with the Court. As noted below, approval of the requested adjustment for claims excluded as duplicates will authorize the payment requested in the letter filed by A.C. Knight. The requested confirmation of the continued exclusion of SMA and DFA board members, however, will affirm the denial of the payments requested in the letters filed by Nathan Roth and Norris Sloan.

Finally, Plaintiffs request that the Court approve an additional payment to Rust in the amount of $206,933.96 for its additional fees and expenses to date for administering the Dean settlement.

Plaintiffs thus request entry of the Proposed Order, attached as Exhibit A, which approves and authorizes the distribution of the proceeds from the second Dean settlement payment according to the previously approved Distribution Plan, with adjustments, and authorizes the following actions by class counsel, Rust, and JPMorgan Chase Bank (the "Escrow Agent") to distribute the settlement proceeds:

1.     Approve the plan to distribute the proceeds from the second Dean settlement payment according to the claimants' *pro rata* shares of class eligible milk volume based on each claimant's reported production of class eligible milk as calculated and determined by Rust and specified in Exhibit B-1 to the July 30, 2013 Affidavit of Charlene Young ("Young Affidavit"), attached as Exhibit B;

2.     Approve an adjustment to the Distribution Plan so the claimants whose claim forms inadvertently were not processed by Rust, listed in Exhibit B-2 to the Young Affidavit,

will receive Dean settlement payments in the amounts they would have received if their claim forms had been timely processed and included in the Distribution Plan;

3.     Approve an adjustment to the Distribution Plan so the claimants who mistakenly understated their milk volume, listed in Exhibit B-3 to the Young Affidavit, will receive proceeds from the second (and subsequent) Dean settlement payment based on actual class eligible milk volumes;

4.     Approve an adjustment to the Distribution Plan so the claimants whose claim forms inadvertently were excluded because they appeared to be duplicates, listed in Exhibit B-4 to the Young Affidavit, will receive Dean settlement payments in the amounts they would have received if their claim forms had been timely processed and included in the Distribution Plan;

5.     Approve an adjustment to the Distribution Plan so the claimants who mistakenly withdrew their claim forms, listed in Exhibit B-5 to the Young Affidavit, will receive Dean settlement payments in the amounts they would have received if their claim forms had been timely processed and included in the Distribution Plan;

6.     Approve an adjustment to the Distribution Plan so the claimants who submitted claim forms after the applicable deadline, listed in Exhibit B-6 to the Young Affidavit, will receive proceeds from the second (and subsequent) Dean settlement payment;

7.     Approve an adjustment to the Distribution Plan so the claims confirmed to be submitted by ineligible SMA board of directors, listed in Exhibit B-7 to the Young Affidavit, will not receive proceeds from the second (or subsequent) Dean settlement payment;

8.     Confirm the claims listed in Exhibit B-8 to the Young Affidavit continue to be disallowed for failure to respond to Rust's audit requests prior to the Court's approval of the Distribution Plan;

9. Confirm the claims submitted by alternates to the SMA board of directors, and specifically those listed in Exhibit B-9 to the Young Affidavit, continue to be disallowed because these claimants are excluded from the subclasses as defined by this Court's Orders;

10. Authorize Rust to effect the payment and distribution of the proceeds from the second Dean settlement payment directly to the eligible claimants listed in Exhibit B-1 and in the *pro rata* portions specified in Exhibit B-1 to the Young Affidavit;

11. Authorize class counsel at Baker & Hostetler LLP to direct the Escrow Agent to transfer the Net Settlement Amount of $12,067,356.94, which is the total amount of funds from the second Dean settlement payment with interest, net the attorneys' fees approved by the Court, and the Escrow Agent's fees and Rust's fees, expenses, and reimbursements as requested herein, to the bank account designated by Rust in the escrow agreement to facilitate Rust's distribution of the funds to the eligible class members;

12. Authorize class counsel at Baker & Hostetler LLP to direct the Escrow Agent to disburse attorneys' fees previously awarded by the Court in the amount of $6,666,666.66, which is the proportional amount of the attorneys' fee awarded from the second Dean settlement payment, to the bank account designated by Baker & Hostetler LLP in the escrow agreement to facilitate Baker & Hostetler LLP's distribution of the attorneys' fees among counsel;

13. Approve the request to pay the Escrow Agent $2,000.00 out of the funds from the second Dean settlement payment as payment for the Escrow Agent's fees for administering the escrow account;

14. Approve the request to pay Rust $364,476.54 out of the funds from the second Dean settlement payment to be allocated as follows: (a) payment of $10,000 to Rust as reimbursement of its payment of a class representative incentive award approved after the initial

Dean payment funds had been distributed; (b) payment of $75,358.39 to Rust as reimbursement of its paying the two claims (listed in Exhibit B-2) which inadvertently were not processed by Rust; (c) payment of $72,184.19 to Rust for distribution to claimants to "make up" payments to the claimants (listed in Exhibits B-4 and B-5) who did not receive proceeds from the initial Dean settlement payment; and (d) payment of Rust's fees in connection with the outstanding invoices for administering the first Dean settlement payment in addition to administering the second Dean settlement payment in the amount of $206,933.96 as explained in the Young Affidavit.

## I.    BACKGROUND

### A.    The Dean Settlement Payments

The agreement with Dean requires it to pay $140,000,000 into a settlement fund over approximately four years. (*See* 7/14/11 Motion for Preliminary Approval, Ex. A at ¶ 7.1, Dkt. 1603-1.)  Dean made an initial payment of $60,000,000 in February 2012, which was distributed. In June 2013, Dean paid the first of four annual $20,000,000 "deferred payments," preliminarily adjusted to reflect opt outs from the subclasses,[2] which is the payment Plaintiffs presently seek authorization to distribute. (*See id.*)

### B.    The Preparation of the Distribution Plan

Plaintiffs previously explained each step taken to prepare the Distribution Plan, *i.e.*, the determination of the eligible claimants and the calculation of their *pro rata* allocation of the settlement proceeds. (*See* 1/4/13 Motion to Distribute Settlement Funds, Dkt. 1919.)  In sum, Rust received and reviewed 7,363 claim forms to confirm whether they were timely, complete, and valid (*see id.* at 4-6); Rust sought additional information from claimants as appropriate (*see*

---

[2]   The parties agreed that Dean's first deferred payment would be $19,100,500, pending resolution of a disagreement on the amount of the opt out reduction allowed by the settlement agreement. (*See* Dkt. 1954.)

*id*.); Rust conducted an audit of the amount of milk stated in the claim forms (*see id*. at 6-7); Rust determined the amount of the settlement proceeds to be allocated to each eligible claimant utilizing a database with information from the claim forms and other sources (*see id*. at 9-10); and Rust calculated each eligible claimant's amount as a percentage of the total class eligible milk volume (*see id*.), which was presented in the Distribution Plan as the basis for allocating the Dean settlement proceeds. (*See also* Young Affidavit at ¶ 4.)

### C.    The Court Approved the Distribution Plan as Fair, Reasonable, and Adequate

On January 8, 2013, the Court determined that Plaintiffs' proposal to distribute the settlement funds on a *pro rata* basis is fair, reasonable, and adequate. (*See* Dkt. 1921.)  The Court authorized Rust to allocate and distribute settlement payments to the claimants according to their *pro rata* portions of the proceeds as calculated by Rust and presented in the Distribution Plan. (*See id.*; *see also* 1/4/13 Motion to Distribute Settlement Funds at Ex. E-3, Dkt. 1919.) Rust subsequently distributed the proceeds from the initial Dean settlement payment according to the Distribution Plan.

### D.    The Calculation of the Proceeds for Distribution from the Second Dean Settlement Payment

Rust calculated that the proceeds for distribution to eligible claimants from the second Dean settlement payment are $12,067,357.08 (the "Net Settlement Fund"). (*See* Young Affidavit at ¶ 32.)

Rust calculated the Net Settlement Fund by starting with $19,100,500.14, which is the amount presently in escrow from the second Dean settlement payment, and then subtracting attorneys' fees in the amount of $6,666,666.66 previously approved by the Court (*see* 7/11/12

Order, Dkt. 1897),[3] and Escrow Agent fees in the amount of $2,000.00 previously approved by the Court (*see* 2/14/12 Order at ¶ 19, Dkt. 1782).

Rust also subtracted the requested payment to Rust in the amount of $364,476.54. That amount includes $206,933.96 for Rust's outstanding expenses and fees for administering the Dean settlement. (*See* Young Affidavit at ¶¶ 33, 43.) That amount also includes reimbursement to Rust for having paid from its own account the $10,000 class representative incentive award to Payne Dairy which the Court approved after the initial Dean payment funds had been distributed (*see* 4/3/13 Order, Dkt. 1935; Young Affidavit at ¶ 33), and reimbursement for Rust having paid from its own account $75,358.39 to the two claimants listed in Exhibit B-2 whose claims inadvertently were not processed by Rust (*see id.* at ¶ 17). That amount additionally reimburses Rust for paying from its own account $72,184.19 in "make up" payments to the claimants listed in Exhibits B-4 and B-5 (*see id.* at ¶ 33), provided the Court approves the claims adjustments requested herein.[4]

In addition, Rust calculated the distribution amount to each eligible claimant from the second Dean settlement payment. This calculation assumes the Court approves the proposed adjustments to the Distribution Plan described below. Exhibit B-1 is a schedule of each claimant's *pro rata* portion of the Net Settlement Fund. For privacy reasons, the claimants are identified by claim number only.

---

[3] Rust calculated the awarded attorneys' fees for disbursement as one-third of the amount of the second Dean settlement payment, consistent with the Court's recognition that class counsel would distribute fees over four years proportionally with Dean's payments. (*See* 7/11/12 Order at 9, n.5, Dkt. 1897.)

[4] Rust will, of course, modify the calculation of the Net Settlement Fund to accord with the Court's ruling as to Rust's requested fees, expenses, and reimbursements.

## II. DISTRIBUTION OF THE SECOND DEAN SETTLEMENT PAYMENT ACCORDING TO THE PREVIOUSLY APPROVED DISTRIBUTION PLAN, WITH ADJUSTMENTS, IS FAIR, REASONABLE, AND ADEQUATE

The Court should approve the distribution of the proceeds from the second Dean settlement payment according to the previously approved Distribution Plan, with minor adjustments proposed below. (*See* 1/8/13 Order, Dkt. 1921 (approving plan for *pro rata* distribution of settlement funds).)   The Distribution Plan is fair, reasonable, and adequate because it reimburses class members based on the type and extent of their injuries. *See, e.g., In re Packaged Ice Antitrust Litig.*, 2011 U.S. Dist. LEXIS 150427, at *1, *65 (E.D. Mich. Dec. 13, 2011) ("'Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable'") (quoting *In re Aetna, Inc.*, 2001 U.S. Dist. LEXIS 68, at *1, *36 (E.D. Pa. Jan. 4, 2001)).[5]  However, the proposed adjustments will make the Distribution Plan more fair, reasonable, and adequate because they better align claimant milk production and settlement payment distribution by accounting for certain claims errors and omissions.

### A. The Proposed Adjustments to the Distribution Plan

Plaintiffs request that the Court approve the following minor adjustments to the existing Distribution Plan to account for information received and confirmed after the Plan was approved and the initial Dean settlement payment proceeds were distributed:

---

[5]  Plaintiffs allege class members would have been paid more for their milk produced and sold in Orders 5 and 7 during the class period absent Defendants' anticompetitive conduct. (*See, e.g.,* 8/4/08 Complaint at ¶¶ 1-4, Dkt. 111.)  The amount of price suppression sustained by each class member, therefore, is directly proportionate to the amount of the class member's milk produced and sold in Orders 5 and 7.  Thus, the distribution of settlement funds according to milk volume reimburses class members based on the type and extent of their injury, *i.e.*, suppressed price milk production and sales.

***Adjustment for payments to claimants whose claim forms were not processed.*** After the Court approved the Distribution Plan and Rust issued settlement checks, Rust learned that it had not processed timely received claim forms for two (2) claimants. (*See* Young Affidavit at ¶ 7.) These claimants are identified by claim number in Exhibit B-2. Plaintiffs request that the Court approve an adjustment to the Distribution Plan so that these claimants will receive Dean settlement payments in the amounts they would have received if their claim forms had been timely processed by Rust.[6] In other words, Plaintiff propose an adjustment so Rust can distribute to these claimants the amounts they would have received from Dean's initial settlement payment, plus their shares of distributions from the second and subsequent settlement payments by Dean. This adjustment, if implemented, will affect payments to other claimants by only .012%. (*See id.* at ¶ 9.)

***Adjustment to correct the milk volumes.*** After the Court approved the Distribution Plan, 24 claimants, after receiving their checks, realized they had understated the milk volumes reported in their claim forms. (*See id.* at ¶ 10.) These claimants are identified by claim number in Exhibit B-3. Rust confirmed that the requested adjustments represent the claimants' actual class eligible milk volume. (*See id.* at ¶ 11.) Plaintiffs request that the Court approve an adjustment to the Distribution Plan so that these claimants will receive proceeds from the second (and subsequent) settlement payment by Dean based on their actual class eligible milk volume. This adjustment, if implemented, will affect payments to other claimants by only .175%. (*See id.*)

---

[6] Rust already paid, from its own account, the amounts these two claimants were supposed to receive from Dean's initial settlement payment. (*See* Young Affidavit at ¶ 9.) If this adjustment is approved, Rust seeks to be reimbursed for the initial payments to these claimants as explained above, and will distribute second and subsequent settlement payments by Dean to these claimants as if their claim forms had been timely processed and included in the Distribution Plan.

9

*Adjustment for payments to claimants whose claim forms were excluded as duplicates.*

After the Court approved the Distribution Plan and Rust issued settlement checks, Rust learned that it had excluded 12 claim forms that appeared to be duplicates but were not. (*See id.* at ¶ 13.)[7] Rust confirmed these claims are not duplicates. (*See id.* at ¶ 14.) These claimants are identified by claim number in Exhibit B-4. Plaintiffs request that the Court approve an adjustment to the Distribution Plan so that these claimants will receive Dean settlement payments in the amounts they would have received if their claim forms had been timely processed. This adjustment, if implemented, will affect payments to other claimants by only .155%. (*See id.*)

This adjustment, if approved, will resolve the issue in the letter filed by Mr. Knight. (*See* Dkt. 1940.) Mr. Knight submitted two forms claiming identical milk volumes (*see id.*), and Rust determined that one form should be excluded as a duplicate and included the other form in the Distribution Plan. (*See* 1/4/13 Motion to Distribute Settlement Funds at 9, n.5, Dkt. 1919.) After Mr. Knight received payment on only one claim, he notified Rust that he had "split" his claim into two forms and should have been paid on both. (*See* Dkt. 1940.) Although Mr. Knight did not respond to Rust's earlier letters informing him of Rust's determination (and asking him to advise Rust if he disagreed), Rust has determined that its communications were not sufficiently clear and recommends paying his second claim. (*See* Young Affidavit at ¶ 13.)

---

[7] Six hundred and eighty four (684) claimants submitted duplicative claim forms. (*See* 1/4/13 Motion to Distribute Settlement Funds at 9, fn. 5, Dkt. 1919.) When Rust received multiple forms from the same claimant, Rust excluded all but one form as a duplicate, notified the claimants of this determination, and requested that the claimants advise Rust if they disagreed with its determination. (*See id.* at Ex. B-2 (example letter).) The 12 claims here appeared to be duplicates but are not. Due to confusion over communications from Rust and Rust's further audit to confirm the claims, counsel believe the payment of these claims is appropriate. (*See* Young Affidavit at ¶ 13.)

***Adjustment for payments to claimants who mistakenly withdrew claim forms.***  After the Court approved the Distribution Plan, three (3) claimants realized they had mistakenly withdrawn their claim forms so they were not included in the Plan. (*See id.* at ¶ 18.)  These claimants are identified by claim number in Exhibit B-5.  Rust learned that there was confusion about whether their claims were included among the "third party filer" submissions,[8] which is a reason they withdraw claim forms they had submitted themselves. (*See id.*)  Rust reviewed the claim forms submitted by these claimants and confirmed they are eligible and have not been paid through third party filer submissions. (*See id.* at ¶ 19.)  Plaintiffs request that the Court approve an adjustment to the Distribution Plan so that these claimants will receive Dean settlement payments in the amounts they would have received if their claim forms had been timely processed.  This adjustment, if implemented, will affect payments to other claimants by only .037%. (*See id.*)

***Adjustment for payments to claimants who submitted late claim forms.***  Claim forms for 32 claimants were received after the May 1, 2012 claims deadline and after the Court approved the Distribution Plan. (*See id.* at ¶ 21.)  These claimants are identified by claim number in Exhibit B-6.  Rust confirmed these claimants are otherwise eligible to participate in the Dean settlement. (*See id.* at ¶ 22.)  Plaintiffs request that the Court approve an adjustment to the Distribution Plan so that these claimants will receive proceeds from the second (and subsequent) settlement payment by Dean.  This adjustment, if implemented, will affect payments to other claimants by only .727%. (*See id.*)

---

[8]   Third party filers submitted forms on behalf of hundreds of claimants.  Frequently, those claimants also personally submitted claim forms.  During claims processing, Rust notified the third party filers and the claimants of the duplicate forms, and sometimes either the third parties and/or the claimants withdrew claims to eliminate duplication.

***Adjustment to stop payments to claimants confirmed to be ineligible.*** After the Court approved the Distribution Plan, Rust received additional SMA documentation confirming that five of the claimants who submitted forms and are included in the Plan are members of the SMA board of directors and, therefore, are not eligible for settlement payments. (*See id.* at ¶ 24.) These claimants are identified by claim number in Exhibit B-7. Plaintiffs request that the Court approve an adjustment to the Distribution Plan so that these claimants will not receive further settlement payment distributions.[9]

### B. The Proposed Adjustments Should Be Approved Pursuant to the Court's Inherent Authority to Administer Class Action Settlements

The Court may approve Plaintiffs' requested adjustments pursuant to its equitable powers to administer class action settlements. *See, e.g., Manual for Complex Litigation, Fourth*, at §§ 21.66, 21.662 ("Class settlements are rarely self-executing and various problems may arise in their administration.... The court's equitable powers may be necessary to deal with other problems that commonly arise during administration of settlement..."); *In re "Agent Orange" Prod. Liability Litig.*, 689 F. Supp. 1250, 1263 (E.D.N.Y. 1988) (modifying a previously approved claim distribution plan to improve its efficacy).

Courts generally approve requests to alter class action settlement distributions when the requests are prompt and there would be no potential delay to the proceedings, the parties would not be prejudiced, the requests are made in good faith, and there is sufficiently good reason for the requests. *See, e.g., In re Orthopedic Bone Screw Prods.*, 246 F.3d 315, 323 (3d Cir. 2001); *Sutton v. Hopkins Cty.*, 2009 U.S. Dist. LEXIS 95263, at *1, *5, (W.D. Ky. Oct. 13, 2009); *In re Crazy Eddie Sec. Litig.*, 906 F. Supp. 840, 844 (E.D.N.Y. 1995). Plaintiffs' requested

---

[9] Rust also requested that the SMA board members return the initial Dean settlement payment proceeds they are not eligible to receive. (*See* Young Affidavit at ¶ 25.)

adjustments satisfy these guidelines.

First, the requests are prompt and would not cause any delay to the proceedings. As soon as claimants suspected possible errors or omissions with their claims, they contacted Rust and Plaintiffs (and, in some instances, the Court), and have remained in constant contact with Rust and Plaintiffs. These claimants more than satisfied any obligation to act promptly and with diligence. *See, e.g., Sutton*, 2009 U.S. Dist. LEXIS 95263, at *6 (claimant acted sufficiently promptly when contacting claims administrator upon learning of settlement). In addition, the proposed adjustments, if implemented, would not cause any delay to the proceedings. The only remaining proceeding is the administration of settlements. Rust believes that it can implement and administer the adjustments without delay to the overall settlement administration. (*See* Young Affidavit at 3.)

Second, the requested adjustments would not result in prejudice to the parties. The adjustments could not prejudice Dean because it agreed to pay a fixed settlement amount. *See Orthopedic Bone*, 246 F.3d at 323 (adjustment to distribution cannot prejudice defendant if its settlement obligation is not expanded). Also, the requested adjustments could not result in prejudice to the subclass members. The requested adjustments, if implemented, would affect payments to claimants by only 1% (*see* Young Affidavit at ¶¶ 11, 14, 19, and 22), which is a negligible amount and, therefore, is not prejudicial, *see Crazy Eddie*, 906 F. Supp. at 844, 846 (adjustment representing 1.4% impact on settlement payment is negligible and not prejudicial to parties). Moreover, claimants could not prove prejudice from any "reduction" in their settlement payments due to the requested adjustments. To the contrary, if the Court determines that the requested adjustments are equitable and ensure the payment of eligible claim amounts, by excluding those claim amounts in the initial distribution, the other claimants received a "windfall

comprised of some portion of recovery that would be owed to otherwise deserving" claimants. *Orthopedic Bone*, 246 F.3d at 324. "[T]he loss of a windfall is not prejudicial." *Id*.

Third, the requests for adjustments are made in good faith. The requests seek to adjust the Distribution Plan, based on information learned and confirmed after the Plan was approved, and to make it more precisely allocate and distribute settlement proceeds based on claimants' class eligible milk volumes. There is no reason to conclude that such requests are not made in good faith. *See, e.g., id.* at 329 (assuming good faith absent contrary evidence).

Fourth, there is good reason for the requested adjustments. As noted, the requested adjustments, as a whole, will improve the Distribution Plan, which is sufficient basis for the adjustments. *See "Agent Orange,"* 689 F. Supp. at 1263 (modifying claim distribution plan to improve its efficacy). Even if viewed individually, there is good reason for each requested adjustment. Plaintiffs' requested adjustments make payments on timely claim forms that Rust inadvertently did not process, correct mistakenly understated milk volumes in claim forms, process claim forms mistakenly excluded as duplicative or withdrawn by claimants, and exclude ineligible claims. Each request seeks to correct errors or omissions for the benefit of the claimants as a whole, which is a compelling reason for approving the requests. *See, e.g., Zients v. LaMorte*, 459 F.2d 628, 630 (2d Cir. 1972 ("It is not novel to announce that a court supervising the distribution of a trust fund has the inherent power and duty to protect unnamed, but interested persons").

Also, there is good reason for the requested adjustment to permit the 32 late claims. *See Crazy Eddie*, 906 F. Supp. at 845-46 ("equities weigh substantially in favor of leniency in allowing late claims" and "late claims should ordinarily be considered"). These claimants submitted late claims because they were unaware of the litigation, do not recall receiving

information about submitting claims, believed their spouses or partners had submitted claim forms, or were experiencing illnesses or family deaths during the deadline for submitting claim forms. (*See* Young Affidavit at ¶ 22.) And, the claimants promptly submitted completed claim forms when they learned that they needed to do so. Courts routinely permit late claims where, as here, the claimants have a reasonable explanation for their untimely submissions and there would be no delay or prejudice caused by accepting the untimely claims. *See, e.g., Orthopedic Bone*, 246 F.3d at 326-29; *In re Cendant PRIDES Litig.*, 235 F.3d 176, 184 (3d. Cir. 2000); *Sutton*, 2009 U.S. Dist. LEXIS 95263, at *6; *Crazy Eddie*, 906 F. Supp. at 845-46; *Zients*, 459 F.2d at 630.

### III. THE COURT SHOULD CONFIRM THE CONTINUED EXCLUSION OF CLAIMANTS WHO DID NOT TIMELY RESPOND TO RUST'S AUDIT AND CLAIMANTS WHO ARE ALTERNATE DIRECTORS OF THE DFA OR SMA BOARDS

Plaintiffs request that the Court confirm the continued exclusion of the claim forms of claimants who did not respond to Rust's audit requests prior to the Court's approval of the Distribution Plan. As noted, Rust conducted an audit of the claims received, which included sending claimants multiple rounds of letters that asked for proof, within 30 days, of the volumes of class eligible milk stated in the claim forms. These letters notified claimants that their claims would be disallowed if they did not respond to the audit request prior to deadlines in 2012.

The Court's January 8 Order disallowed the claims of the claimants who failed to respond to Rust's audit requests prior to the deadlines. (*See* ¶ 4, Dkt. 1921.) After the deadlines, the Court's January Order, and Rust's distribution of the initial Dean settlement payment, seven claimants provided late responses to Rust's audit letters. (*See* Young Affidavit at ¶ 26.) These claimants are identified by claim number in Exhibit B-8. Plaintiffs request that the Court approve the continued exclusion of the claim forms of claimants who did not respond to the audit

requests prior to the deadlines.[10]

In addition, Plaintiffs request that the Court confirm that directors, including alternates, of the DFA or SMA boards continue to be excluded from the subclasses and are not eligible to participate in the settlements. Three years ago, at Defendants' request, the Court modified the class definition to exclude "former and current officers and directors of DFA and SMA…regardless of whether they otherwise satisfy the class criteria." (1/19/11 Order at 14, Dkt. 1255.) The Court's January 8 Order accordingly excluded claim forms submitted by former or current directors of DFA or SMA who evidently disagreed with their lawyers' request to exclude them. (*See* 1/4/13 Motion to Distribute Settlement Funds at 8, Dkt. 1919.)

Two of the excluded directors, Nathan Roth and Norris Sloan, filed letters with the Court arguing they should not be excluded. Mr. Roth's letter claimed he does not "meet any of the criteria for being excluded from the class." (3/28/13 Roth letter, Dkt. 1934.) However, in emails sent to Rust, Mr. Roth admitted he is an alternate member of the SMA board of directors, but claimed he never attended any SMA board meetings or acted as a director. (*See* Exhibit B-10 (collection of communications with Rust).) Similarly, Mr. Sloan's letter acknowledged he is an

---

[10]  Plaintiffs' request to exclude claimants who did not timely respond to Rust's audit is not inconsistent with the request to accept late claim forms. While courts generally allow late claims (*see* § II.B., *supra*), courts more rigorously enforce deadlines that are integral to the effective management of class action settlements, *see Orthopedic Bone*, 246 F.3d at 316-17. Audit deadlines should be enforced because the audit process helps ensure the integrity of the claims administration process and deviation from those deadlines could work harm on the conduct of the proceedings.

In addition, reversal of the Court's prior decision to exclude claimants who failed to respond timely to audit requests would invite similar requests from other excluded claimants and would undermine the finality of the Court's claims administration determinations and prolong this complex proceeding. *See id.* at 326. As Judge McKinley recently observed: "'Drawing a line is essential to achieve certainty and finality in…large class action[s]….'  It is time to draw that line." *Sutton v. Hopkins Cty.*, 2009 U.S. Dist. LEXIS 106378, at *1, *6, (W.D. Ky. Nov. 16, 2009) (citation omitted).

alternate member of the SMA board of directors, but claimed he never attended any SMA board meetings or voted on any matter. (*See* 3/11/13 Sloan letter, Dkt. 1929.)[11]

The letters from Messrs. Roth and Sloan provide no basis for exempting them from the Court's modified class definition. They are members of the SMA board, regardless of the present "alternate" designation, which results in exclusion from the subclasses. (*See* 1/19/11 Order at 14, Dkt. 1255.) Alternate directors do attend the SMA board meetings, as reflected in the meeting minutes. Moreover, deciding which board members should be excluded based on their board position title, attendance, or voting record, as Messrs. Roth and Sloan suggest, would be unworkable. This approach, if adopted, would require Rust, and ultimately the Court, to decide which of the dozens of former and current SMA and DFA board members attended enough meetings to be excluded, voted on subject matters that require exclusion, or otherwise participated on the boards in ways sufficient to support exclusion. The Court's prior ruling excluding directors and officers from the subclasses declined to base class membership on such a factual analysis. (*See id.* at 14-15.)

## IV. THE COURT SHOULD APPROVE AND AUTHORIZE PAYMENT OF THE CLAIMS ADMINISTRATOR'S FEES AND EXPENSES

The Court should approve an additional payment to Rust, in the amount of $206,933.96, for its fees and expenses to date in administering the settlements and claims processes as explained in the Young Affidavit.

The settlement agreements provide for the payment of Rust's fees and expenses from the settlement funds. (*See* 7/14/11 Motion for Preliminary Approval, Ex. A at ¶ 8.5, Dkt. 1603-1; 7/27/11 Motion for Preliminary Approval, Ex. A at ¶ 8.5, Dkt. 1678-1.) And, litigation

---

[11] Mr. Norris also claimed that he should receive a settlement payment because other SMA board members – namely Mr. Roth – received a payment. (*See* 3/11/13 Sloan letter, Dkt. 1929.) While Mr. Norris correctly identified Mr. Roth as a board member, Mr. Norris incorrectly claimed Mr. Roth received a payment. (*See* 3/28/13 Roth letter, Dkt. 1934.)

expenses, including claims administration expenses, routinely are paid from settlement funds. *See, e.g., In re F & M Distrib., Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 11090, at *1, *20 (E.D. Mich. June 29, 1999) ("Expense awards are customary when litigants have created a common settlement fund for the benefit of a class"); *In re Gilat Satellite Networks, Ltd.*, 2009 U.S. Dist. LEXIS 25109, at *1, *19 (E.D.N.Y. Mar. 25, 2009) (authorizing $657,754 payment from settlement fund to claims administrator).

The additional amount of fees and expenses requested for Rust are reasonable given its extensive work in administering the Dean settlement and preparing for the second distribution of settlement proceeds. As part of its administration of the Dean settlement, Rust has taken and responded to 9,864 telephone calls and 485 emails from claimants. (*See* Young Affidavit at ¶ 42.) Also, as described in Plaintiffs' Motion to Distribute Settlement Funds (*see* Dkt. 1919), Rust has prepared and responded to hundreds of follow up letters with claimants. In addition, Rust has investigated over 6,ooo claims and, after its investigation, Rust prepared an amended distribution plan with the adjustments requested above, and calculated the *pro rata* share of the Dean settlement funds for 6,210 claimants claiming 72,902,741,297 pounds of class-eligible milk. An invoice reflecting Rust's specific charges for this work is attached as Exhibit B-11 to the Young Affidavit.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion and enter the proposed Order attached as Exhibit A.

Dated: July 30, 2013                           Respectfully submitted,


/s/ Gary E. Brewer                             /s/ Robert G. Abrams

Gary E. Brewer, Esq.                           Robert G. Abrams, Esq.
BREWER & TERRY, P.C.                            Robert J. Brookhiser, Esq.
1702 W. Andrew Johnson Hwy.                     Gregory J. Commins, Jr., Esq.
Morristown, TN 37816-2046                       Terry L. Sullivan, Esq.
robin@brewerandterry.com                        Danyll W. Foix, Esq.
*Counsel for DFA Subclass*                      BAKER & HOSTETLER LLP
                                                1050 Connecticut Ave., NW, Suite 1100
Thomas C. Jessee, Esq.                          Washington, DC 20036
JESSEE & JESSEE                                 Tel: 202-861-1500
412 East Unaka Ave.                             rabrams@bakerlaw.com
Johnson City, TN 37601                          rbrookhiser@bakerlaw.com
Tel: 423-928-7175                               gcommins@bakerlaw.com
jjlaw@jesseeandjessee.com                       tsullivan@bakerlaw.com
*Liaison Counsel for Dairy Farmer Class*        *Counsel for Independent Farmer
                                                Subclass*

## CERTIFICATE OF SERVICE

I certify that on the 30th day of July, 2013, a true and correct copy of *Dairy Farmer Plaintiffs' Motion for an Order Approving and Authorizing the Second Distribution of the Dean Settlement Funds, Response to Letters Filed by A.C. Knight, Nathan Roth, and Norris Sloan, and Application for Claims Administrator Fees and Expenses* was served by operation of the electronic filing system of the U.S. District Court for the Eastern District of Tennessee upon all counsel who have consented to receive notice of filings in the matters styled *In re Southeastern Milk Antitrust Litigation*, MDL No. 1899.

I also certify that on the 31st day of July, 2013, a true and correct copy of *Dairy Farmer Plaintiffs' Motion for an Order Approving and Authorizing the Second Distribution of the Dean Settlement Funds, Response to Letters Filed by A.C. Knight, Nathan Roth, and Norris Sloan, and Application for Claims Administrator Fees and Expenses* was mailed by First Class U.S. Mail, postage prepaid, upon the following:

A.C. Knight III
203 Forest Road
Laurel, MS 39443

Norris Sloan
Route 1 Box 92
Mountain Grove, MO 65711

Nathan Roth
4499 Gravel Point Road
Mountain Grove, MO 65711

/s/ Robert G. Abrams
Robert G. Abrams